776 A.2d 144

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. THOMAS J. KOSKOVICH, DEFEN-
DANT–APPELLANT AND CROSS–RESPONDENT.

Argued September 26, 2000—Decided June 7, 2001.

450

452

454

458

460

*Stephen W. Kirsch* and *Susan Brody*, Assistant Deputy Public Defenders, argued the cause for appellant and cross-respondent (*Ivelisse Torres*, Public Defender, attorney).

*Bennett A. Barlyn*, Deputy Attorney General, argued the cause for respondent and cross-appellant (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

In this capital case, defendant appeals his conviction and death sentence, claiming numerous errors by the trial court in both the guilt and penalty phases of trial. Further, he asserts that absent

any trial errors, the sentence is disproportionate when compared to similar cases and should thus be vacated. We affirm the capital and non-capital convictions but agree with defendant that certain errors committed during the penalty phase warrant reversal of the death sentence. In view of that conclusion, we remand for a new sentencing proceeding and do not address defendant's proportionality claims.

## I.

### Facts and Procedural History

#### A. The Burglary of the Sporting Goods Store

On April 8, 1997, defendant, an eighteen-year-old high school student, suggested to a friend, Michael Conklin, that they burglarize Adventure Sports, a sporting goods store on Route 23 in Franklin Borough, Sussex County. Defendant explained that he wanted to steal several guns that he had viewed at the store, and Conklin agreed to help. Defendant arrived at Conklin's house that evening to execute the plan. After talking for a few minutes, defendant and Conklin left, with Conklin driving defendant's automobile.

Defendant and Conklin drove past the police station and around Franklin to determine if any police officers were in the area. Conklin dropped defendant off at the store, parked the car at a nearby apartment complex, and waited for defendant's return. Defendant smashed the front window of the store with a baseball bat, smashed a display case, and removed three firearms, a .40 caliber semi-automatic pistol, a .22 caliber revolver, and a .45 caliber semi-automatic pistol. The .22 and .45 caliber weapons would later be used by defendant and a different friend to commit two homicides.

About twenty minutes after being dropped off, defendant returned to Conklin's location. Defendant entered the automobile and instructed Conklin to drive to a nearby laundromat. There, defendant hid the three guns under the hood of the car and

changed his pants. Defendant and Conklin returned to Conklin's house, where defendant spent the night. The next morning defendant displayed the three guns to Conklin and gave him the .40 caliber semi-automatic pistol. Defendant placed the other two guns in a duffle bag and left Conklin's house.

## B. The Homicides and Robbery

Defendant and seventeen-year-old Jayson Vreeland had discussed robbing and possibly killing a delivery person prior to their committing those crimes, although the precise nature and date of that discussion are not indicated in the record. Prior to leaving his home on April 19, 1997, defendant strapped the stolen .45 caliber semi-automatic pistol across his chest and underneath his shirt, and Vreeland strapped the .22 caliber revolver to his chest. They also copied several telephone numbers for local pizzerias from the phone book onto a piece of paper and obtained loose coins from defendant's girlfriend, Kimberly Prestidge.

Defendant and Vreeland left defendant's home in defendant's blue Chevrolet Cavalier, which had two distinguishing characteristics: a loud muffler and a damaged headlight. They proceeded to an abandoned house on Scott Road in Franklin and decided that they would try to have the pizzas delivered to that address. They then drove to a local Dunkin' Donuts to use the pay phone. Defendant and Vreeland called Tony's Pizza to order the pizzas, but quickly canceled that order after learning that Jeremy Giordano, an acquaintance of Vreeland, was on duty as the delivery person that evening. However, after several other restaurants refused to deliver to the remote Scott Road area, defendant and Vreeland called Tony's Pizza a second time and placed the order.

Defendant and Vreeland returned to Scott Road where defendant parked his car in such a manner as to aid in a quick retreat. He loaded the weapons, gave the .22 caliber revolver to Vreeland, and kept the .45 caliber semi-automatic pistol for himself. Defendant and Vreeland then waited at the curb in front of the abandoned house.

At approximately 10:45 p.m., twenty-two-year-old Jeremy Giordano and twenty-five-year-old Giorgio Gallara left Tony's Pizza to make the delivery, with Giordano driving his 1995 Pontiac Grand Am. Giordano approached the address on Scott Road with the passenger side of the Grand Am facing defendant and Vreeland. As Giordano's automobile approached the curb, Gallara lowered the window on the passenger side and asked for $16.50, the sum owed for the pizzas. Defendant turned to his right, looked at Vreeland, and asked him if he had the money, to which Vreeland answered, "yeah." Defendant replied, "[n]o, never mind, I got the money[,]" and reached into his right jacket pocket. He then pulled out the .45 caliber semi-automatic pistol, aimed it at Giordano's automobile, and discharged the gun until it was empty, firing seven shots in rapid succession. Vreeland also fired his weapon into the car.

Giordano's vehicle rolled a short distance and stopped in a bushy, muddy area. Defendant and Vreeland ran to the automobile. Defendant opened the passenger-side door, grabbed Gallara by the jacket, and threw him face down on the ground. Defendant ran around the back of the automobile and similarly removed Giordano from the vehicle. At that point Vreeland yelled, "that's Jeremy, that's Jeremy." Defendant did not recognize either victim. Defendant searched through the clothing of the victims looking for money. Defendant and Vreeland both entered the automobile and searched through the interior of the car, including the glove box.

Vreeland attempted to back the Grand Am out of the muddy area, but the tires spun and became stuck in the mud. Defendant yelled at Vreeland to forget about the vehicle so that they could leave. As they ran back toward defendant's automobile, defendant exclaimed, "I can't believe we did this. I can't believe we did this." Vreeland replied, "I love you man," and they hugged. Vreeland wore black gloves during the shooting and later discarded his blood-stained shirt into a stream.

Once in defendant's vehicle, Vreeland gave defendant the .22 caliber revolver and defendant put both guns under the driver's seat. After driving a short distance, defendant removed his blood-stained khaki pants and put on a pair of white jeans. Defendant drove to a Presbyterian church in Franklin, where he and Vreeland exited the vehicle, approached the front door, and made the sign of the cross. From the church, defendant and Vreeland returned to defendant's home. Defendant placed the two guns and his bloody pants in a gym bag and then put the bag under a pane of glass outside the house. Defendant gave Vreeland a shirt, and they went to a local bowling alley where they stayed a short time before returning to defendant's house. Defendant and Vreeland fell asleep and spent the rest of the night in defendant's home.

After hearing about the killings the next day, Christine Slater, a friend of defendant, contacted the police. The day before the homicides, defendant had shared with Slater his plan to kill a pizza delivery person. A resident of Scott Road who had seen defendant's automobile on Scott Road the evening of the murders also contacted the police after he observed the same vehicle parked at defendant's residence.

During the early morning hours of April 21, 1997, members of the State Police executed a warrant for defendant's arrest at defendant's home. The State Police transported defendant to a fire department parking lot across the street from his home and held him in custody until two officers from the Franklin Borough Police Department arrived. The Franklin officers informed defendant of his constitutional rights as required by *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). The officers searched defendant and found a pouch containing twenty-six pills, which were later identified as Fiorcet (a prescription drug comprised of acetaminophen, caffeine, and a barbiturate).

At the police station defendant signed a *Miranda* card acknowledging that he had been informed of his rights. The officers conducted an inventory search of defendant's person, finding

twelve seeds that appeared to be marijuana and five ten-dollar bills in defendant's wallet.

Detective Jack Repsha of the State Police and Lieutenant Virgil Rome of the Sussex County Prosecutor's Office met with defendant. Detective Repsha informed defendant that he was under arrest and was being charged with the murders of Gallara and Giordano. Defendant was again informed of his constitutional rights by Lieutenant Rome, and he signed a second *Miranda* form waiving those rights. The two officers then interviewed defendant and he confessed to his role in the killings. After a short break, defendant agreed to record his statement. Defendant again waived his *Miranda* rights and gave a forty-six minute taped interview in which he confessed to the crimes.

### C. The Indictments and Guilt-Phase Proceeding

A Sussex County grand jury indicted defendant, charging him with second-degree conspiracy to commit murder, first-degree robbery, and second-degree burglary (count one); purposeful or knowing murder of Giordano by his own conduct (counts two through five); purposeful or knowing murder of Gallara as an accomplice (counts six through nine); first-degree armed robbery (count ten); second-degree burglary (count eleven); felony murder of Giordano (count twelve); felony murder of Gallara (count thirteen); second-degree possession of a firearm for an unlawful purpose (count fourteen); third-degree unlawful possession of a handgun (count fifteen); and third-degree hindering apprehension or prosecution (count sixteen). In a separate indictment related to the crimes allegedly committed at the sporting goods store, the grand jury charged defendant with third-degree burglary (count one), and third-degree theft by unlawful taking (count two).

In seeking the death penalty, the State informed defendant that it would establish that the murder of Giordano was outrageously or wantonly vile, horrible, or inhumane in that it involved depravity of mind, pursuant to *N.J.S.A.* 2C:11-3c(4)(c) (the "depravity-of-mind aggravating factor"), and that the murder was committed while defendant was engaged in the commission of a murder or

robbery, pursuant to *N.J.S.A.* 2C:11–3c(4)(g)(the "felony-murder aggravating factor"). In accordance with *N.J.S.A.* 2C:11–3c, defendant was not eligible for the death penalty for the Gallara murder because he did not commit the homicidal act by his own conduct. (As revealed by the forensic evidence, Vreeland fired the fatal shot that caused Gallara's death.) Defendant pleaded not guilty to all charges.

The guilt phase of defendant's trial was conducted from April 5, 1999, to April 23, 1999. The State presented overwhelming evidence of defendant's guilt. Jason Kelly, a friend of defendant, testified that prior to the commission of the homicides, he gave defendant bullets for a .45 caliber pistol at defendant's request. Christine Slater also testified. She informed the jury about her conversation with defendant in which defendant had stated that he wanted to join the Mafia and be a "hitman," that he thought it would be easier to get into the mob if he killed someone, and that he wanted to be a Navy S.E.A.L. Defendant shared with Slater his plan to kill a pizza delivery person by having a pizza delivered to a remote area, which would allow defendant to kill the delivery person and steal that person's vehicle. Defendant also admitted to Slater that he had burglarized the sporting goods store.

Michael Conklin testified about the Adventure Sports burglary in addition to defendant's plan to rob and shoot a delivery person. (Defendant had apparently asked Conklin to participate in the robbery and shooting along with Vreeland.) Conklin also stated that following the killings, defendant bragged that he and Vreeland ordered a pizza for delivery to Scott Road and murdered the victims. Conklin also testified that after shaking defendant's hand, defendant asked him, "[H]ow does it feel to shake the hand of a killer[?]" That testimony was consistent with the State's theory that defendant committed the crimes to experience the "thrill" of killing.

The State also presented Scott Road resident Stephen Madden as a witness. Madden testified that on the evening of April 19, 1997, the date of the killings, sometime before 10:00 p.m., he

observed a blue Chevrolet Cavalier with a loud muffler drive past his home. Madden also testified that he saw the same automobile drive past his home a second time about fifteen to twenty minutes later. The State presented the testimony of two other Scott Road residents who described seeing an automobile with a loud muffler and one headlight on Scott Road the night of the murders.

Several individuals who were present at Dunkin' Donuts on April 19, 1997, identified defendant as one of two young men they saw using the pay phone that evening. A telephone company representative testified that on that date, between 9:58 p.m. and 10:06 p.m., calls were placed from the Dunkin' Donuts pay phone to Tony's Pizza and other restaurants. The witness testified that a second call was placed to Tony's Pizza from the same phone. As corroborating witnesses, employees from Tony's Pizza and other restaurants testified about delivery orders that they had received that evening. An employee from one pizzeria testified that after he told the caller that he was unsure if his restaurant delivered to Scott Road, the caller became very persistent in trying to convince him to make the delivery (for example, the caller promised to give an extra tip for a completed delivery).

A patrolman from the Franklin Borough Police Department, the first officer to arrive on the scene, described finding Giordano's automobile as well as the two bodies lying on the ground and a large amount of blood outside and inside the automobile. A detective from the State Police testified about finding six spent .45 caliber shell casings on the road in front of the abandoned house, and one spent shell casing in the front passenger seat of the automobile.

Dr. Michael Dunne, the Sussex County Medical Examiner, conducted autopsies of the victims and testified about their injuries. Dr. Dunne described two wounds from the bullets that entered the right side of Giordano's neck and exited the left side, explaining that those bullets killed Giordano instantly. Dr. Dunne also found two entry wounds in Giordano's left knee and recovered two .45 caliber bullets from the knee. Because the wounds in

Giordano's neck and knee were similar, Dr. Dunne concluded that Giordano had been struck in both locations with .45 caliber bullets. Gallara suffered five gunshot wounds, including a graze wound across his nose, two wounds on his right elbow, and a wound on the right side of his face made by a large caliber bullet. Dr. Dunne concluded that a .22 caliber bullet that entered the back of Gallara's head was the fatal shot.

The State also presented evidence recovered from defendant's home during the early morning hours of April 21, 1997. The police found five strips of paper taped to the wall above a coat hook in defendant's bedroom. Those papers contained these handwritten words: "Weapon's spot. Anyone else, we all kill you. Joe's spot. Anybody else, he kill you too. Tom's spot. Anybody else, he kill you too. Jason's spot, anybody else, I kill you. Cocoa Puff's spot, I'll kill you."

The police also seized two empty .22 caliber cartridge boxes, a gym photo identification card of Gallara, fourteen gun magazines, a price list for crime-related items (such as fake I.D. cards and literature promoting credit card fraud), and violent writings that appeared to be song lyrics. A detective from the prosecutor's office read the lyrics to the jury: "About killing, people, you can kill by [illegible]. On by guns, one night you break in, somebody home. And you take their money and kill by drive [illegible] down the road and shout, and shouting. By the big heads. The Best."

Outside the house, near the front porch, the police recovered a bag that contained the .45 caliber semi-automatic pistol, the .22 caliber revolver, and blood-stained khaki pants. The police also recovered other bags that contained clothes, paperwork, an empty wallet later identified as Gallara's, and a pair of black gloves.

The State presented a DNA expert who testified that she found a match between Giordano's blood and the blood on the khaki pants seized from outside defendant's home. The expert further explained that she found a match between blood located on defendant's coat, which he was wearing when arrested, and the blood of Giordano and Gallara. The expert also testified that

Gallara was the dominant contributor to blood found on the black gloves.

The State also produced evidence recovered from a stream near Scott Road, including a shirt, receipts from Tony's Pizza, a guest check, an identification card with Gallara's name on it, and Gallara's driver's license. Detective Repsha testified regarding defendant's statement that chronicled his actions. The jury also heard the audio tape of that statement, in which defendant confessed his role in the killings.

Defense counsel presented the testimony of several witnesses, including Jason Kelly, defendant's friend, who testified that the strips of paper taken from defendant's bedroom were a joke based on the movie "Stripes." Florence Morgan, Conklin's mother, testified that she saw defendant at approximately 8:00 p.m. on April 19, 1997, the night of the murders, and that he seemed anxious and nervous. Kimberly Prestidge, defendant's girlfriend, testified that when defendant and Vreeland returned to defendant's home at approximately 11:30 p.m. on April 19, 1997, they were "wrecked" and "falling all over the place." Prestidge also testified that after defendant and Vreeland returned to defendant's home, she found a five dollar bill in Vreeland's wallet, that there had not been any bills in his wallet earlier in the day, and that the next morning she saw that Vreeland had $170. Defendant himself did not testify.

The defense also presented the testimony of Dr. Frederick Rotgers, an expert in clinical psychology with particular expertise in substance abuse. Dr. Rotgers found no evidence that defendant had any severe mental illness, psychosis, or depression. However, Dr. Rotgers detailed defendant's history of drug and alcohol abuse, especially defendant's use of Fiorcet. The expert concluded that defendant had a substance-abuse disorder, that at the time of the offenses he was under the influence of Fiorcet, and that, based on defendant's use of that drug, his capacity to commit the offenses knowingly and purposely was significantly diminished.

In rebuttal, the State called Dr. Azariah Eshkenazi, an expert in forensic psychiatry, to testify. Dr. Eshkenazi disagreed with Dr. Rotgers's conclusion, noting that defendant's memory of the events was excellent. Dr. Eshkenazi concluded that defendant's ability to act with knowledge and purpose was not affected by his use of Fiorcet.

The jury found defendant guilty of purposeful or knowing murder of Giordano, felony murder of Giordano, purposeful or knowing murder of Gallara, felony murder of Gallara, first-degree robbery, and possession of a firearm for an unlawful purpose. The jury also convicted defendant on the burglary and theft charges related to the crimes committed at the sporting goods store.

Jayson Vreeland was tried separately. The State did not seek the death penalty against Vreeland because he was a juvenile at the time of the murders. *N.J.S.A.* 2C:11–3g.

### D. The Penalty Phase

At the penalty phase of defendant's trial, the State sought to establish the 3c(4)(c) depravity-of-mind and 3c(4)(g) felony-murder aggravating factors. In furtherance of that objective, the State relied on the evidence it produced during the guilt phase, with certain minor exclusions.

In response, defense counsel produced numerous witnesses in support of certain mitigating factors enumerated by statute and available under the statutory "catch-all" provision. (For convenience, we omit the specific citations to the mitigating factors and note that the complete listing of those factors can be found at *N.J.S.A.* 2C:11–3c(5)(a) to (g). The "catch-all" factor, found at *N.J.S.A.* 2C:11–3c(5)(h), provides that a defendant may introduce "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense.")

Lois Nardone, a social worker and "mitigation specialist," provided extensive testimony concerning defendant's family and background. She testified that defendant's family was plagued by

domestic violence, infidelity, substance abuse, gambling, criminal behavior, and suicide attempts. Nardone expressed the opinion that defendant was raised in a home without boundaries or structure and that defendant did not have a positive male role model in his life. Nardone asserted that defendant was subjected to emotional neglect and abuse by his family and that he experienced feelings of abandonment and rejection when his mother and father left him to be raised by his grandparents. Nardone also expressed her view that defendant's suicide attempt, which occurred when defendant was awaiting trial in the Sussex County Jail, illustrated the remorse that defendant felt about the killings.

Defendant's father, Stephen Koskovich, chronicled his family's problems and recounted an occasion on which he told defendant he loved him the least of his three sons. Robert Kelly, the father of defendant's friend Jason Kelly, recalled how defendant was a trusted family friend who assisted him and his family when he suffered from cancer. April Kelly, Robert's wife, also described how defendant helped the Kelly family. Leonard Koskovich, defendant's uncle, who described himself as "a menace to society," explained to the jury how he had spent most of his life in prison. He also testified to defendant's disruptive, unhealthy upbringing.

Dr. Edward Dougherty, an expert in forensic psychology, testified that defendant was mentally ill, had a tenuous grasp on reality, and was a developing paranoid schizophrenic. Dr. Gary Glass, an expert in forensic psychiatry, concluded that defendant was mentally ill, was a developing paranoid schizophrenic, and further stated that defendant was affected by mental and emotional disturbances on the date of the crimes.

In rebuttal, the State called Investigator Gary Sandberg of the Sussex County Prosecutor's Office, who testified about a conversation he had with James Stalter, an inmate confined in the cell next to defendant's at the Sussex County Jail. Stalter told Sandberg that defendant stated to Stalter that he (defendant) would rather commit suicide than go to prison because he was afraid of prison.

Timothy Cooney, also of the prosecutor's office, testified about a discussion between himself and defendant's grandmother, Bertha Lippencott, who had been the focus of much of the negative testimony provided by the mitigation specialist, defendant's father, and defendant's uncle. Cooney explained how Lippencott criticized the specialist's report, labeling it "fiction." On cross-examination, Cooney observed that Lippencott cooperated with the State because she was concerned about her reputation and did not want to be blamed for the murders.

Mrs. Giordano, the victim's mother, read a victim-impact statement in which she described her family's feelings about the loss of Jeremy and the impact that it had on their lives. On cross-examination, Mrs. Giordano stated that her whole family "would most like to see Thomas Koskovich take the evil that he's done, [and] turn his life over to Christ[.]" Mrs. Giordano elaborated that "[w]e are not in favor of the death penalty. I would like the jury to evaluate everything according to what they feel is their job to do according to the laws ... [and] according to how they feel that they have to answer to their God." Defendant declined to make an allocution to the jury.

The jury returned its verdict on May 7, 1999. Eleven jurors voted in favor of the depravity-of-mind aggravating factor, and one juror voted against it. Because aggravating factors must be found unanimously, that one juror's "no" vote served as the entire jury's rejection of the depravity-of-mind factor. However, the jury unanimously found that the State had proven beyond a reasonable doubt the felony-murder aggravating factor.

In consideration of the mitigating factors proffered by defendant, ten jurors found defendant's age at the time of the murder to be a factor. Five jurors similarly found that defendant lacked a significant prior criminal record.

Concerning the catch-all factors, a varying number of jurors found numerous mitigating factors. Twelve jurors found that defendant experienced a significant sense of abandonment and rejection after his father left the family when defendant was about

ten years old. The jurors concluded that that rejection further deepened when his mother left him at the age of thirteen to live with her boyfriend. Twelve jurors found that defendant was raised in a home in which infidelity, violence, substance abuse, gambling, criminal activity, and suicide attempts were pervasive. Four jurors found that defendant began abusing drugs at age thirteen as a means of self-medication to deal with his long history of untreated depression. Twelve jurors found that defendant was raised in a home without boundaries, structure, or positive role models. Twelve jurors found that defendant was subjected to emotional abuse and neglect at the hands of his family. Eleven jurors found that defendant was under the influence of a mental or emotional disturbance. Lastly, two jurors found that defendant's ability to appreciate the wrongfulness of his conduct was impaired as a result of intoxication.

The jury unanimously rejected the following mitigating factors: that defendant was under the influence of extreme mental or emotional disturbance that was insufficient to constitute a defense to prosecution; that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired as a result of mental disease or defect but not to a degree sufficient to constitute a defense to prosecution; that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of intoxication but not to a degree sufficient to constitute a defense to prosecution; that defendant was remorseful as evidenced by his suicide attempt while awaiting trial; and that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect but not to a degree sufficient to constitute a defense to prosecution.

The jury unanimously determined that the felony-murder aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Accordingly, the trial court sentenced defendant

to death in a judgment of capital conviction filed May 7, 1999. We note for completeness that the trial court's original judgment provided that if defendant's death sentence was not implemented by May 7, 2004, his sentence would be automatically modified to a life sentence with a thirty-year period of parole ineligibility. On the State's motion, with no opposition from defendant, this Court summarily amended the judgment to remove that modification. *State v. Koskovich,* 161 *N.J.* 144, 735 *A.*2d 570 (1999).

In respect of the robbery committed against Giordano and Gallara, the trial court sentenced defendant to twenty years imprisonment with ten years of parole ineligibility. For the possession of a weapon for an unlawful purpose conviction, defendant was sentenced to ten years imprisonment with five years of parole ineligibility. For the murder of Gallara, defendant was sentenced to prison for life with thirty years of parole ineligibility.

The trial court also sentenced defendant for his other crimes. For the burglary of the sporting goods store, defendant was sentenced to five years imprisonment with three years of parole ineligibility. For the theft at the store, defendant was sentenced to five years imprisonment, with two and one-half years of parole ineligibility, which was made consecutive to the burglary sentence. In sum, the trial court sentenced defendant to an aggregate non-capital sentence of life imprisonment plus forty years, with a fifty and one-half year period of parole ineligibility.

Defendant appeals to this Court as of right under *Rule* 2:2–1(a).

## II.

### Guilt Phase

Defendant asserts that he was denied a fair trial because of numerous errors during the guilt phase. We conclude that no claim of error warrants reversal of defendant's capital conviction. We will address each claim separately, starting with defendant's assertions regarding the admission of evidence seized from his bedroom shortly after the crimes occurred.

## A. Admission of Evidence Seized from Defendant's Bedroom

■ Defendant argues that the trial court erred in admitting certain evidence seized by investigators from his bedroom shortly after the homicides. As noted, that evidence included the five strips of paper, gun magazines, a price list for crime-related items, and violent writings that appeared to be song lyrics. We will summarize the arguments of the parties in respect of each piece of evidence, starting with the paper strips.

At trial, defendant objected to the admissibility of the strips of paper found over the coat hooks, arguing that they were irrelevant and that the handwriting had not been properly authenticated. According to defendant, he placed the signs over the coat hooks so that his friends would know where to hang their coats. He asserts that the handwritten language derived from a scene in the movie "Stripes," in which one character jokingly threatens to kill anyone who touches his belongings.

The trial court admitted the paper strips. The police officer who seized the strips testified that he believed them to be relevant because they contained the word "kill." The court noted,

> we're dealing in this case with a young man who is alleged to have rather, for no real purpose, except possibly establishing himself by reputation as a criminal, if that can be considered a purpose, who for no good purpose supposedly shot and killed some people. And I guess this is trying to show some type of background that he had the mentation to kill people. It's open to a lot of argument both ways, but it seems to me appropriately probative. The State can try to show this as [an] indication of a mindset.

Outside the presence of the jury, the State moved to offer into evidence the gun magazines seized from defendant's bedroom to corroborate testimony about defendant's familiarity with guns and to refute the notion that the gun he ultimately used might have been fired accidentally. Defense counsel objected, arguing that the magazines, which contained such titles as "Combat Hand-guns," "Handgunning," and "Guns and Weapons," were highly prejudicial. Counsel also argued to the trial court that "the fact that [defendant] looks at guns, enjoys guns really is not an aspect in this case."

The court agreed with the State, admitting the magazines. The court found that defendant's interest in guns "could be part of showing a familiarity with the weapons and ability to use them." Subsequent to its initial ruling, the court agreed to limit the admission to photocopies of the magazines' covers.

The State also offered into evidence a piece of lined notebook paper that listed prices for a number of crime-related items, including fake identification materials and literature promoting credit card fraud. The State contended that such evidence was probative of a mindset of someone embarking on a life of crime. Defense counsel objected on the grounds that the price list would be used solely to show that defendant was a bad person who thought about illegal things. The trial court admitted the evidence, essentially accepting the State's basis for admission.

The trial court also admitted the song lyrics into evidence. Defense counsel objected, arguing that the lyrics had no probative value. In agreeing with the State, the trial court admitted the evidence because it "bespeak[s] a concern that, an involvement, sort of obsession with killing people, and we are dealing with a man who's alleged to have killed other people."

In reviewing the admissibility of each of the disputed items, we must determine whether such evidence was relevant to any fact attempted to be proved or disproved by the State. All relevant evidence is admissible at trial unless prohibited by a specific rule. *State v. Wilson,* 135 *N.J.* 4, 13, 637 *A.*2d 1237 (1994). *N.J.R.E.* 401 defines relevant evidence as "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." To be relevant, evidence must have "probative value, which is the tendency of the evidence to establish the proposition that it is offered to prove." *Wilson, supra,* 135 *N.J.* at 13, 637 *A.*2d 1237. In determining whether evidence satisfies that standard, courts focus on the "logical connection between the proffered evidence and a fact in issue[.]" *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990). "If the evidence offered makes the inference to be drawn more

logical, then the evidence should be admitted[.]" *State v. Covell*, 157 *N.J.* 554, 565, 725 *A.*2d 675 (1999).

Applying those tenets, we are satisfied that the admitted evidence was relevant and, therefore, admissible. Each of the disputed items was offered to help prove that defendant killed the victims knowingly or purposefully, and to prove the motive of defendant advanced by the State, specifically, that defendant killed the victims to experience the "thrill" of killing or to establish his reputation as a criminal. The trial court properly admitted the paper strips and song lyrics because they were sufficiently probative of defendant's motive, in that they revealed defendant's obsession with, or at least interest in, killing. As the trial court stated, the paper strips could be interpreted in various ways. Additionally, a defense witness testified about the "innocent" nature of the strips. In a case like this, however, in which the State's basic theory is that defendant murdered his victims to experience the thrill of killing, the paper strips and song lyrics, which referred to weapons and a willingness and desire to kill, are probative of defendant's motive.

Likewise, the gun magazines were relevant because they helped to establish that defendant intentionally and purposefully murdered the victims and understood that by shooting them, death would result. This Court has never held that gun paraphernalia is *per se* irrelevant. *State v. Loftin*, 146 *N.J.* 295, 383, 680 *A.*2d 677 (1996). In *Loftin*, the defendant objected to the admission into evidence of certain gun paraphernalia, including bullets, ammunition, and ammunition-making equipment. *Ibid.* We explained that testimony about that type of evidence supported an inference "of the knowledge, competency, and experience of defendant in handling firearms. Such evidence is significant to show that defendant intended to kill [the victim] when he shot him in the head, and that the shot was not the result of an accidental discharge caused by an inexperienced marksman." *Id.* at 384, 680 *A.*2d 677.

Similarly, in the present case, the State offered the gun magazines not only to show that defendant was interested in guns, but also to demonstrate defendant's experience and proficiency with weapons, which helped prove that the shooting of Giordano and Gallara was purposeful and knowing. Finally, the trial court properly admitted the price list for the crime-related items. The list was relevant to show defendant's familiarity with certain crimes and to demonstrate his overall criminal motive and intent.

In this appeal, defendant argues for the first time that the objects seized from his bedroom were impermissibly admitted into evidence in violation of *N.J.R.E.* 404(b). *N.J.R.E.* 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

Specifically, defendant contends that the seized items represented "other-conduct" evidence (evidence of conduct that is not overtly criminal in nature but nonetheless wrong or improper), which was impermissibly used to show his propensity to commit a crime. In response, the State claims that *N.J.R.E.* 404(b) is not implicated by the items seized from defendant's bedroom, and that, regardless, any error regarding the admissibility of that evidence was harmless because of the other strong evidence produced at trial. The State makes a legitimate argument that the items at issue do not represent "other wrongs" as contemplated by *N.J.R.E.* 404(b), and thus no analysis is required under that rule. Nonetheless, given that there is at least some basis to consider the implication of *N.J.R.E.* 404(b), we will address defendant's claims.

Evidence of a defendant's other crimes, wrongs, or acts may not be admitted into evidence to prove a defendant's criminal disposition as a basis for proving guilt of the crimes charged. *State v. Covell, supra,* 157 *N.J.* at 563, 725 *A.*2d 675; *see also State v. Nance,* 148 *N.J.* 376, 386, 689 *A.*2d 1351 (1997) (observing that "courts should exclude evidence of other crimes, civil wrongs, or

acts enumerated in the ... rule when such evidence is offered solely to establish the forbidden inference of propensity or predisposition"). Importantly, Rule 404(b) does allow such evidence to be admitted to prove other factual issues, like a defendant's motive, intent, or plan. *Covell, supra,* 157 *N.J.* at 563, 725 *A.*2d 675.

■ Although not overtly criminal in nature, the disputed evidence in the present case was admitted to show both defendant's intent and his motive for the killings. In *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992), this Court established a four-pronged test to determine when "other-crime" evidence is admissible under *N.J.R.E.* 404(b). The same four-part test is used to determine whether "other-conduct" evidence should be admitted. *Nance, supra,* 148 *N.J.* at 387, 689 *A.*2d 1351. The test is as follows:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230 (citation omitted).]

Under the first prong of *Cofield,* the evidence of a defendant's prior bad conduct must be relevant to a material fact in dispute. (Because of the similarity of issues, the analysis under this first prong of the *Cofield* test resembles our previous discussion in respect of whether the items were relevant under *N.J.R.E.* 401.) At criminal trials, "courts generally admit a wider range of evidence when the motive or intent of the accused is material." *Covell, supra,* 157 *N.J.* at 565, 725 *A.*2d 675. *See also State v. Rogers,* 19 *N.J.* 218, 228, 116 *A.*2d 37 (1955) ("All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense.").

Courts have frequently admitted other-crime and other-conduct evidence as probative of intent and motive. For example, in *State v. Covell, supra,* 157 *N.J.* at 558, 725 *A.*2d 675, the defendant was convicted of child luring in violation of *N.J.S.A.* 2C:13–6. The Court reasoned that the defendant's statement that he was sexually attracted to young girls was properly admitted at trial and satisfied the first prong of the *Cofield* test because the "defendant's purpose in luring [the victim] is an essential element to convict defendant[.]" *Id.* at 567, 725 *A.*2d 675. Specifically, the defendant's statement made "it more likely that defendant's purpose in beckoning to [the victim] was to commit a sexual crime with or against her." *Id.* at 566–67, 725 *A.*2d 675.

In *State v. Erazo,* 126 *N.J.* 112, 117, 594 *A.*2d 232 (1991), the defendant was convicted of capital murder. On the evening of the charged murder, the defendant made certain statements about a prior murder he had committed and for which he had been convicted. The defendant challenged the admission of those statements, as well as the admission of the records of that prior conviction. *Id.* at 130, 594 *A.*2d 232. The Court found that the

[d]efendant's statements evidence his state of mind at the time he killed [the victim].... They were relevant to whether defendant had killed [the victim] purposely or knowingly[.] Thus, defendant's statements related to the crucial issue of his mental state. The records of defendant's convictions ... were necessary to prove the State's theory of defendant's motive.

[*Id.* at 131, 594 *A.*2d 232.]

In *State v. Crumb,* 307 *N.J.Super.* 204, 231, 704 *A.*2d 952 (App.Div.1997), *certif. denied,* 153 *N.J.* 215, 708 *A.*2d 66 (1998), evidence of the defendant's racist writings were admitted into evidence to help prove the defendant's motive. The Appellate Division reasoned that "[a]lthough defendant's writings are constitutionally protected free expressions of his racial beliefs and are not themselves unlawful, they nonetheless may be interpreted by a jury to constitute other wrongs or acts." *Ibid.*

In this case, the State's theory was that defendant purposefully or intentionally murdered Giordano and that his motive for doing so was to experience the "thrill" of killing. In that regard, we are

satisfied that the evidence taken from defendant's bedroom was relevant to demonstrate defendant's intent. We note that the evidence was not admitted to prove that defendant was a "bad person." Rather, the fact that defendant had a long-standing interest in firearms and violence indicates that he fired his weapon intentionally, not accidentally.

Moreover, defendant's familiarity with firearms tends to prove that he understood that when he fired his weapon at the victims, death would result. The references to killing and death on the paper strips and in the song lyrics helped to reveal defendant's motive and helped the jury to understand, to some degree, defendant's state of mind. Lastly, the evidence admitted in this case was somewhat analogous and similar in nature to the evidence admitted in *State v. Covell, State v. Erazo,* and *State v. Crumb.* The first prong of the *Cofield* test has been satisfied.

■ The second prong of the *Cofield* test requires that the other-conduct evidence be similar to, and reasonably close in time to, the offense charged. *State v. Covell, supra,* 157 *N.J.* at 567, 725 *A.*2d 675. We conclude that the disputed evidentiary items, all of which relate to guns, violence, killings, or other forms of criminal conduct, were sufficiently similar in nature to the crimes for which defendant was charged. Although the violent writings and the other items do not compare perfectly to an actual killing or robbery, we find that there is a logical connection between that evidence and the crimes charged sufficient to satisfy *Cofield's* second prong. Moreover, the temporal requirement under the second prong is satisfied because the items were recovered from defendant's bedroom shortly after the killings and thus were reasonably close in time to the offenses charged.

■ The third prong of the *Cofield* test "requires some showing that the person against whom the evidence is being used actually committed the other crime or wrong." *State v. G.V.,* 162 *N.J.* 252, 275, 744 *A.*2d 137 (2000) (Coleman, J., concurring in part and dissenting in part). That prong is satisfied here because there is no serious dispute that the items recovered from defen-

dant's bedroom belonged to defendant. Moreover, the jury could have reasonably interpreted items like the language found on the paper strips or the violent song lyrics to be an expression of defendant's intent to kill. *See State v. Covell, supra,* 157 *N.J.* at 568, 725 *A.*2d 675 ("Although being sexually attracted to young girls in and of itself is not a crime, a jury may interpret defendant's expression of those feelings to be a wrong or bad act in relation to his intent.... We find that the statement satisfies part three of the *Cofield* test.").

■■■■■ The fourth prong of the *Cofield* test requires application of the balancing test contained in *N.J.R.E.* 403. That test requires the trial court to exclude evidence if " 'its probative value is substantially outweighed by the risk of ... undue prejudice.' " *State v. Covell, supra,* 157 *N.J.* at 568, 725 *A.*2d 675 (citation omitted). Evidence claimed to be unduly prejudicial is excluded only when its "probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the issues in the case. *State v. Thompson,* 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971). Moreover, "[t]he mere possibility that evidence could be prejudicial does not justify its exclusion." *State v. Morton,* 155 *N.J.* 383, 453–54, 715 *A.*2d 228 (1998), *cert. denied,* —— *U.S.* ——, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Additionally, certain types of evidence, including evidence of motive or intent, "require a very strong showing of prejudice to justify exclusion." *State v. Covell, supra,* 157 *N.J.* at 570, 725 *A.*2d 675.

Two prior cases are instructive. In *State v. Loftin, supra,* 146 *N.J.* at 383–86, 680 *A.*2d 677, this Court considered whether ammunition and bullet-making equipment should have been admitted into evidence at the defendant's trial. Acknowledging that the evidence may have prejudiced the defendant, the Court permitted it nonetheless. " '[T]hat evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part

of the proof.'" *Id.* at 385, 680 *A*.2d 677 (quoting *State v. Stevens*, 115 *N.J.* 289, 308, 558 *A*.2d 833 (1989)).

Likewise, in *State v. DiFrisco*, 137 *N.J.* 434, 645 *A*.2d 734 (1994), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996), the Court considered the admission of certain testimony in the defendant's penalty phase trial. The Court noted that, "[c]onsidering that defendant confessed to the execution-style killing of [the victim], the fact that he stole a car, committed a few traffic violations, and yelled at his mother had very little tendency to divert the jurors' attention from their duties." *Id.* at 497, 645 *A*.2d 734.

Similarly, defendant in the present case has not made the strong showing of prejudice required to justify exclusion of the disputed evidence. The evidence seized from defendant's bedroom was important to the State's theory of the case because it helped to explain defendant's motive for the killings. It was not so inflammatory as to distract the jurors from performing their jobs fairly and in a deliberate fashion. Thus, the fourth prong of the *Cofield* test has been satisfied.

■■■■■ In sum, we conclude that the trial court properly admitted the disputed evidentiary items. The evidence was relevant to establishing defendant's motive and intent. That the jury was diverted from its duties because of that evidence is highly unlikely. The magazines, song lyrics, paper strips, and crime-related price list were not so inflammatory that they caused the jurors to render a verdict that they would not have otherwise rendered. Admission of the items, therefore, satisfied all prongs of the *Cofield* test. Even if we assume some slight error on the part of the trial court in admitting the disputed items, it was not clearly capable of producing an unjust result because, absent those items, there remained strong and overwhelming evidence of defendant's guilt. *State v. Marrero*, 148 *N.J.* 469, 496–97, 691 *A*.2d 293 (1997).

### B. Alleged Prosecutorial Misconduct in Summation

Defendant argues that the State engaged in prosecutorial misconduct by suggesting to the jury in its guilt-phase summation that there could have been a third homicide victim. The State responds that there was no misconduct and that, even if this Court determines that the disputed remarks were prejudicial, they were harmless.

During the State's summation, the prosecutor described the telephone calls that defendant and Vreeland placed to various pizza restaurants on the night of the killings. The prosecutor noted that one restaurant considered making the delivery but ultimately declined to do so. Specifically, the prosecutor stated: "Thankfully for [the restaurant's delivery person] his boss decided not to make that delivery. [The delivery person] may have been killed that night, as well." The trial court overruled defendant's objection to the prosecutor's remark, explaining: "Insofar as the reference [that the delivery person] . . . could have been killed, as well, if he had shown up on the scene. I think, again, that's a—that's an arguably fair comment that could be made based upon the evidence which was presented in this case."

In considering whether to reverse a conviction based on prosecutorial misconduct, we must examine "the severity of the alleged misconduct and its prejudicial effect on [a] defendant's right to a fair trial." *State v. Timmendequas*, 161 *N.J.* 515, 575, 737 *A.*2d 55 (1999). Prosecutorial misconduct is not grounds for reversal unless the "misconduct was so egregious that it deprived the defendant of a fair trial." *State v. Frost*, 158 *N.J.* 76, 83, 727 *A.*2d 1 (1999). To reverse a conviction on that basis, the Court must find that the misconduct was " 'clearly and unmistakably improper,' and . . . substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *Timmendequas*, *supra*, 161 *N.J.* at 575, 737 *A.*2d 55 (citation omitted).

We have repeatedly recognized that the prosecutor's primary duty "is not to obtain convictions, but to see that justice is done." *State v. Ramseur,* 106 *N.J.* 123, 320, 524 *A.*2d 188 (1987). Prosecutors must be particularly careful to fulfill that duty in capital cases in which death is a potential penalty. *State v. Williams,* 113 *N.J.* 393, 448, 550 *A.*2d 1172 (1988). That we expect prosecutors to make powerful arguments in summations to the jury is, however, equally clear. *State v. Chew,* 150 *N.J.* 30, 84, 695 *A.*2d 1301 (1997), *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999). Within certain boundaries, prosecutors are thus afforded considerable leeway in making closing arguments. *Ibid.*

Applying those tenets, we conclude that the prosecutor's statement about a possible third victim did not rise to the level of prosecutorial misconduct. Defendant correctly points out that the prosecutor erred in referring to an *additional,* as opposed to an *alternative,* victim. However, defendant's ability to find one isolated and fleeting reference to a third victim is insufficient to establish prosecutorial misconduct. Nor did that one reference deprive defendant of a fair trial. The prosecutor implied that had another pizza restaurant decided to make the delivery, the delivery person from that restaurant would have been the victim, instead of Giordano or Gallara. We do not believe that the jury, after hearing all of the evidence presented in this case, would have thought realistically that the prosecutor suggested that defendant intended to kill Gallara, Giordano, *and* a third victim.

## C. Court's Instruction Concerning "Own–Conduct" Verdict

Defendant argues that the trial court's jury instruction on knowing or purposeful murder did not inform the jurors that they could return a non-capital murder verdict, even if they disagreed individually in respect of whether defendant fired the fatal shot. Accordingly, defendant contends that the court's charge to the jury deprived him of a legitimate opportunity to receive a non-unanimous "own-conduct" verdict under *State v. Brown,* 138 *N.J.* 481, 651 *A.*2d 19 (1994). As noted below, such a verdict would

have made defendant ineligible to receive the death penalty. In response, the State asserts that the trial court correctly instructed the jury on knowing and purposeful murder and accomplice liability, and that the court's instruction did not violate the "own-conduct" requirement established by *Brown*.

Following the presentation of evidence and closing remarks, the trial court instructed the jury on knowing or purposeful murder, explaining the meaning of those terms. Defendant concedes that that aspect of the charge was proper. Defendant also acknowledges that the court stressed to the jurors that, although they had to agree unanimously on whether defendant was guilty or not guilty, they did not have to agree on the underlying theory of guilt. For example, the court instructed the jury that they "would ... have to agree unanimously and beyond a reasonable doubt that the defendant had acted either purposely or knowingly, but the jury would not necessarily have to be in unanimous agreement on which particular mental state the defendant had."

After explaining the concepts of purposeful and knowing states of mind, the court instructed the jury on the defense of intoxication, the charge of aggravated manslaughter, and the felony-murder charge. The trial court then instructed the jury about accomplice liability, informing the jurors that

> the defendant Thomas Koskovich could be responsible for the purposeful or knowing murder of the victim, or for the aggravated manslaughter of the victim or for the felony murder of the victim even though he did not personally fire the bullet or bullets that directly caused the death of the victim if his accomplice Jayson Vreeland fired the fatal bullet or bullets.

> There are some limitations on the criminal responsibility of an accomplice which I want to mention to you. As indicated by what I said earlier, a person is basically responsible for the actions of an accomplice in crime just as though he himself had performed those actions. There are however, two exceptions to the rule which are important in this case. The first is, that in order to be subject to the death penalty for a purposeful or knowing murder, the defendant must have caused the death of the victim by his own conduct. And in the context of this case, that exception or limitation means that if the jury finds the defendant Thomas Koskovich is guilty of the knowing or purposeful murder of Jeremy Giordano and that's a finding that [has] to be made by the unanimous vote of the jurors, then the jury would have to make a further decision as to whether the defendant Thomas Koskovich personally fired the bullet or bullets that directly caused the death of Jeremy Giordano.

If the jury unanimously finds beyond a reasonable doubt that the defendant Thomas Koskovich fired the bullet or bullets that caused the death of Jeremy Giordano, then the defendant would be-would be subject to the possibility of having the death penalty imposed upon him and we would move to a penalty proceeding during which the jury would hear further evidence and would decide whether the death penalty should actually be imposed.

Later in its charge, the court summarized the possible outcomes that the jury could reach:

[I]f the jury unanimously finds beyond a reasonable doubt that the defendant Thomas Koskovich is guilty of purposeful or knowing murder but the jury does not unanimously find beyond a reasonable doubt that the defendant personally fired the bullet or bullets that directly caused the death of Jeremy Giordano, then I will sentence the defendant to a term of imprisonment which may go up to life imprisonment and there will be a mandatory minimum sentence of at least 30 years imprisonment without possibility of parole.

... If the jury unanimously finds beyond a reasonable doubt that the defendant Thomas Koskovich is guilty of purposeful and knowing murder and the jury also finds unanimously beyond a reasonable doubt that the defendant personally fired the bullet or bullets that directly caused the death of Jeremy Giordano then the defendant would be subject to the possibility of having the death penalty imposed upon him and we would move to a penalty proceeding during which the jury would hear further evidence and would decide whether the death penalty should actually be imposed.

. . . .

... The State has also brought charges against the defendant Thomas Koskovich involving the killing of [Giorgio] Gallara. In general those charges parallel the charges involving the killing of Jeremy Giordano except for the identity of the victim. In the interest of keeping my instructions to you relatively simple and clear I will not repeat in detail the instructions which I gave with respect to the charges involving the death or the killing of Jeremy Giordano.

. . . .

In general, the instructions which I gave with respect to the charges involving the killing of Jeremy Giordano apply with respect to the charges involving the killing of [Giorgio] Gallara, exception of course for the identity of the victim and the outcomes are mostly the same.

On the varied lists which I will give to you the charges involving the killing of [Giorgio Gallara] are set forth in the same detail as the charges involving the killing of Jeremy Giordano. So the verdict list has the charges set forth in equal detail with respect both to Jeremy Giordano and [Giorgio] Gallara. However, there is one very important difference between the killing of Jeremy Giordano and the killing of [Giorgio] Gallara so far as the defendant Thomas Koskovich is concerned.

The State has presented proofs attempting to establish that the defendant Thomas Koskovich personally fired the bullet or bullets, .45 caliber which directly caused the death of Jeremy Giordano. But the [S]tate has not presented any proofs

attempting to establish that the defendant Thomas Koskovich personally fired the bullet or bullets, .22 caliber which directly caused the death of [Giorgio] Gallara. On the contrary, the only proofs presented by the [S]tate on this issue tend to establish that Jayson Vreeland fired the bullet or bullets which directly caused the death of [Giorgio] Gallara. Accordingly, under the proofs in this case, the jury can not find that the defendant Thomas Koskovich by his own conduct caused the death of [Giorgio] Gallara through personally firing the fatal bullet, even though the jury may find that the defendant Thomas Koskovich is guilty of the purposeful or knowing murder of [Giorgio] Gallara if it accepts the proofs of the [S]tate as being true.

In short, if you believe the State's proofs and if you also believe them insofar as they involve accomplices in crime, you could find the defendant Thomas Koskovich guilty of the purposeful or knowing murder of [Giorgio] Gallara. But you could not find him guilty of having personally caused the death, which means that he would not be subject to the death penalty on that charge.

So the defendant Thomas Koskovich is not subjected to the possibility of the death sentence with respect to the killing of [Giorgio] Gallara.

After the court completed its formal instructions, the court indicated to the jury that it would also explain the verdict list. At that juncture, defense counsel requested that the court ensure that the "own-conduct" charge explicitly indicate that unanimity was not required, to which the judge responded, "it will be covered when I go over the verdict list. I think that's an easier way to do it. So I'll do it that way." Thereafter, the court instructed the jury as follows:

I just want to take a couple of minutes to briefly go over the verdict list with you. You'll notice that I set up a separate entry for each charge against the defendant. And under each charge I have the essential elements of what has to be proven for that charge. And then there's a place for the jury to vote not guilty or guilty. . . .

I want to emphasize what I said or point out again what I've said in the earlier instructions. For each verdict where you're asked, where you return either a not guilty or guilty, wherever the jury enters a not guilty or guilty determination, that must be unanimous. So all 12 of you, if the answer to the first charge was not guilty, all 12 of you would have to agree it's not guilty. If it were guilty all 12 of you would have to agree that it was guilty. So it has to be unanimous.

There are however two spots on this verdict list where there is departure for the requirement of a unanimous vote of the jury. Let me just point those out to you so you'll be aware of them as you come to them. This [is] on the very first charge, the charge of purposeful and knowing murder of Jeremy Giordano. You will see that first you would say either not guilty or guilty of that charge.

. . . .

. . . [I]f you return a verdict on purposeful or knowing murder the verdict should . . . unanimously be either not guilty or guilty. However, you drop right below

that you'll see another entry. If the jury finds that the defendant is guilty of this charge, so if you have found that . . . he's guilty of purposeful and knowing murder, then you have to answer another question.

And that other question is, does the jury unanimously find beyond a reasonable doubt that the defendant Thomas Koskovich personally fired the bullet or bullets that directly caused the death of Jeremy Giordano. You're asked to answer that question. And the distinction between the options . . . is important. If you answer that question yes then the defendant would be subject to the possibility of the death penalty and would go to the penalty phase. If you answer the question no, let's say you find him guilty but you did not find that he fired the fatal bullet or bullets personally and directly. If you answer no then the case would not proceed as to a penalty phase and I would simply sentence the defendant to up to life imprisonment with mandatory minimum without parole of 30 years.

But let me just point out a difference. In order to answer that question yes all 12 of you must agree. Notice the question says, does the jury unanimously find beyond a reasonable doubt that the defendant Thomas Koskovich personally fired the bullet or bullets that directly caused the death of Jeremy Giordano. In order for the answer to be yes all 12 of you must agree. But suppose all 12 of you didn't agree. Let's suppose you had a discussion about it and you went through it, you sorted it, you exchanged views among each [other], between each other and just for example suppose six of you thought the answer should be yes and six thought the answer should be no, where six thought he fired the fatal bullets and 6 thought he did not. The answer then is no. In other words that does not require a unanimous verdict the no. The no just reflect[s] it isn't unanimous. So if it [is] 11 to one, if it's ten to two, nine to three, whatever combination less than 12 to zero, if it's not unanimous agreement that the answer is yes then the answer is no. Okay.

The following day, defense counsel objected to the court's "own-conduct" instruction. The court overruled the objection. The court explained that the charge had been tailored to the facts of the case and that it correctly emphasized to the jury that defendant could not be subjected to the death penalty unless the jury found that he murdered Giordano by his own conduct. The court reasoned that the jury had been provided with an appropriate and objective charge, and that defendant "could not have gotten a better charge[.]"

 To be eligible for the death penalty under *N.J.S.A.* 2C:11–3c, a defendant must cause the victim's death by his or her own conduct (or under other circumstances not pertinent to this appeal). *State v. Loftin, supra,* 146 *N.J.* at 349, 680 *A.*2d 677; *see also State v. Feaster,* 156 *N.J.* 1, 38, 716 *A.*2d 395 (1998) ("[T]he New Jersey Death Penalty Act . . . 'resurrect[ed] the distinction

between a principal and an accomplice' in determining whether a defendant is a candidate for the death penalty.") (citations omitted), *cert. denied,* —— *U.S.* ——, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001); *State v. Brown, supra,* 138 *N.J.* at 509–10, 651 *A.*2d 19 (observing that "the Act makes death-eligible only those defendants who are convicted of purposeful or knowing murder and . . . [who] 'committed the homicidal act by [their] own conduct' ").

■■■ However, the "own-conduct" element is distinct from whether a defendant committed purposeful or knowing murder. *State v. Feaster, supra,* 156 *N.J.* at 38, 716 *A.*2d 395. The "own-conduct" element acts as a "trigger" with respect to whether a defendant is eligible for the death penalty. *Ibid.; see also State v. Brown, supra,* 138 *N.J.* at 510, 651 *A.*2d 19; *State v. Gerald,* 113 *N.J.* 40, 93, 549 *A.*2d 792 (1988) ("The legislative history of the Act makes it clear . . . that in enacting [*N.J.S.A.* 2C:11–3c], the Legislature intended to distinguish, for purposes of punishment only, a murderer who actually killed—the 'triggerman'—from one whose conviction rests on a theory of vicarious liability[.]")

In *Feaster, supra,* 156 *N.J.* at 42–43, 716 *A.*2d 395, this Court recently discussed the relationship between the "own-conduct" requirement and accomplice liability. We specifically addressed the instruction to be given the jury in respect of that issue:

In capital cases that present a jury question whether a defendant is guilty of death-eligible own-conduct murder or accomplice-liability murder, the trial court, after instructing the jury on the requisite elements of the charged offenses, should instruct the jury first to determine whether the defendant is guilty of purposeful-or-knowing murder. The jury should be instructed that only if it unanimously reaches a guilty verdict on that offense should it then determine whether the defendant committed the murder "by his own conduct" or, alternatively, as an accomplice, the charge emphasizing that because those alternatives are mutually exclusive the jury should consider them simultaneously. During the course of its instructions, the court should make clear to the jury that it need not be unanimous on the own-conduct determination, and it must inform the jury of the legal consequences of its own-conduct finding.

We emphasize that the jury's initial determination of guilt or innocence on the charge of purposeful-or-knowing murder is not intended to resolve whether the defendant acted as principal or accomplice. Only subsequent to a guilty verdict of purposeful-or-knowing murder will the jury specifically consider what form of

murder—accomplice-liability or own-conduct—supports the murder conviction. Our case law supports that view of the jury's deliberations.

[*Ibid.* (internal citations omitted).]

We are satisfied that the court in this case properly instructed the jury on the own-conduct requirement. Initially, the court described to the jury the elements of knowing or purposeful murder and explained that a guilty finding on that issue had to be unanimous. As noted, that question is distinct from the "own-conduct" question, and the trial court properly separated the two inquiries for the jury. The court indicated to the jury that if it unanimously found defendant guilty of knowing or purposeful murder, only then was it to consider whether defendant had committed the murder by his own conduct.

Furthermore, the trial court emphasized that in order for defendant to be eligible for the death sentence, the jury had to find unanimously that defendant committed the murders by his own conduct. The court also stressed that if less than all of the jurors agreed, the jury had to return a "no" verdict on the "own-conduct" issue. The verdict list itself explicitly indicated to the jury that if it voted "no" on that issue, the case would "not proceed to a penalty phase." Thus, consistent with *Feaster*, the trial court properly informed the jury that it need not be unanimous on the "own-conduct" issue. The court also informed the jury about the sentencing consequences of the "own-conduct" finding. Accordingly, defendant was not deprived of a legitimate opportunity to receive a non-unanimous "own-conduct" verdict.

## III.

### Penalty Phase

Defendant claims numerous errors in the penalty phase, many of which we reject. However, we find merit in three of defendant's claims. They are: first, that the trial court erred in instructing the jury concerning its use of the victim-impact testimony; second, that the court erred in failing to explicitly inform the jury that the court would likely sentence defendant on the

non-capital convictions to consecutive sentences and that as a result, defendant would likely spend the rest of his natural life in prison if the jury did not impose the death sentence; and third, that the trial court erred in instructing the jury on how to weigh the aggravating and mitigating factors, which comprises the core of the jury's function in the penalty phase. We conclude that the combined effect of those three errors warrants reversal of defendant's death sentence.

We begin our analysis by discussing defendant's claim of error regarding the content of the victim-impact testimony. That discussion will furnish the context in which to analyze defendant's claims regarding the court's instruction in respect of that testimony. We will then discuss the three errors that, when viewed collectively, constitute reversible error, starting with the trial court's instruction in respect of the victim-impact evidence. Lastly, we will turn to defendant's non-meritorious claims. In the course of our discussion of defendant's claims, we will address the State's cross-appeal.

### A. Admission of Victim–Impact Statement

Defendant argues that the victim-impact statement presented to the jury by Loretta Giordano, Jeremy's mother, was unduly prejudicial and violated guidelines established by this Court for such statements in *State v. Muhammad,* 145 *N.J.* 23, 678 *A.*2d 164 (1996). Specifically, defendant argues that the statement was too long, inflammatory, emotional, non-factual, and was not sufficiently restricted to the impact that Jeremy's death had on his immediate family. In response, the State contends that the statement complied with the guidelines set forth in *Muhammad.* The State maintains that both the content and length of the statement were proper and that it did not abridge defendant's constitutional rights.

At the conclusion of the penalty phase of the trial, the State proffered the victim-impact statement of Mrs. Giordano. Defendant objected to various portions of the statement and proposed editing the statement to approximately half its original length.

The trial court conducted a *Rule* 104 hearing to consider defendant's objections. Specifically, defendant objected to references to the Giordano family's religion, Jeremy's relationship with his grandparents, references to the death of Jeremy's grandfather and the effect the grandfather's death had on Jeremy's sister, Mrs. Giordano's descriptions of Jeremy as an infant, and a poem that described Mrs. Giordano's feelings about Jeremy's death.

The trial court made minor changes to the statement and rephrased certain portions of it, but for the most part rejected defendant's arguments and left the statement intact. (The statement as delivered to the jury by Mrs. Giordano is reprinted as an appendix to this opinion.) The trial court, concluding that the statement did not violate the standards promulgated in *Muhammad,* explained:

> There is nothing in the statement, with the minor additions—especially with the minor editing, changes that I have made in the course of our discussion thus far, which is grossly inflammatory. There's nothing that's unduly prejudicial. And there's nothing extremely likely to divert the jury from its focus on the aggravating and mitigating factors. There is nothing in it containing opinions about the defendant, about the crime, in terms of the—you know, the nature of the crime, other than in terms of it's [a] hard thing that hit us. And there's nothing in it about the appropriate sentence. So the—the statement does not violate the—what I'll call the negative restrictions of the Supreme Court as reflected in the [*Muhammad*] case and in other cases.

Addressing the length of Mrs. Giordano's statement, the trial court observed:

> Now, I don't think the statement is unduly long in terms of it being burdensome on us. After all, the trial has taken 20 plus days to get to this point. Everybody else has had days and days to present evidence. When I say everyone, the State has had a chance for days to present evidence and Defense has, for days, presented evidence. And there's been much presented. And I think if the family wants to give some of the details of the background and—we shouldn't sit here with a stop watch and with a—an editor's blue pencil and limit and edit in an unduly—in an unduly controlled environment. So I think there—this is the—this is the family statement, this is Mrs. Giordano's statement, and so long as she meets the requirements of the Supreme Court rulings and of the statute, I think she should be able to say it in her own way and in the kind of detail that she feels comfortable with.

We have recounted the history of the Victim's Rights Amendment in *State v. Muhammad, supra,* 145 *N.J.* at 32–35, 678 *A.2d*

164, and need not repeat that history here. Following the passage of that amendment, the Legislature enacted *N.J.S.A.* 2C:11–3c(6), which provides: "When a defendant at a sentencing proceeding presents evidence of the defendant's character or record pursuant to subparagraph (h) of paragraph (5) of this subsection, the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors."

In *State v. Muhammad, supra,* 145 *N.J.* at 40, 678 *A.*2d 164, we concluded that the victim-impact statute was constitutional under both the Federal and State Constitutions. Examining the Legislature's intent, we noted that "the Legislature [has] determined that before a jury determines whether to sentence a defendant to death, the jurors should, in limited circumstances, be informed about the uniqueness of the victim as a human being and the particular harm caused by the crime." *Id.* at 45, 678 *A.*2d 164.

In addition to upholding the constitutionality of the statute, we provided guidance to lower courts in considering the admissibility of such evidence. We indicated that the victim-impact evidence had to be relevant and reliable and must satisfy the balancing test contained in *N.J.R.E.* 403. *Id.* at 47, 678 *A.*2d 164. The Court suggested that, in evaluating the specific testimony under *N.J.R.E.* 403, "there is a strong presumption that victim impact evidence that demonstrates that the victim was a unique human being is admissible." *Id.* at 55, 678 *A.*2d 164. We noted that certain statements are impermissible, including "the victim's family members' characterizations and opinions about the defendant, the crime, or the appropriate sentence." *Id.* at 47, 678 *A.*2d 164.

Likewise, the Court noted that "statements that are grossly inflammatory, unduly prejudicial, or extremely likely to divert the jury from its focus on the aggravating and mitigating factors should be excluded." *Ibid.* We reasoned that evidence admitted under the victim-impact statute should be restricted "to statements designed to show the impact of the crime on the victim's family and to statements that demonstrate that the victim was not a faceless stranger, but was a unique individual human being.

There is no place in a capital case for unduly inflammatory commentary." *Id.* at 48, 678 *A.*2d 164.

The Court also cautioned against extensive use of victim-impact evidence and required strict adherence to the legislative provisions. *Id.* at 52–53, 678 *A.*2d 164. Specifically, we noted that "[v]ictim impact testimony may not be used as a general aggravating factor or as a means of weighing the worth of the defendant against the worth of the victim." *Id.* at 53, 678 *A.*2d 164. Rather, we emphasized that the statute required "that such evidence can be introduced for only one purpose, namely, to assist the jury in determining the appropriate weight to give the catch-all mitigating factor." *Ibid.*

Importantly, we observed that victim-impact evidence may not be introduced in such a manner that would foster the arbitrary and unconstitutional imposition of a death sentence. *Ibid.* To protect the rights of capital defendants from that possibility, the Court outlined certain procedural safeguards. *Id.* at 54, 678 *A.*2d 164. For example, we determined that absent special circumstances, only one survivor would be allowed "to provide the jury with a glimpse of each victim's uniqueness as a human being and to help the jurors make an informed assessment of the defendant's moral culpability and blameworthiness." *Ibid.* Especially significant to the present case, the Court also emphasized that

> [t]he testimony can provide a general factual profile of the victim, including information about the victim's family, employment, education, and interests. The testimony can describe generally the impact of the victim's death on his or her immediate family. The testimony should be factual, not emotional, and should be free of inflammatory comments or references.
>
> [*Id.* at 54–55, 678 *A.*2d 164.]

With those tenets in mind, we address defendant's arguments. Defendant first claims that the statement was too long and otherwise not appropriate in its tenor and content. As support, defendant points to *State v. Timmendequas, supra,* 161 *N.J.* 515, 737 *A.*2d 55, in which the victim-impact statement encompassed only six pages. In contrast, Mrs. Giordano's statement comprised approximately fifteen pages. We reject defen-

dant's argument. We find nothing in our capital jurisprudence that would require us to impose an artificial limit on victim-impact testimony. As the Court observed in *State v. Muhammad, supra,* 145 *N.J.* at 47, 678 *A.*2d 164, "the decision to admit specific victim impact statements will typically be in the discretion of the trial court[.]" We should not restrict that discretion by requiring a trial court to measure a victim-impact statement with stop-watch precision.

 We do not retreat, however, from our reasoning in *Muhammad* that victim-impact evidence should provide only a glimpse of the murder victim's life and background, and the impact that his or her death has had on immediate family members. Within those parameters, trial courts retain wide discretion concerning the length of victim-impact testimony. In short, victim-impact evidence must be considered on a case-by-case basis, as no two witnesses will be affected by crime precisely in the same manner. The varying factual circumstances presented in capital cases counsel against our establishing a rigid limit on the time or length of such evidence. The trial court did not abuse its discretion in the present case.

Defendant next claims that the victim's mother's use of poetry in her testimony was improper. Mrs. Giordano included the following poem in her statement to the jury:

As time passes by and you're not here
The days are long and the nights too much to bear
I think most of those loving times, your great big smiles and your silly rhymes
Oh how I wish you were here for a while
I miss your hug and joking ways
And I wish you were here to stay
I know God's love is holding you tight
I know God holds us in his sight
So as time passes by and by I know you hear my awful sigh.
Remember always that I care.
And Mommy and all of us love you, oh, my Jer.

Defendant contends that the poem was too emotional. Moreover, according to defendant, any statement containing poetry, not

prose, violates *Muhammad.* In response, the State emphasizes the brevity of the poem and contends that the poem was not overly emotional.

We decline to establish a *per se* prohibition against the inclusion of poetry in victim-impact testimony. Although we do not read *Muhammad* as requiring such a *per se* rule, we do share defendant's concern about the emotional nature of poetry and similar forms of expression. The Court is reluctant to infringe on the ability of victims to express themselves as they see fit, yet we are mindful that such unfettered expressions may be unduly prejudicial to defendants. As in so many other areas of the law, the Court must consider competing concerns in determining the propriety of victim-impact testimony. In considering those concerns here, we uphold the inclusion of the poetry in the present case but caution trial courts to be particularly vigilant in future cases in ensuring that such forms of expression do not breach the parameters established in *Muhammad.*

In its cross-appeal, the State argues that allowing a family member of a murder victim to testify about the family's opposition to the death penalty violates the guideline established in *Muhammad, supra,* 145 *N.J.* 23, 678 *A.*2d 164, which prohibits victim-impact witnesses from expressing their opinions about the appropriate sentence to be imposed. In response, defendant contends that victim-impact witnesses who do not support the imposition of the death penalty should be allowed to share that opinion with the jury because most jurors assume that the victim's family prefers the death penalty.

On cross-examination, defense counsel, over the State's objections, questioned Mrs. Giordano about whether she and her family supported the imposition of the death penalty for defendant. Mrs. Giordano testified that she and her family, "coming from a family of faith and Christians," wanted defendant to "commit himself to Christ." As previously noted, Mrs. Giordano stated that "[w]e are not in favor of the death penalty. I would like the jury to evaluate everything according to what they feel is their job to do according

to the laws of the State of New Jersey, according to how they feel that they have to answer to their God." Immediately thereafter, the court explained that it allowed that testimony because it was "useful" for the jury to know. The court, however, cautioned the jurors that "even though Mrs. Giordano and her family may not be supporters of the death penalty, as many people in our society are not, her views aren't controlling."

We agree with the State's position. In *Muhammad, supra,* 145 *N.J.* at 55, 678 *A.*2d 164, we barred victim-impact testimony "concerning the victim's family members' characterizations and opinions about the defendant, the crime, or the appropriate sentence." The Court imposed that restriction to help ensure that victim-impact evidence did not inflame the jury or prevent it from deciding the appropriate punishment based solely on relevant factors. Although primarily motivated by a concern that family members would testify in support of the death penalty and thereby unduly prejudice the defendant, the Court's directive in *Muhammad* applies equally to testimony concerning a family's opposition to the death penalty.

Just as victim-impact testimony supportive of the death penalty could inflame the jury and distract it from relevant evidence, so too could testimony in opposition to the death penalty. Moreover, in *Payne v. Tennessee,* 501 *U.S.* 808, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), the United States Supreme Court left undisturbed the holding in *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987), that "the admission of a victim's family members' characterizations *and opinions* about the crime, the defendant, and the appropriate sentence violated the Eighth Amendment [of the United States Constitution]." *Payne, supra,* 501 *U.S.* at 830 n. 2, 111 *S.Ct.* at 2611 n. 2, 115 *L.Ed.*2d at 739 n. 2 (emphasis added). We thus clarify that *Muhammad's* prohibition on victim-impact testimony concerning the appropriate penalty is intended to apply to testimony either in support of, or in opposition to, the death penalty. We are mindful of the possibility that some jurors will assume that a victim-impact witness prefers the

death penalty when otherwise silent on that question. To guard against that possibility, trial courts should instruct the jury that a victim-impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard.

In sum, viewing Mrs. Giordano's statement in its entirety, we cannot conclude that the court abused its discretion in admitting it. Nothing contained in that statement had the capacity to affect the jury to such an extent that it would have acted arbitrarily in imposing the death sentence. Mrs. Giordano's opinion that she and her family were opposed to the death penalty, although inappropriate, did not prejudice defendant and actually may have been of some minor benefit to him. (Nor did Mrs. Giordano's opinion prejudice the State in view of the jury's disposition.) Aside from that aspect of Mrs. Giordano's testimony, the victim-impact evidence did not transgress the parameters established in *Muhammad*, and, therefore, we will not disturb the trial court's discretionary rulings.

## B. Jury Instructions Relating to the Victim–Impact Statement

Defendant argues that the trial court erred in instructing the jury in respect of how to evaluate the victim-impact evidence and how it was to be utilized during deliberations. Specifically, defendant contends that the court's instructions improperly permitted the jury to weigh or "balance" the worth of Jeremy Giordano against the worth of defendant, to consider sympathy for the victim's family, and to consider the victim-impact evidence in relation to evidence other than the catch-all mitigating factors. The State asserts that the trial judge's charge, when viewed in its entirety, properly instructed the jury on how to evaluate and utilize the victim-impact evidence.

Because those asserted errors in the charge form a major basis of defendant's overall challenge, we recite the charge at length.

After instructing the jury about aggravating factors, the court turned to mitigating factors, informing the jury:

[I]n the area of mitigating factors we—we see another sense in which there is a kind of preference in the law to a sentence of imprisonment. And that is that there are some listed statutory factors. The law dealing with mitigating factors and capital punishment list[s] a number of potential mitigating factors which may be present in a case. And if the defense thinks those are present, they can try to prove them. And so far that's the same thing as the law for aggravating factors. The law with respect to aggravating factors lists the aggravating factors. The difference, however, is that the [S]tate cannot go beyond the aggravating factors listed in the statute, nor can the jury. But when mitigating factors, in addition to a number of mitigating factors that are listed, there is a catch-all factor that is made extraordinarily broad. And the catch-all factor is any other factor relevant to the defendant's character or record or to his circumstances of the offense. So that is a very broad factor. And it—it allows, under that heading, many potential mitigating factors to come in. So the Legislature has deliberately created not just a list of mitigating factors, but an opportunity for the defendant to argue that there are other mitigating factors in his particular case.

. . . .

Now, you only get to the mitigating factors if you first found that at least one aggravating factor exists. The defendant does not have the burden of establishing a mitigating factor by some standard of proof. He has the burden, if he wants you—if he wants you to consider mitigating factors, he has the burden of producing evidence of the mitigating factor. And of course the defense has spent some time trying to do that. But the defense does not have the burden of proving . . . the existence of mitigating factor[s]. In other words, the defense doesn't have to prove that a mitigating factor exists by a preponderance of the evidence or by the greater weight of the evidence or by reasonable doubt. All the defense has to do is introduce reliable evidence that the mitigating factor exists. And then if there is evidence proffered, each individual juror has to make a qualitative judgment as to whether the evidence really establishes, in the mind of that juror, that there is that mitigating factor. The same evidence could be used to establish a number of different mitigating factors. So one piece of evidence might considerably give rise to support for more than one mitigating factor.

. . . .

If there is evidence of [a] mitigating factor, . . . you must, each individual juror, who thinks that evidence is reliable, must give that evidence such weight as it deems—he or she deems appropriate. And balance it against the aggravating factor.

Now, keep in mind that the offering of mitigating factors is not given by way of justifying or excusing the defendant's conduct. He's been found guilty of murder. And that's extremely serious, and no matter what else happens, he's going to be punished at least very severely for that. And there's—it's not—it's not excused. And it's not justified. But there may be—these mitigating factors are offered to

present facts about the defendant's life or character or circumstances surrounding the murder which would lead you to impose a sentence less than death.

And mitigating factor[s] may be used to weaken the [S]tate's proof concerning the existence of [the] aggravating factor[s] or the weight of [the] aggravating factors. It may also be used, mitigating evidence, to establish the existence of mitigating factors and to bolster their weight and to push you in the direction of a—of a favorable answer to the defendant in the issue of the balancing of aggravating and mitigating factors. In considering any mitigating factor you can take into account the normal sympathy that such a mitigating factor might inspire or justify.

. . . .

Now, ... you [do not] have to find that these mitigating factors exist, by any means. You have to consider the evidence, yourselves, and each juror has to figure out whether he or she thinks these mitigating factors exist.

After describing the statutory mitigating factors, the court then began its description of the catch-all mitigating factor:

The next mitigating factor[s][are] number 6 though [sic] 14, are not listed in the statute, except that they come under the catch-all of any factor—mitigating factor relevant to the defendant's character or record or the circumstances of the offense. And the—the—the defense has presented evidence about these. And—and you may—you should consider that evidence and see whether you think that the claimed mitigating factor exists.

After describing each of the mitigating factors, the court proceeded to instruct the jurors about use of the victim-impact evidence:

I—you—you, of course, heard some testimony from Mrs. Giordano, the mother of Jeremy Giordano, indicating the—the impact that the death of her son had on her and—and on the rest of the family. And I want to point out to you that that kind of evidence is admitted for a limited purpose, and it's—it's only meant to be used for a limited purpose and not for any other purpose. That evidence is to be used by you in determining the appropriate weight to be given to certain mitigating factors. And those are the kind of catch-all mitigating factors. And they are, in terms of our verdict list, they are mitigating factors 6, 7, 8, 9, 10, 11, 12 and 13. So from 6 on those are-those are mitigating factors not specifically listed in the statute, which I submitted to you for your consideration, because they—they do— there was evidence about them. They do relate to the defendant's background and his makeup and to the circumstances of the offense.

And—and this—and there may be some others that you will find. There's a space in the verdict list for you to find other mitigating factors that none of us have thought of. But—and if you find them it would apply to that, too. *But this impact statement is—is meant to relate to that. So it kind of balances the victim's background and circumstances against the defendant's background. Balance them. But it's a—it's a sort of a parallel opportunity.* And it's—it's—it's to be considered in relation to those—those mitigating factors, 6 through 14, and any others that you may find. And it's not to be considered in terms of boosting an

aggravating factor. And it's not—not to be used by you in deciding whether there is an aggravating factor or in terms of adding any weight to an aggravating factor. It's only meant to [a]ffect your determination of the weight of those certain mitigating factors.

There's one thing, too, that—that we do want to point out to you. A crime against a—a very nice, decent person is really no worse than a murder—a murder of a nice decent person is, in a certain sense, under our law, no—no worse than the murder of somebody who isn't so attractive. So happens that the young man in this case, Jeremy Giordano, seems to have been a very fine, nice, nice young man. But even if he were not, even if you—even if the local—even if some local reprobate that nobody liked was killed, that would still be a crime, and the aggravating factors and guilt or innocence would be measured in terms of that. So the law—it's not, by admitting these impact factors, meaning to make any inappropriate distinctions about the fundamental blameworthiness of all—of all murders. So you—you are meant to use that fact—that statement that Mrs. Giordano made for the purpose of helping you to weigh the impact of some of the mitigating factors dealing with the defendant's history and his record and circumstances of the offense.

[ (emphasis added).]

Before the trial court, defense counsel objected to that part of the charge pertaining to the use of the victim-impact statement and recommended that the charge be modified. The court disagreed, noting that "the charge was appropriate as given." After the jury returned the death sentence, defendant again objected to the court's instruction and the court again rejected defendant's argument, explaining:

The Defense also urges that I made an error in neglecting to say—to use in instructing the Jury the specific language in the model charge, which reads: "You must decide the case on the evidence without reference to conjecture and without any sympathy except such sympathy as a mitigating factor may inspire and you must decide the case without any bias or prejudice."

I did not use that specific language, but the instructions were clear on how sympathy could be used. It could be used in terms of enhancing or in terms of evaluating a mitigating factor.

The Jury was also told how it could—how it was to use the victim impact statement made by Mrs. Giordano. And the instructions were adequate in my judgment.

The Jury was also given an opportunity, I might say, to emphasize—to employ sympathy for the Defendant in a way that I believe was never before given to a jury in this case under the special circumstances of this case, which I thought it appropriate for the Jury to be instructed, to be allowed to know that Mrs. Giordano and the family did not think that the death penalty should be imposed on this Defendant.

I did that because I thought in the absence of such a clear affirmative manifestation the Jury might by silent inference draw the conclusion that the Giordano Family was in favor of the death penalty when it was not.

So I allowed that testimony to be given.

And that I think was a factor that weighed very heavily in favor of the Defendant and very heavily in favor of a non-capital penalty.

Now the Jury ended up ultimately not accepting that, but it wasn't because of any runaway sympathy for Mrs. Giordano's statement. It was not that at all.

The Jury did have the right to—and I instructed them that they had the right not to be controlled by the wishes of the family with respect to the non-imposition of the death penalty, but the Jury certainly, certainly was not exposed to a misuse of Mrs. Giordano's statement in a way prejudicial to the Defendant. Exactly the opposite is true in this case.

We have repeatedly stressed that "clear and correct jury instructions are essential for a fair trial." *State v. Brown, supra,* 138 *N.J.* at 522, 651 *A.*2d 19. *See also State v. Martini,* 131 *N.J.* 176, 271, 619 *A.*2d 1208 (1993) ("An appropriate charge is essential for a fair trial."), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. Concepcion,* 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988) ("Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial."); *State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981) ("Appropriate and proper charges to a jury are essential for a fair trial.").

Accordingly, "[t]he trial court has an absolute duty to instruct the jury on the law governing the facts of the case." *State v. Concepcion, supra,* 111 *N.J.* at 379, 545 *A.*2d 119. *See also State v. Green, supra,* 86 *N.J.* at 287–88, 430 *A.*2d 914 ("[T]he trial court should explain to the jury in an understandable fashion its function in relation to the legal issues involved. . . . [The charge must provide] a comprehensive explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find."); *State v. Butler,* 27 *N.J.* 560, 595, 143 *A.*2d 530 (1958) ("[A] mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case.").

We have also explained that "[a] charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin,* 119 *N.J.* 2, 15,

573 A.2d 1359 (1990). Because of the importance of jury instructions, "[w]e have consistently held that incorrect charges on substantive elements of a crime constitute reversible error." *State v. Rhett*, 127 N.J. 3, 7, 601 A.2d 689 (1992); *State v. Martin*, *supra*, 119 N.J. at 15, 573 A.2d 1359 ("So critical is the need for accuracy that erroneous instructions on material points are presumed to be reversible error."); *State v. Grunow*, 102 N.J. 133, 148, 506 A.2d 708 (1986) ("Erroneous instructions on matters or issues material to the jurors' deliberations are presumed to be reversible error.").

█ Further, in *State v. Muhammad*, *supra*, 145 N.J. at 51–52, 678 A.2d 164, we recognized that instructions in capital cases are more complex than in non-capital cases, and highlighted the importance of limiting instructions concerning victim-impact evidence. We have also noted that "[a]llowing victim impact information to be placed before the jury without proper limiting instructions has the clear capacity to taint the integrity of the jury's decision on whether to impose death." *State v. Hightower*, 146 N.J. 239, 264–65, 680 A.2d 649 (1996). Therefore, a trial court should specifically instruct the jury on how to use victim-impact evidence. *Id.* at 266, 680 A.2d 649. Particularly significant to the present case, we emphasized in *Muhammad:*

[v]ictim impact testimony may not be used as a general aggravating factor or as a means of weighing the worth of the defendant against the worth of the victim. . . . The victim impact statute mandates that such evidence can be introduced for only one purpose, namely, to assist the jury in determining the appropriate weight to give the catch-all mitigating factor.

[*Muhammad*, *supra*, 145 N.J. at 53, 678 A.2d 164 (emphasis added).]

█ Applying those tenets, we first address defendant's argument that the trial court impermissibly instructed the jury to "balance" defendant's background against that of the victim, Jeremy Giordano. Specifically, defendant objects to the following language contained in the court's charge: "But this impact statement . . . kind of balances the victim's background and circumstances against the defendant's background. Balance them. But it's a—it's a sort of a parallel opportunity."

We agree with defendant. Although the court did not instruct the jury to "weigh the worth" of defendant against that of the victim, the court's directive to jurors that they balance the victim's background against that of defendant was akin to asking the jury to compare the worth of each person. As such, it violated *Muhammad.*

The State argues to the contrary, relying on our approval of the trial court's instruction about the use of victim-impact evidence in *State v. Timmendequas.* That reliance is misplaced. In *State v. Timmendequas, supra,* 161 *N.J.* at 632, 737 *A.*2d 55, the trial court instructed the jury:

> [I]f you as a juror have not found to be present mitigating factor (h) or mitigating factors in addition to those listed, meaning if you haven't found affirmatively as to factors number 3 through 25, if no one found any of those, you then must not give any consideration to this evidence regarding the victim's character or the impact of the murder on survivors. And that is so, because it *only may be used in terms of balancing or in terms of assessing the weight to be given to the evidence concerning the defendant's character or the circumstances of the offense.*

In considering whether that charge comported with *Muhammad,* we referred to the prosecutor's summation, in which she stated to the jurors that " '[i]f you gave credit to any of the defendant's character evidence ... we refer to that as Factor H mitigation, you are then to weigh it against whatever weight you determine is appropriate for victim impact.' " *Id.* at 633, 737 *A.*2d 55. We concluded that, viewing the charge in its entirety, in conjunction with the prosecutor's comments, "defendant [could not] demonstrate that the jury instruction regarding victim-impact evidence constituted plain error." *Id.* at 634, 737 *A.*2d 55. *See also State v. Robinson,* 165 *N.J.* 32, 47, 754 *A.*2d 1153 (2000) (recognizing that arguments of counsel "can mitigate prejudice resulting from a less-than-perfect charge").

Because the instruction in *Timmendequas* informed the jury that the victim-impact evidence may be used "in terms of balancing" certain mitigating evidence, the State contends that the charge in the present case was also proper. However, the instruction in *Timmendequas* clearly informed the jurors that the victim-impact evidence was to be used only in assessing the proper

weight to be given to the catch-all factor. The court in that case did not invite the jury to balance the defendant's background against that of the victim as the court did explicitly in this case.

In *Muhammad,* we expressed our concern that weighing the worth of the victim against that of the defendant might prompt jurors to impose the death penalty arbitrarily. *Muhammad, supra,* 145 *N.J.* at 53, 678 *A.*2d 164. Common experience informs us that comparing convicted murderers with their victims is inherently prejudicial because defendants in that setting invariably will appear more reprehensible in the eyes of jurors. That contrast is particularly stark in the present case: Jeremy Giordano was a hard-working, religious, law-abiding young man, whereas defendant was a convicted murderer. We are convinced that the court's instruction infringed on the integrity of the penalty phase and impermissibly increased the risk that the death sentence would be arbitrarily imposed. That error, in combination with the other errors identified below, warrants reversal of defendant's death sentence.

 Next, we consider defendant's argument that the trial court erred in not warning the jury against considering sympathy for the victim's family in its deliberations. Defendant theorizes that the court's erroneous instruction to the jury to balance the victim's background against that of defendant was compounded by the fact that the court told the jury that it could consider sympathy for defendant, but not for the victim's family. Defendant contends that because the jury was told to balance the backgrounds of the victim and defendant, and because the court instructed the jury to take into account sympathy for defendant, the jury also must have improperly considered sympathy for the victim's family. Defendant thus suggests that the trial court was obligated to advise the jury explicitly not to feel sympathy for the victims.

The State counters that victim-impact evidence and the limited emotion it engenders does not violate constitutional principles. The State acknowledges that emotions should not be allowed to

unduly inflame jurors to the point of compromising their deliberations, but stresses that victim-impact evidence inherently conveys certain emotions, like pity, compassion, mercy, and sympathy, to the jury.

We agree with the State. That jurors are able to divest themselves of ordinary human emotions and disregard all feelings they may have for the victim's family is unlikely. That said, trial courts must work to ensure that "fatal emotionalism" is not injected into the jury's deliberations. *State v. Zola,* 112 *N.J.* 384, 431, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). We would have preferred the court to deliver an explicit charge to better guard against that possibility. On this record, however, we cannot conclude that the court's omission deprived defendant of fair deliberations. See *Muhammad, supra,* 145 *N.J.* at 45, 678 *A.*2d 164 (observing generally that brief statement from victim's family is "unlikely to inflame the jury").

Finally, we consider defendant's argument that the court's instruction allowed the jury to consider the victim-impact evidence in relation to the statutory mitigating factors and not solely in respect of the catch-all factors. Defendant focuses on this one phrase of the court's instruction in making that argument: "[the victim impact evidence is] to be considered in relation to those— those mitigating factors, 6 through 14, *and any others that you may find.*" (emphasis added). Defendant contends that the highlighted language authorized the jury to consider the victim-impact evidence in relation to the statutory mitigating factors. In response, the State argues that that phrase simply referred to any other catch-all factors that the jury may have found beyond those listed by the court. The State stresses that when the charge is examined in its entirety, the disputed phrase refers exclusively to any catch-all mitigating factor beyond those proffered by defendant.

After reviewing the charge in its entirety, we are persuaded by the State's argument. The court stressed the limited manner in

which the victim-impact evidence could be used. The court specifically informed the jury that it could find mitigating factors beyond those proffered by defendant, and that there was a space on the verdict list for that very purpose. We are satisfied that when reviewed in context, the disputed language did not invite jurors to consider the victim-impact testimony outside of the permissible setting of the catch-all mitigating factors.

In sum, we agree with defendant that the trial court erred in its charge to the jury to the extent that it suggested or invited jurors to balance the worth of defendant against the worth of his victims. That error, when combined with the other errors discussed below, warrants reversal of defendant's death sentence. Defendant's other two claims of error—that the trial court failed to advise the jury not to feel sympathy for family members of the victim and that it allegedly authorized the jury to consider Mrs. Giordano's testimony outside of the limited context of the catch-all mitigating factors—are without merit for the reasons already stated.

## C. Jury Instruction Concerning Sentences for the Non–Capital Crimes

Defendant argues that the court's penalty-phase instruction to the jury concerning the sentences it would impose for the non-capital convictions was insufficient. Defendant contends that the court failed to inform the jury about the possible sentences that defendant could receive for the non-capital convictions, and also failed to inform the jury whether those sentences would be imposed consecutively or concurrently. Defendant asserts that the allegedly flawed instruction "greatly and inappropriately increased the likelihood of a death sentence[.]"

The State concedes that the trial court did not explicitly inform the jury of the precise range of imprisonment for each non-capital conviction or advise the jury that there was a reasonable likelihood that the sentences would be imposed consecutively. However, the State argues that reversal of the death sentence is inappropriate because the court clearly informed the jury that defendant would never pose a threat to society. The State contends that, in so

doing, the trial court implicitly informed the jury that defendant would be incarcerated for the remainder of his natural life. The State also emphasizes that when viewed in light of defense counsel's opening and closing remarks, which clearly suggested to the jury that defendant would spend the rest of his life in prison if spared the death penalty, any error in the court's instruction was harmless.

During defense counsel's arguments to the jury, counsel stressed to the jury that if spared the death penalty, defendant would remain in prison for the rest of his life. During opening remarks at the commencement of the death penalty phase, defense counsel stated:

[Mitigating factors] are the kinds of things that would suggest to you, to a jury, that the death penalty is not the only just and appropriate punishment that can be imposed upon Mr. Koskovich. And I would hope that you understand that the significance of your verdicts last week, that they almost guarantee that if, in fact, this jury decides to vote for life, that Mr. Koskovich will·never see the light of day outside an institution as long as he lives.... [T]he fact of the matter, as a practicality, that's it. Mr. Koskovich is going to spend the rest of his life in prison, notwithstanding this other momentous decision that you must make.

Similarly, in closing remarks, defense counsel explained:

[I]f you choose to spare Mr. Koskovich's life, you should not, for one minute, think that he will not be punished. It is, if you accept what the prosecutor says, clear evidence of how horrible it must be to know you're going to spend the rest of your life in prison. Clearly, if you believe the prosecutor, it's so horrible [defendant] would rather die.

. . . .

If you picture—go in that jury room, and you go in that bathroom, and you close that door, and realize that essentially you are never, ever coming out, that is what you are going to be doing for the rest of your life, that would be the better existence than Thomas Koskovich is looking at if he spends the rest of his life in prison.

The simple pleasures that we probably take for granted, walking on the beach, looking at the stars at night, or getting a cup of coffee and reading the New York Times in bed, he's never, ever going to do. He will eat when and what someone tells him. He will sleep in the same place where he is told and when he is told. And he will be surrounded, I suggest, by people who are not really all that nice. And he will be confined, most of the time, to a very, very small space. He will, if you spare his life, be significantly and seriously punished.

In its penalty phase instruction, the trial court instructed the jury as follows:

Also want to have you keep in mind, in a certain sense, that there are other crimes that have been involved in this case with respect to which sentences will be imposed by me. In this penalty phase, of course, you're dealing with just one of the crimes that is involved in this case, and, you know, fundamentally, in your decision you're focusing just on the murder of Jeremy Giordano. That's the one that gives rise to the penalty phase. There will be some references to other crimes as part of one of the aggravating factors. But your basic task here is to decide what the penalty should be for the knowing and purposeful murder of—of Jeremy Giordano.

Mr. Koskovich will be sentenced for all of the other crimes. He will be sentenced by me for the murder of [Giorgio] Gallara. He will be sentenced by me for the crime of robbery. He will be sentenced by me for the crime of unlawful—of possession of a weapon for an unlawful purpose. He will be sentenced by me for the burglary of the Adventure Stores—Adventure Sports Store, and for the theft from that store. I'll probably do that about three weeks from now. I'm not sure what sentence I will impose. I have a considerable amount of discretion as to what the sentence will be for some of those crimes. And I have—have considerable discretion with respect to whether I make those sentences concurrent or over-lapping, or whether I make them consecutive, which means they're added one after another. So I'm not sure precisely what I will do about—about those. I can tell you there will be a sentence for each of those crimes. And I can tell you that[.]

Let me just stop for a moment and say that if, of course, you sentence the—you determine that the defendant should be sentenced to death for the murder of Jeremy Giordano there will be a sentence in which it really doesn't matter what happens for the other crimes, because if he were—if he were put to death that—that—that would be the end of any sentencing process. The other sentences would not be served. But if Mr. Giordano—if Mr. Koskovich does not get the death penalty for the death of Jeremy Giordano, then the other sentences will be important. And without committing myself in advance to precisely what they will be, I can tell you that they will be sufficient to make sure that society is fully protected from the risk of any further violence from the defendant. So when you decide what the penalty should be in this case, decide it in terms of what you think the appropriate penalty is for this crime of the knowing and purposeful murder of Jeremy Giordano. Don't be worried that—that if you do not sentence the defendant to death or direct the defendant be sentenced to death for this crime, that he will be out on the street in the near future. That will not occur. So you do not have to worry that—that if you fail to impose the death penalty society will not be protected from further acts of violence by Mr. Koskovich, because it will be. The point is decide in terms of what is the appropriate penalty for this case, whether the penalty should be death or less than death.

Now, we are now dealing with, fundamentally, the one very, very, very serious crime of the knowing and purposeful murder of Jeremy Giordano by the direct conduct of the defendant, Thomas Koskovich. And you've already found the—the defendant guilty of that crime. And now you are going to decide whether the penalty for that should be the death penalty, or whether it should be something less than the death penalty.

If you do not vote to impose the death penalty unanimously, then I will sentence the defendant to a term of imprisonment which may go up to life imprisonment for this crime, and it must be at least 30 years without any possibility of parole.

Defense counsel objected to that charge. The court overruled the objection, explaining that:

I've made very ample statement about what is going to happen on the other crimes. The charge is long enough as it goes, probably, you know, the—the difficulty is there are a lot of things that have to be covered, and so we have to cover them, but—but it—it gets to be sort of mind boggling in terms of what people have to absorb. Fortunately, we do have a verdict list that helps to structure it. But I—I have told them, very, very clearly, not only that other sentences are available, but I've indicated, rather strongly, in a way that—that—that I—I've indicated, rather strongly, what the result of the other sentencing will be.

. . . .

The jury's decision should not be influenced by [the potential sentences that could be imposed for the other crimes] and the way of trying to take it out of influence is to assure them that it will be handled adequately.

. . . .

I don't know any more needs to be said. ·

▉ Trial courts are obligated to inform penalty-phase juries about the potential sentences that a defendant could receive for non-capital convictions arising from the same trial as the capital murder conviction. In *State v. Martini, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208, we held that

when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count.

We clarified those requirements in *State v. Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677. In that case, we held that "if the court, based on the evidence presented believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed." *Ibid.* *See also State v. Timmendequas, supra,* 161 *N.J.* at 636,

737 *A.*2d 55; *State v. Feaster, supra,* 156 *N.J.* at 90–91, 716 *A.*2d 395.

 Those obligations are premised on our belief that a capital sentencing jury should be fully informed about its responsibility in deciding the appropriateness of the death penalty. *State v. Loftin, supra,* 146 *N.J.* at 370, 680 *A.*2d 677. As we have explained, "[t]o hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." *State v. Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188. Failing to inform jurors about other sentences undermines their responsibility and invites speculation concerning those sentences, thereby risking a death verdict based on a jury's "unwarranted fear of the defendant's premature release from prison." *State v. Bey,* 129 *N.J.* 557, 602, 610 *A.*2d 814 (1992). Moreover, the Court has emphasized that "[w]hen a jury is choosing between life and death, it should not be misled into treating the case as one that it is not." *State v. Nelson,* 155 *N.J.* 487, 505, 715 *A.*2d 281 (1998), *cert. denied,* 525 *U.S.* 1114, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999).

 With those principles in mind, we turn to defendant's argument that the trial court should have instructed the jury that the court was likely to impose consecutive sentences. The court did not explicitly inform the jury during the penalty phase that it planned to impose consecutive sentences. If the court held that belief and failed to so inform the jury, an error in the charge would have resulted. We must thus determine whether the court believed that there was a realistic likelihood that it would impose such sentences prior to its charge.

On March 18, 1999, during *voir dire* of prospective jurors, the court discussed with one prospective juror the other crimes for which defendant was charged. The court explained that "[t]he likelihood is that [defendant] would, in the whole context of the case, if he did not get the death penalty, he would be sentenced to

a number of consecutive terms to the point at which he would, in fact, never be released from prison." Additionally, the court stated that "[w]e do not have for the crimes involved here conceptually the idea of life without parole. But the same result can be obtained in a case where there are multiple charges, and there probably would be if he were convicted of murder but not given the death penalty." On March 24, 1999, during *voir dire*, the court indicated that if defendant was convicted of murder, "even if he doesn't get the death penalty, the likelihood is he'd get more than 30 years."

On April 20, 1999, in a charge conference outside the presence of the jury, the court indicated to counsel that "there were two murders so there could be consecutive sentences. I don't want to get too much into that, but I think if this man doesn't get the death penalty, my general approach should be he should be incapacitated for as long as I can make him, I think." Additionally, the court remarked "I will almost certainly make it consecutive. I will almost certainly make all of the other crimes consecutive and I will almost certainly recommend that he never be paroled." However, the court stated that "I don't want to tell the jury all that. My real view of this man is, if he doesn't get the death penalty, ... then he should really be incapacitated basically for the rest of his life to the extent that we can do it."

Those expressions by the trial court convince us that prior to the jury instruction, there was a realistic likelihood that the court would impose consecutive sentences. The court revealed its intent to incapacitate defendant and ensure that defendant would remain in prison for the remainder of his life. The court, therefore, should have informed the jurors of its intent so as to ensure that the jury was fully aware of its responsibility in deciding the appropriateness of the death penalty. That the jury was not so explicitly informed is clear from the record.

 The State argues that any error committed by the court in instructing the jury was cured by defense counsel's remarks to jurors that defendant would spend the rest of his life in prison.

For example, in *Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677, we reasoned that although the court did not inform the jury about the other sentences to be imposed on the defendant, the "failure to give such information was harmless error." We stressed that defense counsel was repeatedly allowed to inform the jury that if the defendant was spared the death penalty he would likely die in prison, and that "during summation, defense counsel was permitted to argue that defendant's life should be spared because he would likely die in prison." *Ibid.* Therefore, we concluded that the jurors were fully informed about their sentencing options, including the practical effect of a life sentence. *Id.* at 373, 680 *A.*2d 677.

 The circumstances in this case are different from those present in *Loftin.* Although defense counsel in both cases adequately informed the jury of the likely sentence for each non-capital crime, the remarks of counsel in the present case were effectively erased by the trial court's equivocations. Jurors were first informed by defense counsel that "Mr. Koskovich is going to spend the rest of his life in prison[.]" But then the jury heard from the court itself: "I have—have considerable discretion with respect to whether I make those [non-capital] sentences concurrent or overlapping ... [s]o I'm not sure precisely what I will do about—about those." We cannot conclude with confidence on this record that the jury clearly understood the consequences of their rejecting the death penalty. When combined with the other instructional errors identified, the error in this aspect of the charge warrants reversal of defendant's death sentence.

### D. Jury Instructions about Consideration and Weighing of the Aggravating and Mitigating Factors

Defendant argues that the trial court erred by failing to explicitly instruct the jury that, if the jury as a whole did not unanimously find the depravity-of-mind aggravating factor, no one juror could consider that factor in balancing the remaining felony-murder factor·and the mitigating factors. Defendant also claims that the

trial court erred by using the term "random" in describing the murder within the framework of the depravity-of-mind factor. Specifically, defendant argues that "random" in that context was a vague term and thus impermissible. The State disagrees. The State asserts that the trial judge clearly and properly instructed the jury that it had to find the proposed aggravating factors unanimously and beyond a reasonable doubt, and to then weigh only those aggravating factors it found against the mitigating factors to determine the appropriate penalty.

 Before examining the jury instructions, we first recount the relevant procedural history. The State proffered two aggravating factors: the 3c(4)(c) depravity-of-mind factor and the 3c(4)(g) felony-murder factor. The jury unanimously found that the felony-murder factor was proved, but rejected the depravity-of-mind factor. The jury voted eleven to one in favor of finding the depravity-of-mind factor. However, the one juror's "no" vote served as the jury's rejection of that factor. *State v. Bey,* 112 *N.J.* 123, 159, 548 *A.*2d 887 (1988). Because the jury rejected the depravity-of-mind factor, it was authorized to balance only the felony-murder factor against the mitigating factors to determine the appropriate punishment. *Ibid.*

At the start of the penalty phase, the trial court instructed the jury as follows:

And if an aggravating factor has already been proven, and you heard the evidence of mitigating factors, you're to take that evidence of mitigating factors, take that evidence proving the aggravating factor, and you're to weigh them together, and make a qualitative judgment about whether the aggravating factors outweigh the mitigating factors or not.

If you unanimously find, beyond a reasonable doubt, that the aggravating factors do outweigh the mitigating factors, then the penalty should be death.

At the conclusion of the penalty phase, the court delivered to the jury its final instructions, addressing the jury's consideration of aggravating and mitigating factors:

As a general proposition you know aggravating factors are those which would tend towards imposing the death penalty, and mitigating factors are those which would tend towards the sentence of imprisonment. The factors have to do with the circumstances of the crime and the personal traits, qualities and background of the

defendant. Your task is not merely to decide the existence of aggravating and mitigating factors. That's an important part of your task. But really the more complicated part of your task probably will be to evaluate those factors, if you find them to—to exist on both sides of the—of the evaluation, to evaluate them and to make a unique, individualized judgment about the appropriateness either of the death penalty or imprisonment, acts of punishment for this—this defendant.

Now, aggravating factors are tightly controlled as to what can be an aggravating factor. There's a rather short statutory list of aggravating factors. And the [S]tate, in this case, has alleged that two of them are present. So those two aggravating factors, which we'll discuss in some detail, are the only two which can be considered in this penalty phase. The jury can't think of other aggravating factors that it believes might be appropriate. You can't do that. You're limited to the two which the [S]tate has claimed exist. So you have to focus, when you get to aggravating factors, on whether either or both of them, aggravating factors, exist. The fact that some of us might think that perhaps another factor could have been applied here, there or the other place, a—an aggravating factor, that's irrelevant. Two have been claimed. And that is what you are limited to in deciding whether an aggravating factor is present.

The burden of proof in the penalty phase—the burden of proof—the first burden of proof that the State has is to show, by evidence beyond a reasonable doubt, that one or more aggravating factors exist.

The second burden of proof that the [S]tate has, if it passes that first one, is to show by evidence, beyond a [reasonable] doubt, that the aggravating factor or factors proven to exist outweigh the mitigating factor or factors.

Now, the State has the burden of proving the exist[e]nce of an aggravating factor beyond a reasonable doubt.

The court proceeded to define proof beyond a reasonable doubt.

The court then directed the jury's attention to the verdict sheet and stressed that, to consider whether the death penalty was appropriate, the jury first had to find unanimously that at least one of the two alleged aggravating factors was proven beyond a reasonable doubt. Specifically, the court stated:

[A]s part of that concept that the imposition of the death penalty is unusual and rare, the [S]tate is required not just to—if the death penalty is to be imposed, it's not—it's required not just to prove that there is a knowing and purposeful murder. That has already been proven in this case. But in addition to that, it has to show that there is one of a limited number of aggravating factors in addition to the murder which make it appropriate to impose the death penalty in a case. So proving an aggravating factor is absolutely indispensable to the possibility that a death penalty might actually be imposed.

Turning to the depravity-of-mind aggravating factor, the court informed the jury in part:

Now, if you find that the murder was random, entirely pointless and senseless, if you find that unanimously, beyond a reasonable doubt, then you should—you should say that this aggravating factor is present.

. . . .

Now, you will notice when you look at this aggravating factor that you're asked to answer the question yes or no. In order for the jury to answer the question of whether that aggravating factor exists, in order to answer that yes all 12 jurors have to be convinced, beyond a reasonable doubt, that the factor is present. So all 12 jurors have to agree, beyond a reasonable doubt, that that factor has been proven before you can vote yes. The no vote does not require unanimity. It—it could be that all 12 jurors might think the answer is no, and if so the answer would be no. But the answer is no if even one juror thinks that this aggravating factor is not present. So if—if one juror thinks that this aggravating factor is not present or two, three, four, five, six, whatever, but if even just one juror thinks this aggravating factor is not present, the answer is no. And you will note on the form that if the vote is no, I ask you to show what the vote is. So show, you know, six-six, zero-twelve, you know, one-eleven, whatever it is, show—show—show what it is.

The court repeated similar instructions in respect of the jury's consideration of the felony-murder aggravating factor. The court further instructed the jury that:

Now, your first task, before you get into mitigating factors, your first task is to see whether or not any aggravating factors exist. If you answer no to all the aggravating factors, if your answer to the first three questions we ask you on the jury verdict list is no, then your work is done. That's the end of the case. If no aggravating factors are present, then the death penalty does not apply, and you check no and—on aggravating factor one and on the two subsections of aggravating factor two, and you return to the jury—to the courtroom and hand me that jury list. And if that's what you have decided, you've answered no to all three of those questions, that's the end of the case. . . . That would be the end of the case. Now, if you do find that at least one aggravating factor is present, then you get to the mitigating factors.

After describing the mitigating factors, the court instructed the jury on how to balance the aggravating and mitigating factors:

The balancing of aggravating and mitigating factors, as I mentioned during jury selection, is not mechanical or numerical in nature. It's not a question of counting up the factors and the higher number wins. My guess would be if you get to balancing, there will be more mitigating factors than aggravating factors, just because of the nature of the case. But it's not just a . . . question of counting up the numbers. The—you don't just count them. You have to consider the factors qualitatively. Some of the factors may be much more significant than the others. And you have to consider that and make a judgment about that.

One aggravating factor may be found to outweigh, beyond a reasonable doubt, numerous mitigating factors, may be even all mitigating factors. And similarly one

or two aggravating factors, two aggravating factors, that's the most you could find in this case, two aggravating factors, might be overcome by just one mitigating factor, depending on how you size up the factors and what weight you—you—you give to them. So you—you are—are asked, as you weigh these—weigh these factors, to take a hard look at—at the evidence. And what you are being asked to do is figure what the weight is and how do they relate to each other. And when all is said and done, does the aggravating factor or factors, beyond a reasonable doubt, outweigh the mitigating factors that are shown to be in the case—that—that are found to be in the case. That is what you have to do.

You—you—you have to decide this—this matter. And it comes down to being an individualized judgment by each juror as to the appropriateness of the death penalty or imprisonment as punishment for the defendant as you weigh those factors.

Now, if you look at the—at the final part of the verdict list, it's the section called "Result of Balancing of Factors", you're asked to answer a number of questions. And first one is if the jury has unanimously found, beyond a reasonable doubt, that at least one aggravating factor exists, it must answer this question. Does the jury unanimously find, beyond a reasonable doubt, that any aggravating factor or factors proven to exist outweigh the mitigating factor or factors.

You're asked to answer that yes or no.

Now, in order to answer the question yes all 12 jurors must agree that, beyond a reasonable doubt, the aggravating factor or factors outweigh the mitigating factors. All 12 of you must agree. If less than 12 agree, if anywheres [sic] from 1 to 12 think the answer is no, then the answer is no, and we ask you to indicate, in that case, if the answer is no, we ask you to indicate the breakdown of yes or no votes.

At the conclusion of the court's instruction, defendant raised numerous objections, but he did not object to the instruction concerning the balancing of the factors until he filed a motion for a new trial. The court rejected defendant's objection, explaining that "the [j]ury was adequately and firmly instructed with respect to the fact that if [an aggravating] factor was not unanimously found that the [aggravating] factor was out of the case completely and just had no weight whatever in any deliberations of the [j]ury when they failed to find that the aggravating factor was present."

Defendant emphasizes that it was crucial for the jury to understand that if all twelve jurors did not agree that the murder was "depraved," then none of the jurors could consider the depravity-of-mind factor in considering whether to impose the death penalty. Defendant alleges in his brief that the court's instruction to the jury did not inform the jury that "they had to strike *all consideration* of depravity from their deliberations when balancing the

sole remaining aggravating factor—the felony-murder factor—against the mitigating factors."

In contrast, the State contends in its brief that, because of the court's explicit instruction that the rejection of any aggravating factor by even one juror served as the jury's rejection of that factor, "it must be presumed that each juror recognized that the unproven or non-existent aggravating factor ... was to play no part in his or her deliberations regarding the appropriate penalty."

The question, then, that we must resolve is whether the instruction adequately informed the jury that if, as a whole, it rejected the depravity-of-mind factor, no one juror could then consider that factor during the weighing of the felony-murder factor against the mitigating factors. If the instruction was deficient in that regard, we must decide under the plain-error standard whether that deficiency had the clear capacity to bring about an unjust result. *State v. Simon,* 161 *N.J.* 416, 476–77, 737 *A.*2d 1 (1999).

We have emphasized repeatedly the importance of the balancing process engaged in by jury members during the penalty phase. *State v. Timmendequas, supra,* 161 *N.J.* at 635, 737 *A.*2d 55. The balancing process is "a judgmental determination by the jury, based on conflicting values, of whether defendant should live or die." *State v. Biegenwald,* 106 *N.J.* 13, 62, 524 *A.*2d 130 (1987). Our State's "capital-sentencing scheme delegates to jurors the sensitive task of determining whether a defendant convicted of capital murder will live or die." *State v. Koedatich,* 118 *N.J.* 513, 524, 572 *A.*2d 622 (1990). The jury's determination during the penalty phase "focuses on whether death is the appropriate punishment for the defendant." *Ibid.*

The jury makes that profound decision through its "determination of the existence of aggravating and mitigating factors and the balancing of the former against the latter." *State v. Bey, supra,* 112 *N.J.* at 158, 548 *A.*2d 887. Our capital jurisprudence has recognized that "the jury must ... make the normative judgment

whether the aggravating outweigh the mitigating factors beyond a reasonable doubt. That decision, in effect, determines the appropriateness of the death penalty for the defendant." *Ibid.* The importance of the jury's determination cannot be overstated, as "[t]he entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die." *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188.

■■ Although the importance of jury instructions in criminal cases is well-established, we have emphasized that jury instructions "are even more crucial in a capital case because of the jury's responsibility to decide whether a defendant shall live or die." *Bey, supra,* 112 *N.J.* at 162, 548 *A.*2d 887. Additionally, we have noted that when considering a contradictory or confusing jury charge, "[w]here the life of an accused is at stake, it is too risky to determine what the instructions ... could mean to the twelve lay minds of the jurors." *State v. Wynn,* 21 *N.J.* 264, 271, 121 *A.*2d 534 (1956); *see also State v. Rose,* 112 *N.J.* 454, 508, 548 *A.*2d 1058 (1988) ("in a death penalty context, and in the face of such abundant and inflammatory evidence ..., the necessity for a careful and precise limiting instruction to this jury was clear and compelling"). Accordingly, we are especially sensitive to ensuring the correctness of jury instructions concerning the jury's balancing of aggravating and mitigating factors, because that balancing represents the core of the jury's function in the penalty phase.

■■ We agree with defendant that the charge was flawed. The trial court correctly instructed that an aggravating factor had to be found unanimously by the jury. However, the court did not explicitly inform the jurors that if the jury as a group rejected an aggravating factor, no one juror could consider that factor during the weighing process, even if he or she voted for that factor individually. As the Court emphasized in *State v. Muhammad, supra,* 145 *N.J.* at 52, 678 *A.*2d 164,

even if eleven jurors find that the evidence supports an aggravating factor, they are not permitted to consider that factor if the twelfth juror made no such finding. Nevertheless, we trust that those eleven jurors will adhere to the trial court's limiting instruction and deliberate about the appropriate sentence without consideration of those aggravating factors that they found to exist beyond a reasonable doubt.

The need for a clear and explicit instruction was especially appropriate in the present case. The main theme of the State's case was that defendant was a "depraved" murderer, a person who killed for the thrill of it. Accordingly, the State spent a disproportionate amount of time at trial directing the jury's attention to evidence of defendant's alleged depravity, in comparison to the limited focus on the felony-murder aspect of the case. Likewise, the court's instruction itself focused primarily on the depravity-of-mind factor, not the felony-murder factor.

That eleven jurors were convinced, beyond a reasonable doubt, that the depravity-of-mind aggravating factor had been proved is understandable in view of the State's emphasis and proofs adduced at trial. However, at no point did the court give a limiting instruction that required those eleven jurors to deliberate without consideration of the very aggravating factor that they had found to exist. Our dissenting colleagues have embraced the State's argument that the jury could not have failed to understand that each individual juror was prohibited from considering the rejected depravity-of-mind factor even if he or she voted for it individually. We disagree. Given the vital nature of that aspect of the charge, we are unwilling to infer that which the trial court did not explicitly convey. Moreover, throughout the instruction, the court employed the word "you" when referring to both the jury as a whole and individual jurors. That terminology could have confused the jury concerning whether the court was referring at a given time to the twelve-member jury or to an individual juror.

We reiterate the need for clear instructions in capital cases, especially with respect to the jury's balancing of aggravating and mitigating factors. That balancing is at the heart of death penalty deliberations and requires the jury to make a life or

death decision. Because of the singular and unique importance of that decision, there must be little chance that the jury as a whole, or even an individual juror, is confused about the process. We conclude that the instruction in this case failed to adequately inform the jury that once the depravity-of-mind aggravating factor was rejected, none of the individual jurors could consider that factor when weighing the felony-murder aggravating factor against the mitigating factors. That error, combined with the other identified errors, qualifies as plain error and warrants reversal of defendant's death sentence.

▮ Defendant also argues that the trial court erred by not informing jurors that if the jury as a whole rejected an aggravating factor, no one juror could consider the evidence in support of that factor in the weighing process. We disagree. The evidence related to the depravity-of-mind factor was broadly relevant to the felony-murder factor and, therefore, the jury did not need to concern itself with any limitations on the use of that evidence.

▮ Lastly, we reject defendant's claim that the trial court erred in its description of the depravity-of-mind factor. Specifically, defendant argues that the trial court's use of the term "random" in describing the murder resulted in an impermissibly vague instruction. In discussing the depravity-of-mind factor in a previous case, this Court itself has referred to "random acts of violence":

> These words ["depravity of mind"] mark society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose). This term isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these *random acts of violence.* The killer who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that there was no reason to murder, evinces what we define as depravity of mind.
>
> [*Ramseur, supra,* 106 *N.J.* at 209, 524 *A.*2d 188 (internal footnotes omitted) (emphasis added).]

*See also State v. Moore,* 122 *N.J.* 420, 478, 585 *A.*2d 864 (1991) (referring to "the randomness or senselessness [aspect of depravi-

ty-of-mind factor] discussed in *Ramseur*"). Viewing the charge in its entirety, we are satisfied that the use of the term "random" in this case was not vague and, therefore, did not deprive defendant of a fair penalty-phase proceeding.

### E. Jury Instructions Concerning "Extreme Mental or Emotional Disturbance" Mitigating Factor, *N.J.S.A.* 2C:11–3c(5)(a)

Defendant proffered numerous statutory mitigating factors during the penalty phase. He asserted that he suffered under the 2C:11–3c(5)(a) factor ("extreme mental or emotional disturbance") and that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was "significantly impaired" as the result of metal disease or defect pursuant to *N.J.S.A.* 2C:11–3c(5)(d).

■ Defendant argues that the trial court erred in its charge. Defendant contends that the court's instruction precluded the jury from finding the 2C:11–3c(5)(a) factor applicable if defendant suffered from a mental "disease" or "defect" (as opposed to a "disturbance"). In essence, defendant argues for the first time on appeal that the trial court erroneously precluded the jury from considering any evidence of defendant's mental illness to support the existence of the 2C:11–3c(5)(a) factor. That alleged error, according to defendant, rendered the jury's balancing of aggravating and mitigating factors fatally flawed. In response, the State stresses that defendant failed to raise that objection at trial and further, that the court's charge, when viewed in conjunction with the court's recharge, properly informed the jury.

The trial court instructed the jury on the "extreme mental or emotional disturbance" statutory factor as follows:

The first [mitigating factor] is that the defendants—defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution.

Now, emotional and mental are used in their ordinary sense, and we are not talking, with respect to this mitigating factor, about a defendant who has a mental illness or a mental disease. You have heard testimony that Mr. Koskovich does

have a mental illness, and has mental disease. And that's addressed in some other factors. But even if he doesn't have a mental illness, it's possible that he may have been subjected to extreme mental or emotional disturbances, may have been under the influence of extreme mental or emotional disturbances which clouded his judgment and his control, even though he may have been generally healthy or mentally healthy or even if he was not generally mentally healthy. So the point is this factor might exist in a person who does not have—have any mental disease. It might exist in a person who was free of mental pathology. He might have ... some enormous stress factors taking place in his life at the time of the murder that—that influenced him, affected his thinking, affected his emotions in a way which was rather extreme.

This mitigating factor, it's a statutory factor. It's one listed in the statute. And the statute says the—the—to be considered here the—the disturbance, the emotional disturbance, or the mental disturbance, has to be extreme before this mitigating factor exists.

So you have to look at the things that were influencing the defendant, and you have to make a judgment as to whether the—the—there was—the defendant was being influenced by an extreme mental or emotional disturbance at the time he committed this act.

Now, again, the mitigating factor, as you'll notice when you read it, is the defendant was under the influence of an extreme mental or emotional disturbance insufficient to constitute a defense to prosecution.

This disturbance wasn't enough to excuse him from guilt for the murder. He's been found guilty of the murder, but it's something that might impact on what the sentence should be. And you will notice that we ask you there to give the number of yes votes and the number of no votes. It may be that it's 12 on one side and 12 on the other. It doesn't have to be. Just whatever they are, that you should again, you should discuss the thing, see if you can come up with a consensus on this and all the other mitigating factors. But if you don't have a unanimous vote, just, when you finish your deliberations on that factor, just show what the votes are.

After the court completed its charge, defense counsel objected to various portions of it, but not specifically to the court's instruction about the "extreme mental or emotional disturbance" factor.

During deliberations, the jury sent the court a note asking "is there a legal definition of extreme or significantly impaired in considering mitigating factors? If not, please provide examples, if possible." The court understood the jury's question to relate to the "extreme mental or emotional disturbance" factor, as well as the *N.J.S.A.* 2C:11–3c(5)(d) mitigating factor. Accordingly, the court re-instructed the jury in the following manner:

The answer is that there is a definition of those words that we typically use in the law. It basically parallels standard dictionary references. But I will give it to you.

The question with reference to extreme is obviously a reference to Mitigating Factor 1, which is the defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution.

So the jury is asking what does extreme mean in that factor. And let me give you a somewhat fuller explanation of that factor than I did earlier. And there will be a reference in it to the specific meaning of the word extreme.

I wanted to remind you that this mitigating factor may be present even though the defendant was not intoxicated and had neither a mental disease nor a mental defect. It, of course, may be present, in addition, that he had those things. But even if he did not have those things it may be present.

This mitigating factor is established by evidence showing that defendant was suffering from an extreme mental or emotional disturbance, and that such disturbance influenced him to commit the murder. In this regard you are to consider the evidence on the totality of his intellectual and emotional processes at the time he acted. In other words, what was he thinking or feeling at the time; what was the effect of those feelings and thoughts upon him. Then you must consider whether his thoughts or feelings constituted extreme mental or emotional disturbance, and if they did, whether he was under their influence or power.

By disturbance we mean agitation, confusion or violent change. But in order to find this factor present you must also be satisfied that the mental or emotional disturbance was extreme. That is that it was great in degree.

Extreme simply means great in degree.

I want to remind you that in order to find the presence of this factor you must determine that the defendant was suffering from an extreme mental or emotional disturbance, and that such disturbance influenced him to commit murder.

However, if you find that the emotional or mental disturbance was not extreme, you may still consider any emotional or mental disturbance when you're dealing with Mitigating Factor 12 below, which deals with nonextreme mental or emotional disturbance.

Because defendant did not specifically object to the court's instruction at trial, "we must determine whether the court's ... charge was plain error possessing the clear capacity to bring about an unjust result." *State v. Feaster, supra,* 156 *N.J.* at 40, 716 *A.*2d 395. Under the plain error standard, "defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights." *State v. Morton, supra,* 155 *N.J.* at 421, 715 *A.*2d 228 (citation omitted).

 Moreover, in reviewing the charge, we must consider it as a whole. *State v. Loftin, supra,* 146 *N.J.* at 374, 680 *A.*2d 677 ("When the contested instruction concerns a mitigating factor, we similarly examine the instruction in its entirety[.]"). We have

explained that concepts like "extreme mental or emotional distur-bance" require the jury to make a qualitative judgment. *State v. Harris*, 141 *N.J.* 525, 566–67, 662 *A.*2d 333 (1995). In *State v. Loftin, supra*, 146 *N.J.* at 374, 680 *A.*2d 677, we explained that a court's instruction on the "extreme mental or emotional distur-bance" factor should convey to the jury that "it could conclude defendant suffered from extreme mental disturbance even if it did not conclude that defendant suffered from a mental disease or defect." In concluding that the trial court's instruction in that case was proper, we noted that "[a]lthough the jury charge did not contain the precise language in the model jury charge, the instruc-tion in no way suggested that the c(5)(a) factor could not be found absent mental disease or defect." *Ibid.*

In other words, a court's instruction in respect of the 3c(5)(a) factor must inform the jury that it need not find that a defendant suffered from a mental "disease" or "defect" to find that the defendant suffered from an "extreme mental or emotional disturbance." Defendant, however, presents a different argument here. He contends that the court's instruction improperly pre-cluded the jury from finding the "extreme mental or emotional disturbance" factor because the court suggested to the jury that it *not* consider evidence of defendant's mental disease or defect in making its determination. In support, defendant points to this portion of the court's charge:

> [W]e are not talking, with respect to this mitigating factor, about a defendant who has a mental illness or a mental disease. You have heard testimony that Mr. Koskovich does have a mental illness, and has mental disease. And that's addressed in some other factors.

In rebuttal, the State contends that even if the 3c(5)(a) charge was erroneous, it was corrected by the court's re-instruction in response to the jury question, in which the court informed the jury that

> I wanted to remind you that this mitigating factor may be present even though the defendant was not intoxicated and had neither a mental disease nor a mental defect. It, of course, may be present, in addition, that he had those things. But even if he did not have those things it may be present.

 We agree with the State. Viewed in its entirety, the court's instruction informed the jury that it could consider evidence of defendant's mental disease or defect in evaluating whether defendant suffered from an "extreme mental or emotional disturbance," but that it was not required to find that defendant suffered from a mental disease or defect to find the 3c(5)(a) statutory factor. We are also satisfied that the court's instruction was not plain error because it did not possess the clear capacity to bring about an unjust result. Any error contained in the court's initial instruction was effectively cured by the re-instruction and, therefore, we find that the instruction was not improper.

## F. Merger of Weapon Possession and Murder Convictions

 Defendant was given separate, consecutive sentences for his murder and possession of a firearm for an unlawful purpose convictions. Defendant argues that the conviction for possession of a firearm for an unlawful purpose should have been merged into his murder convictions. We agree, as does the State, that the convictions should have been merged. Accordingly, on remand, the trial court should enter an amended Judgment of Conviction consistent with this opinion.

## G. Jury Instructions on the Real–Time Length of Non–Death Sentences

In *Simmons v. South Carolina*, 512 *U.S.* 154, 157, 114 *S.Ct.* 2187, 2190, 129 *L.Ed.*2d 133, 139 (1994), the government presented "future dangerousness … [as] a factor for the jury to consider when fixing the appropriate punishment." The United States Supreme Court held that when a defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the jury be informed that the defendant is ineligible for parole. *Id.* at 162, 114 *S.Ct.* at 2193, 129 *L.Ed.*2d at 138.

 In *State v. Loftin, supra,* 146 *N.J.* at 371, 680 *A.*2d 677, we held that *Simmons v. South Carolina* did not apply in New

Jersey because "future dangerousness" is not an aggravating factor in New Jersey. Defendant contends that *Loftin* was incorrectly decided and, therefore, asks us to overrule that decision. We conclude that defendant has not presented a persuasive reason or argument why we should overrule *Loftin.* Accordingly, the holding in *Loftin* is reaffirmed.

## H. Trial Court's Imposition of Consecutive Sentences for Defendant's Non–Capital Convictions

 The court sentenced defendant to an aggregate non-capital sentence of life imprisonment plus forty years. Defendant argues that the court erred in requiring that all five non-capital sentences be served consecutively as opposed to concurrently. The State contends that the trial court did not abuse its discretion in making the non-capital sentences consecutive, as the overall sentence was consistent with the gravity of the crimes committed by defendant and fully complied with the Code of Criminal Justice.

In justifying the sentence it imposed for the non-capital crimes, the trial court focused especially on the killing of Gallara, but also noted that the other non-capital crimes "each ... contain[ ] its own serious evil." The court observed that "the primary objective to be obtained in the sentence which I impose today is to make it as certain as I can that the Defendant is never free to inflict harm upon other persons." Moreover, the court noted that

we have a real need to impose deterrents on this Defendant by making it certain that he will not be able to injure anyone in the future and we have a real need to indicate to the rest of society by way of deterrents ... that crimes such as this really cannot be tolerated and will be punished very severely.

We articulated the standards to be utilized by trial courts at sentencing in *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), and we not need repeat those standards here. Defendant asserts that the robbery of Gallara and Giordano was "part and parcel" of the murder of Giordano and Gallara and, therefore, the sentences should be concurrent. We disagree. In the past, we have rejected similar arguments in different contexts. *See State*

*v. Mejia*, 141 *N.J.* 475, 504, 662 *A.*2d 308 (1995) (rejecting defendant's argument that trial court abused its discretion in imposing a twenty-year sentence for robbery consecutive to his sentence for murder); *State v. Brown, supra*, 138 *N.J.* at 559, 651 *A.*2d 19 (observing that "[d]efendant's assertion that such [consecutive] sentencing is improper because the murders and robberies were part of one criminal transaction has no support in our cases.").

We are satisfied that the robberies and killings were not so intertwined that the court should have imposed concurrent sentences. *State v. Yarbough, supra*, 100 *N.J.* 627, 498 *A.*2d 1239. Likewise, we reject defendant's argument that the trial court erred in imposing consecutive sentences in respect of the offenses relating to the sporting goods store. In view of the separate and distinct nature of those offenses, the court did not violate the *Yarbough* standards or abuse its discretion in sentencing defendant as it did for the non-capital convictions.

## I. Alleged Prosecutorial Misconduct During Penalty–Phase Summation

In the State's summation at the penalty-phase of the trial, the prosecutor stated:

> This has been a long, it has been a difficult, . . . it has been a somewhat stressful trial for everyone involved. And the trial is the matter of State of New Jersey versus Thomas Koskovich. It is not the case of Thomas Koskovich versus Bertha Lippencott. This is the matter of the State of New Jersey versus Thomas Koskovich.

The prosecutor also remarked:

> When you begin your deliberations you will be talking about death. It's a topic that none of us likes to talk about, yet it is something that we all face. And I ask that you face it in that jury room, as you must, with respect to your deliberations in this matter, with the same courage, with the same dignity, and with the same discipline that, for instance, a terminal cancer patient faces death.
>
> [Defense counsel], in her opening statement, in the guilt phase of this trial, back a month ago, talked to you about some of the responsibilities of citizenship that we all have. Potential for military service, potential for jury service. She compared those two. And in military service we ask our soldiers, who are summoned to face life and death decisions on a regular basis, often times without the opportunity to deliberate, to consult with others before acting. In jury service we're certainly going to ask you to deliberate, to consult with each other before reaching a decision. And I ask you to face the decision that you must make as a soldier called

to service to his country would, with that same courage and dignity and discipline with respect to a topic that admittedly we don't like to talk about.

Before the trial court, defendant argued that those comments were improper. More specifically, defendant objected to the prosecutor's reference to Bertha Lippencott, contending that the prosecutor inappropriately suggested to the jury that defendant attempted to blame others, namely, his grandmother, for his crimes. The trial court disagreed, explaining that the prosecutor's reference was a fair comment based on the evidence defendant presented to the jury.

Defendant also objected to the State's soldier and cancer-patient analogy, contending that the prosecutor improperly asked the jury to have the courage to impose the death penalty. Defendant asserted that in doing so, the prosecutor improperly minimized the importance of the jury's responsibility. Again, the trial court disagreed. The trial court indicated that, although the prosecutor's analogy was "not the reference I might have chosen myself," it was broadly appropriate. Defendant repeats both objections in this appeal.

In reviewing allegations of prosecutorial misconduct at the guilt phase of a capital trial, we utilize the same standards that are used to review allegations of misconduct in the penalty phase. *Timmendequas, supra,* 161 *N.J.* at 589, 737 *A.*2d 55. *See also State v. Pennington,* 119 *N.J.* 547, 565, 575 *A.*2d 816 (1990) ("The 'fair trial' standard applies to alleged prosecutorial misconduct in both the guilt ... and penalty phases of a capital trial[.]"). Thus, we incorporate by reference our discussion found in Section II.B. *Ante* at 488, 776 *A.*2d at 167.

We first address defendant's argument that the prosecutor impermissibly suggested to the jury that defendant tried to blame others for his actions. A similar argument was made in *State v. Feaster, supra,* 156 *N.J.* at 85, 716 *A.*2d 395. There, the prosecutor remarked in summation that the defendant " 'should be required to accept the ultimate responsibility for that act and that's the death penalty.' " *Ibid.* The defendant claimed that the

prosecutor's comment impermissibly characterized the mitigating evidence as the defendant's attempt to escape responsibility for his conduct. *Id.* at 86, 716 *A.*2d 395. Although we determined that the prosecutor's comments were tantamount to characterizing the mitigating evidence as an "excuse," we concluded that defense counsel's argument to the jury and the trial court's instructions about the role of aggravating factors made the jury "well aware of their responsibility and the proper role mitigating evidence was to play in the discharge of that responsibility." *Id.* at 87, 716 *A.*2d 395. We conclude similarly in the present case.

The prosecutor in the present case did not state that defendant blamed others for his actions, nor did the prosecutor encourage the jury to impose the death penalty as a method of forcing defendant to accept responsibility for his actions. In mitigation, defendant presented a considerable amount of testimony about his difficult background, much of which focused on his grandmother. Within that context, the prosecutor's statement about Bertha Lippencott merely focused the jury's attention on the central issues involved in the penalty phase. We are satisfied that the prosecutor's comments did not have the capacity to distract the jury from its duties and thus did not deprive defendant of a fair penalty-phase hearing.

We turn next to the prosecutor's comments concerning soldiers and terminal cancer patients. A decision of the United States Supreme Court, *Caldwell v. Mississippi,* 472 *U.S.* 320, 105 *S.Ct.* 2633, 86 *L.Ed.*2d 231 (1985), provides a useful analytical framework within which to review those comments. In that case, the prosecutor suggested that the ultimate responsibility for determining the appropriateness of the death sentence rested with appellate courts, not the jury itself. *Id.* at 323, 105 *S.Ct.* at 2636, 86 *L.Ed.*2d at 235–36. Emphasizing the important duty and role of the jury in death penalty cases, the Court observed that its capital punishment jurisprudence was premised "on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly

awesome responsibility.'" *Id.* at 341, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 247. The Court overturned the death sentence, concluding "[b]ecause we cannot say that [the State's effort to minimize the jury's sense of responsibility for determining the appropriateness of death] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Ibid.* See also *State v. Rose, supra,* 112 *N.J.* at 478, 548 *A.*2d 1058 (concluding that prospective jurors who expressed strong desire to avoid responsibility for decision resulting in death were properly excluded from jury).

 Like the United States Supreme Court, we also assume that capital-sentencing jurors recognize the gravity and significance of their responsibility. In that regard, the State must in no way minimize the importance or significance of the jury's role. Viewing the prosecutor's statement within that framework, we do not believe that the statement had the capacity to dispel the jury's sense of responsibility. To the contrary, the prosecutor's comments tended to convey to the jury the seriousness of its task. We also reject defendant's argument that the prosecutor impermissibly suggested to the jurors that they needed the courage to impose a penalty of death. Our review of the record persuades us that the prosecutor's statement emphasized to the jury that it should deliberate with courage and dignity. Such encouragement is not inconsistent with our capital jurisprudence. The prosecutor's comments reinforced to the jurors that they had a grave task, and did not impermissibly minimize the importance of the jury's decision.

 We add this brief cautionary note. In *State v. Papasavvas,* 163 *N.J.* 565, 622–26, 751 *A.*2d 40, *corrected by,* 164 *N.J.* 553, 753 *A.*2d 1148 (2000), we recently observed the frequency with which some prosecutors approach the bounds of propriety by their remarks to jurors. Although the prosecutor's remarks at issue here were not improper, we emphasize that prosecutors must avoid prejudicial and overly emotional or extraneous references at all stages of the criminal process, especially in capital proceedings.

For present purposes, we are satisfied that defendant's right to have the jury deliberate fairly in the penalty phase was not violated by the prosecutor's remarks in summation.

## J. The Jury's Consideration of Co–Defendant Vreeland's Age and Ineligibility for the Death Penalty

In its cross appeal, the State argues that the trial court should not have informed the jury that co-defendant Vreeland was under the age of eighteen at the time of the murders and, therefore, not subject to the death penalty under statutory law. The State maintains that allowing the jury to consider that information was improper because it was irrelevant to defendant's character. Defendant contends that the precedent relied on by the State is inapposite, and that the court properly instructed the jury that the information was relevant to the statutory mitigating factor about defendant's age. (As previously noted, Vreeland was not subject to the death penalty because he was a juvenile at the time of the murders. *N.J.S.A.* 2C:11–3g.)

At the start of the penalty phase, the State objected to a mitigating factor proffered by defendant that provided, "the codefendant, Jason [sic] Vreeland, who is equally culpable, is not exposed to the death penalty simply because he was 17 at the time of the commission of the offense, only 16 months younger than Thomas Koskovich." The trial court refused to allow that mitigating factor to be considered under *N.J.S.A.* 2C:11–3c(5)(h), the catch-all mitigating factor, explaining

> the State Supreme Court has repeatedly ruled ... that the treatment given to a codefendant is not admissible under catch all factor (h). That's the ruling of the State Supreme Court.
>
> ... [W]e have the Supreme Court rule which indicates that the treatment of a codefendant is not a mitigating factor. And although I, perhaps, would not have voted that way, ... I am, of course, required to follow the directives of the Supreme Court, the rulings of the Supreme Court. So I will not permit the age of Jason [sic] Vreeland to be offered as a mitigating factor.

Although the court did not allow Vreeland's age to be introduced as a catch-all factor, the court stated that:

I will permit, as part of discussing the significance of age as it relates to the defendant, Thomas Koskovich, I will allow the defense to point out that by statute people under 18 are not even possibly—potentially subject to the death penalty. They are absolutely shielded from the death penalty because they are less than 18 years of age.... And I think in the context of this case, ... it is appropriate to point out, not as a mitigating factor standing independently, but as a way of giving meaning to Mr. Koskovich's age related mitigating factor, I think it is appropriate to point out that below 18 one does not even get exposed to the death penalty, and, indeed, we have an example of that in this case, ... which is that the codefendant is not being exposed to the death penalty. So I will allow it to come in as a way of urging that age should be an important mitigating—that Mr. Koskovich's age should be an important mitigating factor for him.

Accordingly, in instructing the jury about the statutory mitigating factor concerning age, *N.J.S.A.* 2C:11–3c(5)(c), the court informed the jury that

age can be significant in some cases. It's up to the jury to see what it was. Here the defendant was 18 years of age. He had passed his 18th birthday and not yet reached his 19th birthday when the murder was—was committed. So he is relatively young at the time he committed the murder. And that might have something to do with respect to whether a jury would consider his age to be a mitigating factor or not. It was, perhaps, in the minds of some of us, a thought that let us say an 18 year old person might—might not be expected to—he's certainly expected not to kill people. So it's not—it's not justification. But he—it might be understood that he would be—have less good judgment and less control than, let us say, a—a 40 year old person who's—who's matured more and has had more life experience. So this is something that you can consider.

In considering whether age is a mitigating factor here, you can also take notice of the fact that although Mr. Koskovich is of an age where he is subject to the death penalty, if other things end up that way, in terms of his age, he barely qualifies. In our state people below the age of 18 cannot be put to death. They can be sentenced to life imprisonment, but they cannot be put to death for—for any murder. So you might consider that in deciding what—what weight you might want to give, if any, to this mitigating factor.

And you can also note that, although it does not excuse, and is not necessarily controlling, the fact that the other defendant in this case, Mr. Vreeland, was short of 18 years of age. He was 17. And because of that he will not be subject to the death penalty. So you may consider that in deciding what weight you will give, if any, to this mitigating factor.

 *N.J.S.A.* 2C:11–3c(5)(c) provides that the jury may find as a mitigating factor "[t]he age of the defendant at the time of the murder[.]" *N.J.S.A.* 2C:11–3c(5)(h), the catch-all factor, allows juries to find as a mitigating factor "[a]ny other factor which is relevant to the defendant's character or record or to the circum-

stances of the offense." As the State correctly points out, this Court has prohibited juries from being permitted to consider a co-defendant's sentence as a mitigating factor under (5)(h).

In *State v. Gerald, supra,* 113 *N.J.* at 105, 549 *A.*2d 792, the Court held "that the sentencing court or jury may not consider the co-defendants' sentences as a mitigating factor under *N.J.S.A.* 2C:11–3(c)(5)(h)." We reasoned that "the legislature has limited the scope of section (5)(h) to any factor that is 'relevant to the defendant's character or record or to the circumstances of the offense[,]'" and the "sentences received by [a] co-defendant . . . plainly is not relevant to either [a defendant's] character or his record." *Id.* at 103, 549 *A.*2d 792. In *State v. Brown, supra,* 138 *N.J.* at 554–57, 651 *A.*2d 19, and *State v. DiFrisco, supra,* 137 *N.J.* at 502–06, 645 *A.*2d 734, we repeated that juries are not permitted to consider a co-defendant's sentence as a catch-all mitigating factor. Consistent with that case law, the trial court correctly chose not to instruct the jury about Vreeland's sentence as an independent mitigating factor under *N.J.S.A.* 2C:11–3c(5)(h).

We also agree that the trial court did not improperly inform the jury that, as a matter of statutory law, Vreeland was not subject to the death penalty. In commenting on the distinction between Vreeland and defendant, the trial court did not improperly inform the jury of Vreeland's sentence, nor was the court's instruction inconsistent with our reasoning in *Gerald* and its progeny.

A significant amount of evidence concerning Vreeland and his role in this case was presented to the jury during the guilt and penalty phase of the trial. Rather than have jurors speculate on whether Vreeland was subject to the death penalty (which, in turn, could have distracted the jury from considering the evidence presented), the court simply informed the jury about New Jersey's capital sentencing law. By instructing the jury as it did, the court properly focused the jury's attention on the crucial issues before it and furnished for the jury a context in which to consider the statutory mitigating factor concerning defendant's age. We find no error in that part of the court's charge.

## K. Cumulative Error

As noted, three errors asserted by defendant collectively warrant reversal of his capital sentence. They relate to the trial court's instruction to the jury in respect of the victim-impact evidence, the court's instruction concerning defendant's likely noncapital sentences, and the court's instruction in respect of the balancing of aggravating and mitigating factors as the death-sentence determiner. Because we find that those instructions constitute cumulative error warranting reversal of the death sentence, we do not address whether any of them, standing alone, would warrant that same result.

Although we have found cumulative error in this case, "we still adhere to the general principle that '[a] defendant is entitled to a fair trial but not a perfect one.'" *State v. Feaster,* *supra,* 156 *N.J.* at 84, 716 *A.*2d 395 (citation omitted). Moreover, we do not set aside a death sentence lightly. The errors we have identified all relate to the trial court's charge to the jury. As noted elsewhere in this opinion, a correct charge to the jury is singularly important for ensuring that jurors discharge their function accurately, fairly, and free from any impermissible influences. That function is all the more vital in a capital case. We have made a qualitative determination that, in the context of the entire penalty-phase proceeding, the combined effect of the three errors identified "was clearly capable of affecting ... the sentence." *Id.* at 85, 716 *A.*2d 395.

We have also noted in various sections of this opinion that the evidence of defendant's guilt was overwhelming. Although the quantum of evidence is an important factor for overcoming errors in the guilt phase, it cannot cure those errors that strike at the core of the jury's obligation to balance the aggravating and mitigating factors in accordance with statutory requirements and prior case law. By design, our capital sentencing system authorizes the jury to accept a single mitigating factor over the combined weight of one or more aggravating factors and in so doing, to reject the death sentence. That system cannot function proper-

ly unless the jury is adequately instructed on all aspects of its penalty-phase responsibilities, irrespective of the quantum of evidence against the defendant. "The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial[.]" *State v. Orecchio*, 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954).

## IV.

### Constitutionality of the Death Penalty Statute

■ Defendant argues that the New Jersey death penalty statute, *N.J.S.A.* 2C:3–11c (the "Act"), is unconstitutional because it fails to adequately narrow and define the class of individuals eligible for the death penalty and fails to provide a system of effective appellate review. We have repeatedly upheld the constitutionality of the death penalty statute and do so here. Defendant presents no persuasive argument or reason why we should depart from our well-established precedent.

Accordingly, "[w]e hold that the Act is constitutional under the Eighth Amendment to the federal Constitution. We conclude, furthermore, that the Act is valid under [Article I, paragraph 12 of] the New Jersey Constitution." *State v. Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188. We do not address whether the Act is unconstitutional as applied to defendant because he has not raised that issue in this appeal.

## V.

### Conclusion

The capital and non-capital convictions of defendant are affirmed. The trial court's imposition of consecutive sentences in respect of defendant's non-capital convictions is affirmed except as noted in Section III.F. above. The constitutionality of the death penalty statute is reaffirmed. Defendant's death sentence is set aside and the matter is remanded for a new penalty proceeding

consistent with this opinion. Defendant's proportionality claims are preserved.

## APPENDIX

### STATE V. KOSKOVICH
### VICTIM–IMPACT STATEMENT OF
### LORETTA K. GIORDANO

My name is Loretta K. Giordano. I am the mother of Jeremy Joseph Giordano. I reside in Hamburg, New Jersey. And I've been asked to give a statement to the Court to express the impact that this crime has had on my family and myself.

My husband's name is Joseph R. Giordano. He is the father of Theresa Katherine Giordano Navarro, Jeremy Joseph Giordano and Valerie Renee Giordano.

In a nutshell, the immediate impact this matter—murder has had on my family and me is that going on this trial every day has been like going to Jeremy's funeral over and over and over again.

This crime has had a tremendous impact on our family. I'll first tell you about my husband, Joe. At the time of the murder of our only son, Jeremy, my husband was just starting a woodworking business in which Jeremy was also becoming interested. Jeremy always encouraged his family members, as well as strangers. Jeremy not only helped with his words, he physically helped his father load the raw lumber in and out of the woodworking shop. He would stop by frequently, pop his head in to see if his father needed anything, to say hello and to make sure his father was all right, or perhaps to see if he needed help lifting larger lumber. Jeremy helped his father financially in purchasing some of the equipment that was needed for his business. Many times Jeremy would bring Joe lunch and visit for awhile. Those were male bonding times that a dad and son would have.

I remember Jeremy offering up ideas for my husband. Jeremy was very good at computers. He and his dad worked on getting

my husband's first computerized woodworking cutting machine working. There were very successful at their task. It looked as though there were many nights that were left to perfect it. Their constant arguing has become so precious to me now. Joe's drive to be successful in his woodworking business not only stemmed from his pride in creating and working for himself, but also from the desire to have something he could share with his son. Jeremy and his dad were finally at the time in their lives that they could respect each other's rights and were getting along very well together. It could be said that the bond of father and son was complete. So, when my son was killed, my husband not only lost his son, but also a good buddy.

There were always projects going on in our house to keep us busy. In one of those projects, Jeremy carefully planned and laid out all the bricks on the side patio. He made a little fountain in the backyard. Jeremy would talk about making the barbecue and a gazebo on the upper plateau of our yard. When he was younger, he and his buddies had the upper plateau for their forts and camping expeditions. Joe always believed in giving Jeremy controlled constructive opportunities within a supervised environment.

Since the murder, my husband has given up his woodworking business for a living and has returned to outside employment.

Now instead of traveling only a few miles down the road, Joe has a long drive five days a week to Carlstadt, New Jersey. He runs the risk of accidents while traveling on major highways like Route 80. When Joe can't sleep well at night, I'm concerned about his travel to and from work. Since my husband has lost his son and his business, he has changed. The future of sharing anything with our son has been permanently destroyed forever. Many nights are spent trying to make some sense out of this tragedy and sorting out personal feelings. The grieving process has been a long one, and it's not yet over.

Jeremy's death also had a major impact on our eldest daughter, Theresa, who's now age 26. She has been married to Jose Navarro for almost three years. Being the oldest child, Theresa always felt responsible for her brother. This is the way we raised our children. They were all taught to take care of and be friends to each other, with the guidance of my husband and myself. From the first news of the murder, she had to deal with the feelings like I should have been there for Jeremy.

Theresa is a professional chef. She lost a year of employment due to this tragedy. Theresa, as well as the rest of the family, regard Jeremy as a friend. Jeremy would lend financial aid to his sister when she needed it. I remember a time her car insurance was due. Jeremy lent her the money. Jeremy was very proud of his sister. He would tell everyone that she was a professional chef. Knowing how much Jeremy respected her, Theresa had a hard time getting herself together to go back into the industry. Theresa loved her brother very much.

Jeremy was always a good listener for Theresa. They would talk about the future, opening a restaurant together. I remember times when Theresa and Jose would come up and Jeremy would come bouncing through the door after work and get us to go all out to the diner. He had a way about him that made you feel good, no matter how bad you felt.

These are just some of the things that have been taken from Theresa.

I remember a time the kids decided they were going to go on vacation by themselves. It was a journey into adulthood. Theresa was 22 and Jeremy was 20. It was a time for bonding for them that's now gone forever.

When Theresa visited they would enjoy midnight trips to the bagel shop together. And Jeremy's favorite bagel was one with everything on it, and he liked cream cheese with salmon.

The kids had many every day normal things that they would do, like just talking or taking a ride. And these times are lost forever.

We thank God we have good memories to hold onto. In my oldest daughter's words, Jeremy wasn't just a brother, he was a living, breathing human being that she misses unconditionally.

Theresa feels that this not only impacted her life, but also the lives of her husband, sister, mother, father, grandparents, uncles and aunts. I think you get the picture. In the beginning when all this chaos took place, it ripped a hole in her that to this day still has not been able to mend. Though she tried many things, what it all comes back to be is that Jeremy is gone forever, and she wants to know why.

Theresa has suffered in many ways after the murder of her brother. She struggled financially and sometimes felt like she was losing her sanity. But more importantly to her, her family and her marriage suffered the most. When this chaos started, we were starting to make progress as an adult family. After Jeremy's death our family members were separated emotionally. Each of us not knowing how to feel or what to say to one another. It made us so emotionally raw that we couldn't be around each other, separating us physically as well. It has gotten better in the past months, but when one of us starts getting hurt again, it literally rubs off on the others, causing more pain, friction, hurt and finally, separation. So you see, we not only lost a huge chunk of our lives with Jeremy's death, at times we are losing our own lives in a separation because of the pain, and not knowing how to deal with it.

In April 1997 Theresa had been married for only about seven months. Theresa and Jose struggled through what any young married couple would. Little did they know something more severe than daily struggles was just coming down the pike. When Theresa got the call about Jeremy's death at 6:00 that morning, it was something that she knew was going to change her life and her

marriage forever. Jose and Theresa, who talked about everything, didn't say one word to each other on their trip up to Hamburg. Since then their marriage has been up and down, kind of like a yo-yo. Anger and outrage pours out of Theresa at times. Her hurt and sadness pours out of her every day, affecting their marriage all the time. Jose tries to support her and cheer her up. Just—just what someone who loves you would do. But her pain and sorrow is so imbedded and deep that she feels hopeless at times. But then, at times she remembers a greater purpose, that she wanted something to live on in Jeremy's memory. Theresa has opened up her own business, a restaurant and catering business called Jeremiah's. It's our family business that Theresa knows Jeremy would have loved to be a part of. He is the biggest part of it, because to Theresa, Jeremy is her inspiration, her friend and always her brother.

Now there will be no new memories to create with her brother, so she holds tight to the ones she has.

In regard to our youngest daughter, Valerie, who's now 20, she explains that the death of any kind is hard to go through. But when family informs you that your only brother was murdered in a small, quiet town, it's even more devastating.

At the time of the murder she was living in Dallas, Texas. She felt a responsibility and guilt of not being able to help her brother that night. She thought, "It should have been me" and "Why did he have to go?" and "Why couldn't I help him?" Being so far from home when it happened made her feel like her hands were tied behind her back.

When she arrived back in New Jersey she found that the crime had captured many people's attention. It was feeding time with the media, and all the parties involved with this were the bait. Our grieving was not personal. There's not a time she can remember during the two weeks she remained in New Jersey for her brother's funeral that a reporter or someone of the like wasn't calling or showing up at the doorstep wanting to know answers

that we didn't have. She can understand the media has the right to know and relay information back to the public, but what happened was a shock to our family. We didn't need the media to pour more salt into an open wound.

She can, however, recall three reporters that have covered this trial since the beginning of this never ending nightmare that have always been gracious enough to allow our family to grieve. They were the only ones that allowed us to grieve personally without sticking news cameras in our faces or writing down every little detail and recounting it back to us, asking us for a comment.

Valerie can remember a time while she was grocery shopping with me one evening, perhaps a month or so after the murders. A girl maybe no more than maybe 11 or 12 years old looked over at Valerie. She then said to her mother, "Mom, look. That's the girl whose brother was murdered. You know, the one delivering the pizzas." Valerie didn't know how to react to what the girl said, but it shocked her, and she had to leave the store before anyone else could see the tears just streaming down her face.

A year after losing Jeremy, Valerie's grandfather, my Dad, passed away. She tried to remain strong for the benefit of me and Joe when her brother died. But when her grandfather died she could not be strong any more. She overloaded herself with part-time work and 18 credit semesters at college to keep her mind off of losing her brother. When her grandfather passed away the same feelings returned as when Jeremy passed away, "I should have been there. Why can't I help him?" She could no longer be strong and started breaking down. First it was panic attacks, only she didn't know what one was, and it was devastating to her. Her body began to get more and more numb. Soon she could no longer feel her arms, legs or face. Her chest would tighten and she would cry, telling me she loved me and her Dad, and that she was going to die. The first panic attack lasted for close to an hour and a half. The ones that followed for the next five months were unbearable. She couldn't finish her semester at

school, and had to drop out. She was terrified to move an inch for fear she would die. She would look over her shoulders a hundred times a day to make sure someone wasn't after her, too. As she was getting closer to the age that Jeremy was when he died, she became scared that she, too, would die at 22.

When they were young adults Jeremy and Valerie would go out late at night to play pool or go bowling or gather up a group of friends and play basketball. As children they would build the tree forts and the bike ramps. Wherever Jeremy went, Valerie was sure to follow. There was hardly a time that he would jokingly say, "Why do you always have to follow me?" But as they grew up, they respected one another's decisions and their friendships. Jeremy was protector and mentor to his little sister. Looking at her in high school with the friends, and making sure that the siblings—excuse me—looking at her high school friends who got along badly with their siblings, she felt lucky to have been graced with his love, understanding and compassion. Jeremy would often see her in the hallways at school and yell to her, "Hey! What's up? How's it going? Isn't lunch nasty today? Do you need money for lunch?" Jeremy tried to guard Valerie from the bad crowd at school and wanted to protect his baby sister from trouble. He was always willing to help her out with any problems, be it financial or personal. He gave her advice, even when she didn't want it, and in the end it was always his advice that helped her get through the hard times.

In the weeks before Val moved to Dallas, Jeremy spoke with her about how great an opportunity it was for her to see a part of the country she had never been to. They grew closer with every passing day. And as they hugged and said their good-byes at a crowded New York—Newark Airport, she knew she's missed him—she would miss him a lot, but she didn't admit it to him. Now she wishes she did tell him how much she loved him and appreciated all he did for her.

Losing someone so close to you alters your life in many ways. That goes without saying. But adapting to live again after the loss of someone is what is hard to do. Not a day goes by for Valerie without waking up with a memory of Jeremy or driving down a road or being reminded of their innocent childhood years together. She clings to the memories of her brother, because they are the only things that no one can take away from her. Valerie lost a friendship and a bond with her brother that her—that are only memories now. She lost a sense of security and sense of herself when her brother died. He was her shield, her protector, and her hero.

Lastly, I'd like to tell you about the personal impact this crime has had on me. Jeremy was my middle child. The day he was born he cried in the delivery room and I looked over at him and said, "Jeremy, stop crying. Mommie is here with you." We knew before he was born that his name was to be Jeremy. My husband had a dream. He told me that we should name our baby Jeremy. Joe knew that we were going to have a boy, even without any tests.

From the start, Jeremy had a bond with Mommie and Daddy. Joe was happy to have a son, a boy, to pass on the family name, a son whom he could teach and raise to become a man.

Jeremy was 22 when his life was taken from him. It seemed the rough times of raising him were in the past. Jeremy was a kind and gentle spirit. And he would help people without prodding. That was my son. My husband and I raised all our children to be giving, helping and polite. Jeremy certainly lived those teachings. We were blessed with good teachers in schools— in our school systems that reinforced the standards that we had taught our children.

One time in fifth grade Jeremy came home in a huff complaining about his teacher. The usual complaint. "The teacher doesn't understand me. He's not fair. I want you to go down to that school and tell him off." We asked Jeremy about the problem.

He explained. "The teacher wants me to clean out my desk. If I don't, he's going to dump it out." We asked, "Well, Jeremy, what do you think we should do?" Jeremy responded, "Go down there and tell him he's wrong." The response we gave him wasn't what he expected. The reply was, "Jer, just go clean out the desk." The story ended with the desk getting turned over and Jeremy having to clean it up. He didn't get far with the "woe is me" routine.

As most young boys grow, they go through the stages of learning to be responsible for their own actions. This episode was only one of many learning experiences for Jer.

As he developed into manhood, our relationship changed. He was no longer the little boy who needed to be taught responsibilities. His life was one of sharing, of companionship, of being a friend, and good listener.

I saw Jeremy put into actions the lessons that he had been taught as he was growing up. Our son was a financial helper to our family. I needed a dishwasher, and Jeremy bought it. I needed a washer, and Jeremy went across the street to Western Auto and bought me a washer and made me a laundry room. He joked with me and said this was his insurance that he would have clean clothes.

When I needed money for groceries, he would give me money. When I needed money for gas to go to work, Jeremy wouldn't even think twice. His reply was, "Is 20 enough or do you need more?" He wasn't stingy with his money. The year before Jeremy died he shared his car with me so I could go to work.

There were times he went to New York State to visit his grandparents. He was concerned about them because of their age. He knew their time left on Earth was coming to a close, and wanted them to feel secure in knowing that they were loved. Little did he know that his time was short. Jeremy had a lot of love to give, and he gave it freely. He visited his grandparents at

least five times a year out of respect and love. I remember his visiting his uncles and aunts.

We had many conversations about God and the Bible. Jeremy's favorite book was Revelations. He was very interested in the seven seals and the future Christ holds for all. I remember a day in May of 1995 when he gave himself to Christ. After this I saw the changes in him. He became even more understanding of his family, and he attended church when he could. I remember waking him up for church many Sundays. He loved to challenge me about Bible verses. Jeremy always showed the fruit of the spirit with his giving smile and love. He showed his Christianity by his good deeds.

One of the most precious reminders of Jeremy's faith is the poem he wrote entitled "The Gift." I found this poem ten days after the murders in one of Jeremy's little testimony books. The book had fallen out on the floor of his Nova, and I picked it up and put it in my purse. On April 29th my oldest daughter and I were at the site of the killings. A man from the media was asking us questions. He wanted to know about Jeremy. I remembered the little book. I gave it to the man, and he found the poem "The Gift." That was the first time I knew the poem was there. I remember feeling very close to my son and was so thankful for the poem. All that has come—all of this has come to an abrupt end. No more poems. No more sharing.

Jeremy's faith and salvation has had the greatest impact on all of us because we know he is resting in heaven. We know his soul is safe with God and that when we leave this world we will all be together.

The last service we attended together was Easter morning at the First Baptist Church of Sussex, where Jeremy attended and belonged. He grew up in that church and attended Sunday school there. Many good memories come to mind. He and Valerie were in Christmas plays together. He especially liked the Jesus birthday cake at the end of the service. And Jeremy knew the art of

forgiveness and repentance; and he was a very good witness to me.

So, as for myself, I've lost a son, a friend, someone that encouraged me, my church-going child, my helper, my buddy. My husband lost a business. I was out of work for five months and couldn't get myself together. I've had to endure the bad snow-storms without Jeremy shoveling the snow and helping with the spring clean-up. The company I work for requested that I use all my vacation, personal and sick time for this trial. I can't even begin to express to you the personal pain that each one of us has endured and are still enduring. Words cannot easily express the deep hurt our souls have suffered from this crime.

How this trial has changed my life and impacted me I think is best described by a poem I wrote.

As time passes by and you're not here
The days are long and the nights too much to bear
I think most of those loving times, your great big smiles and your silly rhymes
Oh how I wish you were here for a while
I miss your hug and joking ways
And I wish you were here to stay
I know God's love is holding you tight
I know God holds us in his sight.
So as time passes by and by I know you hear my awful sigh.
Remember always that I care
And Mommy and all of us love you, oh, my Jer.

I just want to thank you all for listening to me.

ZAZZALI, J., concurring.

I concur in the majority's thoughtful opinion, which concludes that three errors committed during the penalty phase warrant reversal of the death penalty imposed on Thomas Koskovich. Those errors involved instructions to the jury that were identified in a record containing hundreds, if not thousands, of correct decisions by the trial court. Although we cannot expect a trial court to nuance a charge to perfection, those errors require reversal. The decision so to do is a close one. I believe that the presence of other circumstances reinforces and validates the deci-

sion to reverse. We must continue to be acutely sensitive to the possibility of prejudicial error in capital cases.

I write separately to focus attention on other factors that I believe present serious constitutional concerns with respect to the imposition of the death penalty in this and in similar cases. In my view, defendant's young age, viewed in the context of his stunted emotional development, his traumatic childhood, and his condition at the time of the crime, raises the question whether the death penalty, as applied to him, is cruel and unusual punishment in violation of Article I, paragraph 12 of the New Jersey Constitution.

I

The Court today re-affirms its holding in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), that the New Jersey death penalty statute, *N.J.S.A.* 2C:11–3, is facially constitutional under Article I, paragraph 12 of the New Jersey Constitution. *Ante* at 541, 776 *A.*2d at 204. Although I agree that the death penalty statute is constitutional, I believe that the statute may be unconstitutional as applied to Koskovich.

In *Ramseur,* the Court held that three questions must be asked to determine whether a given punishment is cruel and unusual under Article I, paragraph 12 of the New Jersey Constitution: "does the punishment for the crime conform with contemporary standards of decency;" "is the punishment grossly disproportionate to the offense;" and "does the punishment go beyond what is necessary to accomplish any legitimate penological objective." *Ramseur, supra,* 106 *N.J.* at 169, 524 *A.*2d 188. Concerning the second factor, the crime committed by Thomas Koskovich was, as our Legislature has decided, one for which the death penalty is not undeserved. The punishment is not grossly disproportionate to the offense. Thus, I focus only on the first and third inquiries.

To answer the question of whether sentencing Thomas Koskovich to death conforms with contemporary standards of decency, we must look to objective indicators of those standards, in particu-

lar, to acts of the Legislature. *Id.* at 172, 524 *A.*2d 188 (noting that legislative enactments provide for one of "the strongest indicators" of contemporary notions of decency); *Penry v. Lynaugh,* 492 *U.S.* 302, 335, 109 *S.Ct.* 2934, 2955, 106 *L.Ed.*2d 256, 289 (1989) (commenting that legislation provides "an objective indicator of contemporary values upon which [a court] can rely"). The Legislature has placed an absolute prohibition on the execution of juveniles. *N.J.S.A.* 2C:11–3g. Although the Legislature's exclusion of juveniles from the death penalty can be considered objective evidence that society does not condone that practice, the inverse conclusion—that the execution of those eighteen and over is always acceptable—does not necessarily follow. For what we find offensive about the execution of minors is not merely that they are "young," chronologically-speaking, but also that they tend to be immature. This Court has explained that "[i]n determining a defendant's 'relative' youth, a jury must look beyond chronological age to considerations of defendant's overall maturity." *State v. Bey,* 129 *N.J.* 557, 612, 610 *A.*2d 814 (1992). Similarly, as Justice Brennan has observed:

> Insofar as age 18 is a necessarily arbitrary social choice as a point at which to acknowledge a person's maturity and responsibility, given the different developmental rates of individuals, it is in fact "a conservative estimate of the dividing line between adolescence and adulthood. Many of the psychological and emotional changes that an adolescent experiences in maturing do not actually occur until the early 20s."
>
> [*Stanford v. Kentucky,* 492 *U.S.* 361, 396, 109 *S.Ct.* 2969, 2989, 106 *L.Ed.*2d 306, 335 (1989) (Brennan, J., dissenting) (citation omitted).]

By prohibiting the execution of juveniles, the Legislature has expressed a generalization regarding the maturity of those eighteen and over. That in no way rules out the possibility that exceptions to the general rule exist. Just as there are certain to be seventeen-year-olds who are as mature as the average adult, there are undoubtedly eighteen-year-olds who are less mature. The Legislature has acknowledged such exceptions by shifting the responsibility to the criminal justice system to review each defendant as an individual. Pursuant to *N.J.S.A.* 2C:11–3c(5)(c), age of the offender may be considered as a mitigating factor in a murder

trial even when a defendant is not automatically precluded from receiving the death penalty due to his or her youth. Even when the jury rejects the c(5)(c) mitigating factor, this Court has held that a defendant's age may still play a role in the jury's evaluation of the c(5)(h) (catch-all) mitigating factor. *State v. Bey*, 137 *N.J.* 334, 360, 645 *A.*2d 685 (1994), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

I therefore infer from the actions of the Legislature that the citizens of New Jersey do not condone the execution of those who lack the maturity of adults. Against that backdrop, and in view of the circumstances described below, I believe that the execution of Thomas Koskovich may be contrary to contemporary standards of decency.

Concerning the third question, I believe that the death sentence in this case would go beyond what is necessary to accomplish a legitimate penological objective. Any retributive value to be gained from an execution is surely reduced where the offender lacks sufficient maturity to be considered fully culpable. *See Thompson v. Oklahoma*, 487 *U.S.* 815, 836–37, 108 *S.Ct.* 2687, 2699–2700, 101 *L.Ed.*2d 702, 719–20 (1988). Although I am of the view that the death penalty has a deterrent effect in some circumstances, I doubt seriously that imposition of the death penalty in this case would deter other such hopeless individuals. I also fail to see the deterrent value in executing an individual who is likely to retain the impulsiveness and feelings of invulnerability generally associated with childhood and adolescence. *Stanford, supra*, 492 *U.S.* at 404–05, 109 *S.Ct.* at 2993–94, 106 *L.Ed.*2d at 340–41 (Brennan, J., dissenting).

## II.

Having committed his offense at the age of eighteen, Koskovich is one of the youngest defendants in the universe of death-eligible cases. Moreover, his emotional development burdens him even further. One therapist described Koskovich as "a young boy whose emotional, psycho-social development is arrested at about

age eleven." He was raised in an environment that taught him to be inwardly focused, emotionally distant, distrustful of authority, and to value illegal conduct. Neglected and unloved by both his parents and grandparents, Koskovich was left to learn morality from violent song lyrics and gun magazines.

In contrast to so many cases we consider in which the motive is money, revenge, or hatred, Koskovich appears to have killed without any meaningful understanding of why he did what he did. His statements to the police indicate that he lacked a mature understanding of the consequences of his actions and the pain he caused the victims' families. His actions and thought processes, although horrific, were juvenile in nature. He was an exceedingly immature, eighteen-year-old high school student who lived at home, if it can be called that, when he committed acts of psychotic desperation.

Any reasonable observer would conclude, based on the evidence, that defendant's family created or contributed to most of his problems. The majority notes defense testimony to the effect that the Koskovich family "was plagued by domestic violence, infidelity, substance abuse, gambling, criminal behavior, and suicide attempts." *Ante* at 474–475, 776 *A.*2d at 159. Further, his family subjected him to extensive emotional neglect and abuse. *Ibid.*

Koskovich was raised primarily by his paternal grandmother, Bertha Lippincott, who abused alcohol and prescription drugs, gambled often, and tried to commit suicide. As a result of her drinking and drug abuse, she failed to supervise or at times even feed her children, and, later, her grandchildren for whom she was responsible. Koskovich's maternal grandmother, Nancy, suffered from severe depression and after several attempts, ultimately committed suicide. After Nancy died, his maternal grandfather, Jim, became a heavy drinker. He later met Bertha at a bar and the two soon married. They lived together with each of their children in the house where Koskovich would later live. Koskovich's parents, who were the son of Bertha and daughter of Jim, lived together as step-siblings. Koskovich's parents became in-

volved in a sexual relationship and eventually married. To sum up this domestic imbroglio, Thomas was the third son born of a union of step-siblings.

After his birth, the household was, at best, chaotic. The police made regular visits to arrest family members or search for stolen goods. Koskovich's grandparents could often be found drunk and fighting. The family had little money because of Bertha's gambling problem and the house was filthy and overcrowded with people and neglected pets. Koskovich's Uncle Lenny and Aunt Dolly also lived in the house with Dolly's children. Aunt Dolly was an emotionally disturbed substance abuser who tried to commit suicide many times. Uncle Lenny had a history of juvenile delinquency, abused drugs and alcohol, physically abused family members, was emotionally disturbed, and tried to commit suicide more than once when he was a teenager. Lenny is a self-described "menace to society" who has been incarcerated most of his life. The family often compared defendant to Uncle Lenny and, no doubt because of this comparison, young Thomas Koskovich viewed his uncle as his role model. That perception was an augury of future tragedy.

When Koskovich was nine, his parents ended what had been an abusive and non-monogamous marriage. They both deserted Koskovich. His father began a new life on the west coast, rarely to see Koskovich again. When his father left, he told Koskovich that, of the father's three sons, he loved Koskovich the least, a statement that can destabilize relationships and destroy lives when made by any father to any son at any age. Similarly, his mother treated Koskovich as the worst of the children, leaving him behind after taking his younger brother to live with her new family. No family member ensured that Koskovich had enough to eat or had clean clothes to wear. Koskovich, once a good student and kind child, lost interest in school and began to live in an imaginary world. He heard voices and attributed human feelings to inanimate objects, like pencils and toys, for emotional stimuli. Those

behaviors and his sharp academic decline went unnoticed by his indifferent family.

His family also failed to notice his gradual foray into the world of drugs. Koskovich began smoking cigarettes at age eight and at age twelve or thirteen began drinking beer, which was provided by his aunt and uncle. At the same time he also began using marijuana and LSD, and three years later he added hard alcohol to the mix. By the time he was only eighteen, he was abusing his grandmother's prescription opioids and barbiturates such as Darvon, Percodan, Percocet, Fiorinal, and Fioricet. He told doctors that he took pills before and after school in a binge pattern characterized by heavy use for several days in a row. One expert at trial opined that Koskovich was likely under the influence of the Fioricets at the time of offense.

Undoubtedly, however, the nadir of Koskovich's family life was when his mother refused to sign releases for records which would help with the mitigation defense. The indifference of defendant's mother became palpable when she failed to testify at his trial, even for the limited purpose of asking the jury to spare her son's life.[1] Only Koskovich's father and a cousin gave cursory testimony, leaving the overall impression that nobody ever cared about defendant. Indeed, Koskovich's grandmother, Bertha, his sole "maternal figure" his entire life, according to the Office of the County Prosecutor, cooperated with the *Prosecutor* before the

---

[1] Although Koskovich's mother did not speak out on his behalf, the victim's mother did, an act both ironic and irenic. Loretta Giordano, the mother of Jeremy Giordano, testified in the presence of the jury that she and her family were opposed to the death penalty. More to the point, Mrs. Giordano made a prayerful statement in which she suggested that the jury consider sparing the life of the boy who killed her son. The majority concludes that in the future such statements should not be allowed because *State v. Muhammad*, 145 *N.J.* 23, 678 *A.*2d 164 (1996), prohibits victim-impact testimony directed at the penalty to be imposed, regardless of whether the testimony is in support of or in opposition to the death penalty. I agree with that conclusion. However, *Muhammad* does not still my consideration of Mrs. Giordano's extraordinary gesture, when contrasted with the defendant's mother's abject refusal to help her son. It was the only grace note in a sad and sordid matter.

penalty phase. She did so, as the majority notes, "because she was concerned about her reputation and did not want to be blamed for the murders." *Ante* at 476, 776 *A.2d* at 160. Apparently her desire not to be cast in a negative light eclipsed any concern that her grandson could be sentenced to death.

Defendant's background is similar to, or perhaps even less mitigating than, that of many of those defendants sentenced to the death penalty. Thus, those circumstances alone carry only supporting weight. However, in conjunction with, and primarily because of, both defendant's chronological and non-chronological age, that background becomes highly relevant to the propriety of defendant's sentence.

In any event, I do not present those facts to excuse or minimize the crimes of defendant. As the trial judge said, his conduct suggests "a deep capacity for doing evil and for doing unbelievably dangerous and bad things to other people and it calls for a strong sentence." Yet, the trial judge also noted that there is "a sense of loss and sorrow with respect to Thomas Koskovich" and that "there's much that one can sympathize with in Mr. Koskovich's life." The court limned this complex portrait:

He has had a difficult background. He hasn't had the kind of stability that we would want all of our fellow human beings to have.

He hasn't had the nurturing, loving raising that we would like everyone to have.

And he does have, I think, a lot of emotional and psychological burdens that have weighed heavily upon him and which in part explain why he acted in the way in which he did.

And one can, in observing Mr. Koskovich, see some good things and see that perhaps this is a young man in different circumstances who would have had a very different result and would not have been tempted to act in the way in which he did act.

So I must say I feel terribly sorry for Thomas Koskovich and I ... sort of maybe wish I had met him under different circumstances then years before or even earlier and something might have been done to steer him along a more constructive path.

At heart, and at the least, Koskovich was a sad, disturbed, immature boy involved in a scheme with consequences perhaps beyond his mental grasp. At worst, he was, as the trial judge observed, "a basket case." In either case, for all of the above

reasons, Article I, paragraph 12 of the Constitution would, in my view, forbid his execution.[2]

## III.

Because the Court today vacates Koskovich's sentence and remands for a new sentencing proceeding, it is unnecessary to resolve the question whether executing him would violate Article I, paragraph 12 of the Constitution. Should he receive another death sentence, or should a case with a similar set of facts come before this Court in the future, the concerns that I have raised should be considered. By not doing so, we would do worse than abdicate our responsibility. We would risk executing someone incapable of understanding the magnitude and consequences of the crimes he committed. One is able to comprehend why such a boy should be locked away from society for life. It is more difficult to understand why he should be given a lethal injection.

Syllogisms cannot resolve death penalty matters. As much as we search for a calculus to make those determinations, at the end of the day, after a review of all of the facts and law, it is sometimes best to simply invoke intuition, fundamental fairness, and classic principles of discernment to make a holistic judgment about whether the death penalty ought to be imposed. This is one such case.

All of the above facts and factors, collectively considered, create an abiding sense that the imposition of the death penalty on

---

[2] That conclusion is reinforced by the fact that Jayson Vreeland, Koskovich's co-defendant and his junior by a scant sixteen months, was not eligible for the death penalty due to his age. I believe that the fact that Koskovich was eighteen at the time of the crime and so can be executed, while Vreeland was seventeen and so cannot be executed, when both participated in the double killing, raises a unique concern about intra-case proportionality. That kind of arbitrary distinction between two equally culpable participants is antithetical to this Court's promise to "treat like cases alike." *State v. Marshall*, 130 *N.J.* 109, 220, 613 A.2d 1059 (1992) (quoting H.L.A. Hart, *The Concept of Law* 155 (1961)).

Thomas Koskovich would constitute cruel and unusual punishment.

Justice LONG joins in this opinion.

STEIN, J., concurring in part and dissenting in part.

I join in all but one aspect of the Court's comprehensive and well-reasoned opinion. I dissent in part because in my view the victim impact statement submitted by Loretta Giordano, the victim's mother, goes beyond the limitations we set forth in *State v. Muhammad*, 145 *N.J.* 23, 35–59, 678 *A.*2d 164 (1996).

In *Muhammad*, we upheld the constitutionality of *N.J.S.A.* 2C:11–3(c)(6), the "victim impact statute," which allows the prosecution to rebut character evidence offered by the defense with "evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors." In doing so, however, we placed critical limits on the use of that evidence, in order to "effectively harmonize[ ] the victim's constitutional right to have victim impact evidence introduced with the defendant's due process rights." *Id.* at 44, 678 *A.*2d 164. We noted that victim impact statements

> should be limited to statements designed to show the impact of the crime on the victim's family and to statements that demonstrate that the victim was not a faceless stranger, but was a unique individual human being.... [S]tatements that are grossly inflammatory, unduly prejudicial, or extremely likely to divert the jury from its focus on the aggravating and mitigating factors should be excluded.
>
> [*Id.* at 48, 678 *A.*2d 164.]

The parameters set forth in *Muhammad* are critical to its holding. The crossing of those boundaries imply concerns of constitutional magnitude. I believe that Mrs. Giordano's statement exceeded in several respects the limitations imposed by the Court in *Muhammad*, and in doing so deprived Koskovich of his constitutional right to a fair trial.

On the second page of her statement, Mrs. Giordano states that her husband's job status was affected by the death of the victim, and indicates that "[n]ow, instead of traveling only a few miles

down the road, [her husband] has a long drive five days a week. . . . He runs the risk of accidents while traveling in major highways like Rt. 80." We emphasized in *Muhammad* that the admission of victim impact evidence "requires a balancing of the probative value of the proffered evidence against the risk that its admission may pose the danger of undue prejudice or confusion to the jury." *Muhammad, supra,* 145 *N.J.* at 48, 678 *A.*2d 164. The link between the potential of the victim's father suffering a car accident on U.S. Interstate 80 and the victim's murder is extremely attenuated. Suggesting that the defendant will bear the responsibility for future harms that may befall the victim's family is, in my view, the sort of speculation that lies well beyond the appropriate boundaries of victim impact statements.

On page six of her statement, Mrs. Giordano states that the day the victim was born, "he cried in the delivery room and I looked over to him and said, 'Jeremy, stop crying. Mommy is here with you.'" The emotional impact of that statement needs no elaboration, but it is precisely that impact that is cause for concern. Because I discern no purpose for that statement other than to appeal to the emotions of the jury, I find the statements respecting the birth of the victim to be unduly prejudicial and of little probative value in assisting the jury in its deliberations.

For substantially the same reasons, I believe it was error for the trial court to permit Mrs. Giordano to read a poem to the jury. The poem, which is quoted in its entirety by the majority, ante at 500, 776 *A.*2d at 176, does not offer any evidence to the jury that is not provided elsewhere in the statement. Mrs. Giordano's poem does not, in my judgment, serve the purpose of demonstrating "the impact of the crime on the victim's family" or that the victim "was a unique human being." *Muhammad, supra,* 145 *N.J.* at 48, 678 *A.*2d 164. Its inclusion in the victim impact statement was primarily for its emotional effect, and in my view it should have been excluded.

I dissented in *Muhammad* and I continue to believe that *N.J.S.A.* 2C:11–3(c)(6) is unconstitutional. *See Muhammad, su-*

*pra,* 145 *N.J.* at 106–12, 678 *A.*2d 164 (Stein, J., dissenting). The majority in *Muhammad* was cognizant of the concerns expressed by myself, by Chief Justice Wilentz, and by Justices O'Hern and Handler in their separate opinions in that case, and it responded to those concerns by striking a careful balance between the rights of victims and the protections afforded to defendants under the United States and New Jersey Constitutions. That balance is upset when victim impact statements are permitted to contain poetry and other comments intended to appeal primarily to the jury's emotions.

I join Justice Verniero's majority opinion in all other respects.

COLEMAN, J., concurring and dissenting.

I concur in the Court's holding in all respects except for the three reasons stated by the Court for vacating the death sentence. I concur in the opinion of Justice LaVecchia finding no reversible error related to the victim-impact testimony or the trial court's statement to the jury regarding the potential sentences it would impose on the non-capital convictions. I write separately to express the reasons why I believe the decision to vacate the death sentence because of alleged improper or inadequate jury instructions concerning the use of a rejected aggravating factor is misguided. I also disagree with the Court's response to the Public Defender's assertion that the jury should have been instructed to disregard evidence admitted to support a rejected aggravating factor.

I.

In order to determine whether the trial court's instructions were adequate, it is necessary to briefly examine the facts. This case involves a planned robbery and premeditated murder of a pizza delivery person by defendant and Jayson Vreeland. Defendant armed himself with a stolen .45 caliber semi-automatic pistol and gave Vreeland a stolen .22 caliber revolver. The day before the murders, defendant told a friend that he was planning to kill a

pizza delivery man. Defendant called Tony's Pizza and requested that two pizzas be delivered to an abandoned house in a remote location, knowing that Jeremy Giordano, an acquaintance of Vreeland, would likely be the delivery person. Defendant and Vreeland then loaded their guns and waited for the delivery. Because of the remoteness of the delivery location, two people were sent to make the delivery. Giordano drove his vehicle while Giorgio Gallara rode as a passenger to deliver the pizzas. As Giordano approached the abandoned house, Gallara rolled down the passenger's window and asked defendant for $16.50 to pay for the pizzas. Defendant and Vreeland responded by firing their weapons at Giordano and Gallara. When the vehicle stopped after rolling a short distance following the shooting, defendant pulled Gallara and Giordano from the vehicle. Defendant and Vreeland searched both of the victims and the vehicle for money. As defendant and Vreeland were preparing to leave the area, defendant exclaimed, "I can't believe we did this. I can't believe we did this." Vreeland responded, "I love you man," and they hugged.

Autopsy evidence revealed that Giordano was shot twice in the right side of his neck with defendant's .45 caliber gun, causing death almost instantaneously. He was also shot twice in the left knee. Gallara was shot in the back of the head with Vreeland's .22 caliber gun.

Defendant was convicted for the knowing and purposeful capital murder of Giordano by his own conduct. At the penalty phase, the State submitted two aggravating factors: that the murder of Giordano was outrageously or wantonly vile, horrible, or inhumane in that it involved depravity of mind, *N.J.S.A.* 2C:11–3c(4)(c) (depravity); and that the murder of Giordano was committed while defendant was engaged in the commission of robbery or the murder of Giorgio Gallara, *N.J.S.A.* 2C:11–3c(4)(g) (felony murder). The jury unanimously found that the murder of Giordano was committed during the commission of a robbery and Gallara's murder, thus satisfying the c(4)(g) felony-murder aggravating factor. Eleven jurors found the depravity aggravating factor and

one rejected it; hence, it was not established. Consequently, the jury was restricted to balancing the felony-murder aggravating factor against the established mitigating factors.

## II.

Defendant contends that it was plain error for the trial court to fail to instruct the jury that if it did not unanimously find the depravity-of-mind aggravating factor, it could not thereafter consider that rejected factor or the evidence supporting that aggravating factor during its balancing of the remaining felony-murder aggravating factor against the mitigating factors. In Part III.D. of its opinion, the majority analyzes the trial court's instructions to the jury on the aggravating and mitigating factors and the balancing process. The majority concludes "that the instruction in this case failed to adequately inform the jury that once the depravity-of-mind aggravating factor was rejected, none of the individual jurors could consider that factor when weighing the felony-murder aggravating factor against the mitigating factors." *Ante* at 526, 776 *A*.2d at 192.

## A.

As noted earlier, the jury unanimously found the felony-murder aggravating factor, but it rejected the depravity-of-mind aggravating factor. The majority concludes that the trial court's failure to instruct the jury not to consider the rejected depravity-of-mind aggravating factor when weighing the accepted felony-murder aggravating factor against the mitigating factors was plain error.

When the jury was instructed at the end of the penalty phase, the trial court had no way of knowing how the jury would ultimately rule on the aggravating factors. The case was tried on the theory that defendant premeditated a robbery and murder of a pizza delivery person. Defendant called Tony's Pizza after other

randomly called pizza businesses refused to send a delivery person to the remote location.

The jury was instructed that the death penalty cannot be imposed unless aggravating factors are first proven, beyond a reasonable doubt, to the satisfaction of all of the jurors, and unless, in the ultimate analysis, the jury finds, beyond a reasonable doubt, that any aggravating factor or factors proven outweighs all of the mitigating factors found to exist in the case.

. . . .

Now, aggravating factors are tightly controlled as to what can be an aggravating factor. There's a rather short statutory list of aggravating factors. And the state, in this case, has alleged that two of them are present. So those two aggravating factors, which we'll discuss in some detail, are the only two which can be considered in this penalty phase. The jury can't think of other aggravating factors that it believes might be appropriate. You can't do that. You're limited to the two which the state has claimed exist. So you have to focus, when you get to aggravating factors, on whether either or both of them, aggravating factors, exist.

The trial court instructed the jury that aggravating "factors have to do with the circumstances of the crime. [The] most complicated part of [the jury's] task probably will be to evaluate [the aggravating and mitigating factors] ... to make a unique, individualized judgment about the appropriateness of either the death penalty or imprisonment for this defendant." The jury was instructed that in New Jersey, "the imposition of the death penalty is rare.... [After the State has proven a capital murder by the defendant], the State has to [establish beyond a reasonable doubt] that there is one of a limited number of aggravating factors." The trial court also instructed the jury that

you are ... to consider [in the penalty phase] all of the evidence in the case, ... to take a fresh look at all the evidence ... related to ... defendant murdering Jeremy Giordano.... [Y]ou should take a fresh look at the evidence in the context of seeing [whether] it establishes the existence of an aggravating factor ... or a mitigating factor.

The trial court further instructed the jury that the State relied almost exclusively on the guilt-phase evidence to prove the aggravating factors while defendant presented a substantial amount of evidence in the penalty phase concerning mitigating evidence which the jury was to consider.

The jury also was given a verdict sheet, which first asked: "Does the murder of Jeremy Giordano involve depravity of mind

on the part of Thomas Koskovich in that it was random, entirely pointless and senseless." In defining the meaning of the depravity alleged in this case, the judge explained:

Now, the depravity of mind alleged here is that these victims were not victims because either of them had done anything in any way to the defendant, or because they interacted with them in any way which might have, in some sense, triggered or provoked an attack upon them. One of the claims is that the-the victims were purely random victims.

Now, the evidence in this case indicates that there's a certain sense in which they were not random. There was—there was a kind of methodology to—to trying to have someone show up at the Scott Road house, where the murders took place, but there was a randomness as to, the state alleges, and the evidence can support that finding, depending upon how you analyze it, there may have been a randomness in the sense that the identity of the victims really didn't matter. It turns out, incidentally, that Mr. Giordano was known to Jason Vreeland, and there was some effort made not to have him be the first one to show up, because he was known. But under the State's analysis, and you have to see whether you agree with it or not, under the state's analysis and claim the—the killing of Jeremy Giordano was random in a sense that he simply happened to be the person who showed up there, and it could have been Suzy Brown or Joe Smith; that it was simply a randomness of personality. And the legal point of that is that that, in a sense, might make it worse because it—it—it makes it just—just so out of—out of even the normal character of people who commit murders. So there's that element of randomness that might be present. And you have to see whether you agree it is.

Then it's also urged that it's entirely pointless; that there's no real reason for having murdered Jeremy Giordano; that it was literally entirely pointless; and it was senseless. The same idea. Just didn't make any sense, didn't have any point to it.

Now, if you find that the murder was random, entirely pointless and senseless, if you find that unanimously, beyond a reasonable doubt, then you should—you should say that this aggravating factor is present.

I want to point out that one of the things you have to consider in this case is whether this might not have been something that basically was meant to be a robbery, and then turned out to be something else in a way in which the defendant did not calculate that it was. You have to make a fine distinction, I think, and look carefully at the evidence in the case. If someone started out to do a robbery, and something goes wrong in the course of the robbery where, as I indicated earlier, meets with resistance, where someone tries to run away or the victim counterattacks, something like that, and the situation escalates, and there's a murder that results, that—that would not be a random, pointless, senseless murder as required by this aggravating factor.

On the other hand, the fact that robbery may have been a motive in inviting the victims to the Scott Road site does not necessarily mean that this may not have been a random, entirely senseless and pointless murder. And there—and the

reason is this. Forget this case for a moment. Just put this aside and go to a hypothetical case.

If somebody's way of committing a robbery is simply to start out by shooting someone, without asking him for his money or asking him for his car, or asking him for his jewelry, whatever you want to get from him, if your—if a defendant's way to rob somebody is to shoot them first, without warning, and then take the property from—from the—the dead victim, that's a robbery. But—but that's not the usual robbery. That's, in a sense, a robbery preceded by a murder. So even though there—there was a—a motive to commit robbery in that case, the fact that a murder was built in at the start of the robbery could make it not a robbery in terms of this aggravating factor, but could, indeed, make it a random, entirely pointless and senseless killing. So you have to take—shifting to our case—you have to look carefully at what occurred, and how it occurred, and why it occurred to decide whether or not this aggravating factor is present.

The trial court then informed the jury that the second aggravating factor was felony murder. The verdict sheet also inquired: "[D]oes the jury unanimously find beyond a reasonable doubt that the murder of Jeremy Giordano was committed while the defendant was engaged in the commission of (a) the murder of Giorgio Gallara, or (b) the robbery of Giorgio Gallara or Jeremy Giordano."

After the court concluded its discussion of the two aggravating factors and the fourteen specified mitigating factors plus the catchall mitigating factors, the court discussed how the balancing process was to be conducted. In doing so, the court referred to the verdict sheet that included questions to be answered based on the balancing process. The court informed the jury that it could weigh only the aggravating factor or factors found by it against mitigating factors found to exist. That concept was reinforced by the verdict sheet, which asked: "Does the jury unanimously find, beyond a reasonable doubt, that any aggravating factor or factors proven to exist outweigh the mitigating factor or factors?" The clear implication of the charge, when viewed as a whole, is that the jury could not consider an aggravating factor for any purpose unless it first unanimously agreed that that aggravating factor had been proven beyond a reasonable doubt. The jury was expressly informed that a vote of eleven to one meant a rejection of that aggravating factor, which could not then be considered for any purpose.

Depravity as an aggravating factor focuses on the defendant's state of mind, not the victim's mental or physical pain suffered. *State v. Erazo*, 126 *N.J.* 112, 137, 594 *A.*2d 232 (1991); *State v. Bey*, 112 *N.J.* 123, 173, 548 *A.*2d 887 (1988), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). *State v. Ramseur*, 106 *N.J.* 123, 207–08, 524 *A.*2d 188 (1987), *cert. denied*, 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993). It distinguishes those who murder for a purpose from those who murder for no purpose. *Ramseur, supra*, 106 *N.J.* at 209, 524 *A.*2d 188. In the present case, the depravity was based on the allegation that the murder served no purpose for defendant beyond the pleasure of killing. *See id.* at 211, 524 *A.*2d 188. Depravity is frequently viewed as one of the emotions associated with murder. *State v. Cooper*, 151 *N.J.* 326, 383, 700 *A.*2d 306 (1997), *cert. denied*, 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000); *Ramseur, supra*, 106 *N.J.* at 211, 524 *A.*2d 188. Here, as in *Cooper*, the jury most likely rejected depravity as an aggravating factor because it found another motive for the murder, namely robbery. Indeed, the trial court instructed the jury that this could have been a planned robbery in which the murder would precede the robbery and then property would be taken from the victim's body.

Unlike the majority, I find that the trial court properly informed the jury that if it rejected one of the two proposed aggravating factors, the jury could not consider that rejected aggravating factor for any purpose. The jury was instructed that among the two aggravating factors involved, a single vote of "no" on either meant a rejection of that factor. The court further informed the jury that if either or both of the aggravating factors were found to exist beyond a reasonable doubt, the jury had to then engage in the process of weighing the aggravating and mitigating factors.

In arriving at the conclusion that the jury was instructed properly, I have examined the jury instructions in accordance with the settled legal principle that the charge must be viewed as a whole rather than as isolated parts. *State v. Loftin*, 146 *N.J.* 295,

374, 680 *A.*2d 677 (1996); *State v. Martini,* 131 *N.J.* 176, 304, 619 *A.*2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). Thus, under the plain error standard, defendant has not demonstrated that the jury instructions were clearly erroneous and caused the jury to reach a verdict it otherwise would not have reached. *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997). In addition, the evidence that established the felony-murder aggravating factor was overwhelming and that alone precludes the alleged plain error from rising to the level of reversible error.

Contrary to this Court's decisions in other death penalty cases, the majority is willing to speculate that despite the trial court's instruction to the jury to weigh only unanimously agreed-upon aggravating factors, some jurors might have considered the rejected depravity aggravating factor when weighing the aggravating against the mitigating factors. In *State v. DiFrisco,* 137 *N.J.* 434, 502, 645 *A.*2d 734 (1994), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996), the Court held that even if "submission of [the escape-detection] aggravating factor ... was in error, the error would have been harmless because the jury did not find [that] aggravating factor ... unanimously."

Even more compelling are the Court's observations in *State v. Rose,* 112 *N.J.* 454, 548 *A.*2d 1058 (1988). There, the State relied on the depravity-of-mind factor as one of the three aggravating factors submitted to the jury. *Id.* at 474–75, 548 *A.*2d 1058. Although the jury rejected the depravity-of-mind factor, the defendant argued that it should not have been submitted to the jury and that he had been prejudiced by its inclusion. *Id.* at 529, 548 *A.*2d 1058. We agreed with the defendant that there was insufficient evidence to submit the depravity factor to the jury, but we rejected the contention that its inclusion had prejudiced the defendant. *Id.* at 531–533, 548 *A.*2d 1058. In rejecting that contention the Court stated:

> [T]he jury's function in the penalty phase of a capital case is first to assess, independently of each other, the sufficiency of proof of the aggravating and mitigating factors. Its rejection of one such [aggravating] factor neither compels

nor inhibits its determination that another [aggravating] factor exists. · We also note on this record that there was overwhelming proof of the existence of aggravating factors c(4)(f) and c(4)(h). Hence, it would be highly speculative to conclude that the erroneous submission to the jury of aggravating factor c(4)(c), a factor rejected by the jury, prejudicially affected this jury's deliberations concerning the remaining aggravating factors, the mitigating factors, and its weighing process.

[*Id.* at 533, 548 *A.*2d 1058.]

The same is true in the present case. Even if the jury should have been given an additional instruction in anticipation of the chance that it would reject one of the aggravating factors, the jury was clearly informed that it independently had to assess the remaining aggravating factor it found to have been established. The jury's rejection of the depravity aggravating factor did not affect its weighing of the felony-murder aggravating factor against the mitigating factors. Hence, I reject the Court's speculation that one or more jurors mistakenly may have relied on the rejected depravity factor in concluding that the aggravating factor outweighed the mitigating factors.

## B.

Defendant also argues as plain error that "insufficient instructions were given to the jurors to inform them that if they did not unanimously find depravity they should *not* use the evidence supporting the depravity factor against the defendant when it came time to balance aggravating factors and determine the appropriate sentence. . . . [A] jury must . . . be instructed to strike that evidence from its deliberations if the factor is not found unanimously." The Court provides the following response: "We disagree. The evidence related to the depravity-of-mind factor was broadly relevant to the felony-murder factor and, therefore, the jury did not need to concern itself with any limitations on the use of that evidence." *Ante* at 526, 776 *A.*2d at 194.

Although the majority holds that there was no error associated with the trial court's failure to instruct the jury to disregard evidence probative of a rejected aggravating factor, it does so without providing any analysis of this issue of first impression in

this Court. I write separately to explain why I believe the novel issue raised by the Public Defender should be rejected.

In this and most capital trials in which a prior murder is not an aggravating factor, the guilt-phase jury also comprises the penalty-phase jury. In most of those cases, the penalty-phase jury is instructed that the State relies on the guilt-phase evidence to establish the aggravating factors in the penalty phase. Generally, the guilt-phase jury hears evidence presented to establish the elements of the capital murder as well as evidence submitted to prove other crimes associated with the capital murder. Here, defendant was tried for burglary of Adventure Sport, Inc.; theft of weapons from that sporting goods store; conspiracy with Vreeland to commit murder, robbery and burglary; purposeful and knowing murder of Jeremy Giordano by his own conduct; purposeful and knowing murder of Giorgio Gallara as an accomplice; robbery of Giordano and/or Gallara; burglary of Giordano's automobile; felony murder of Giordano and Gallara; possession of a weapon for an unlawful purpose; possession of a weapon without a permit; and hindering apprehension. During the penalty phase, the jury was instructed to rely on the guilt-phase evidence and defendant's mitigating evidence to determine whether any or all of the aggravating factors had been established. The evidence relied on to establish depravity-of-mind was also relied upon, as the trial court instructed the jury, to establish the circumstances of the crime to aid the jury in making the "unique, individualized judgment about the appropriateness of either the death penalty or imprisonment for defendant."

In the guilt phase, unless evidence is admitted for a special or limited purpose, see, e.g., N.J.R.E. 105 and N.J.R.E. 404(b), the jury is not informed of the general purposes for which physical and testimonial evidence is admitted. See N.J.R.E. 402. For example, the depravity and the felony-murder aggravating factors, and each of the crimes involved in the guilt phase, except for possession of a weapon without a permit, required the State to prove mental culpability. Ordinarily, it is impossible to isolate the

evidence presented exclusively to establish a particular aggravating factor.

I would not require the trial court to give the penalty-phase jury a limiting instruction even regarding evidence admitted solely to establish a rejected aggravating factor. Even if such evidence existed, a limiting instruction would be contrary to our law and to the instructions given to the jury in the penalty phase to consider all of the circumstances surrounding the capital murder when deciding whether to impose the death penalty. That is important because in every capital murder, aggravating and mitigating factors are unique, and deathworthiness derives from the totality of the circumstances. Evidence theoretically admitted solely to establish a rejected aggravating factor nonetheless is probative of non-statutory aggravating factors that this Court has permitted a jury to consider as the sentencer. Such evidence also plays a critical role in proportionality review. We have previously stated:

> [W]e think that a proportionality comparison that limits itself to the presence of statutory aggravating and mitigating factors fails fully to explain the sense of proportion in the jury verdicts. The statutory aggravating factors do not encompass all of the characteristics that affect the blameworthiness or deathworthiness of persons who commit murders.
>
> [*State v. Marshall,* 130 *N.J.* 109, 158, 613 *A.*2d 1059 (1992), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993).]

Consistent with that principle, we have permitted "nonstatutory aggravating and mitigating factors ... [to be] presented to the sentencing jury [because those factors] are likely to influence a jury's sentencing decision." *State v. Chew,* 159 *N.J.* 183, 210, 731 *A.*2d 1070 (1999), *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999). That principle was reaffirmed in *In re Proportionality Review Project (II),* 165 *N.J.* 206, 218–19, 757 *A.*2d 168 (2000).

Permitting the jury to consider evidence presented solely to establish a rejected aggravating factor does not mean that rejection of that factor becomes meaningless. Rejection of an aggravating factor means that the State has one less statutory basis to support a sentence of death. But that may or may not be beneficial to the State. In his Special Master's Report to the

Court concerning our Death Penalty Proportionality Review Project, Judge Baime found "that death-sentencing rates in cases with two or more aggravating factors were *lower* than for those cases with one aggravating factor." *In re Proportionality Review Project (I)*, 161 *N.J.* 71, 88, 735 *A.*2d 528 (1999) (emphasis added).

I also reject the Public Defender's argument that a jury should be instructed that if it rejects an aggravating factor, then *all* the evidence probative of that rejected factor should be disregarded by the jury. Here, as in most cases, evidence admitted during the guilt phase was admissible not only to establish the depravity aggravating factor, but also to establish the mental culpability related to the robbery, the homicide, and the other crimes. Defendant's level of premeditation in planning and executing his criminal scheme is probative of knowing or purposeful conduct. All of that evidence is relevant to the jury's sentencing function because "[o]ur system of criminal laws is predicated usually on the imposition of punishment based on the defendant's intent.... Society's concern, the community's concern, the Legislature's concern, is to punish most harshly those who intend to inflict pain, harm, and suffering—in addition to intending death." *Ramseur, supra,* 106 *N.J.* at 207–08, 524 *A.*2d 188 (emphasis omitted).

Based on all of the foregoing principles, I am persuaded that the failure of the trial court to give the jury the two jury instructions urged by the Public Defender, based on an assumption that depravity might be rejected as an aggravating factor, did not constitute error, plain or otherwise. *See State v. Morton,* 165 *N.J.* 235, 242, 757 *A.*2d 184 (2000), *cert. denied,* —— *U.S.* ——, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001); *State v. Harvey,* 159 *N.J.* 277, 287–88, 731 *A.*2d 1121 (1999); *State v. Cooper,* 159 *N.J.* 55, 67, 731 *A.*2d 1000 (1999), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000); *Cooper, supra,* 151 *N.J.* at 382, 700 *A.*2d 306. For all of those reasons, I would not vacate defendant's sentence of death.

Chief Justice PORITZ and Justice LaVECCHIA join in this opinion.

LONG, J., concurring in part and dissenting in part.

I concur in the majority's reversal of the death sentence imposed on Thomas J. Koskovich. I write separately to express my disagreement with the conclusion, expressed in Point IV of the Court's opinion, that because the death penalty was declared constitutional in *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987), that issue is resolved.

## I.

The analysis of a constitutional claim that a death sentence constitutes cruel and unusual punishment is a unique task: It is different in kind from other constitutional inquiries, not only because it has life and death implications, but because it is not contingent on judicial concepts of stare decisis and precedent. Any examination of what is cruel and unusual is inherently mutable, dependent to an extent on public opinion, and necessarily adaptable to our society's evolving values. It is thus not enough to rely on a fourteen-year-old opinion that has been cited without comment over the years to support the notion that the death penalty continues to pass muster when tested against the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958).

## II.

In *Ramseur*, this Court had its first opportunity to step out from under the shadow of irrational federal death penalty jurisprudence and evaluate the death penalty under our own constitution. Instead, and disappointingly, the Court only "half heartedly" invoked our own constitution and continued on in lockstep with federal doctrine, thus foreordaining the conclusion that the death penalty passes constitutional muster. 106 *N.J.* at 347, 524 *A.*2d 188 (Handler, J., dissenting); *see also*, Karen L. Foster, *The New Jersey Supreme Court in the 1990's: Independence is Only Skin Deep*, 62 *Alb. L.Rev.* 1501, 1506–09 (1999).

In *Ramseur,* the Court adopted the test applied under the federal cases to determine whether a punishment is cruel and unusual:

> First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?
>
> [106 *N.J.* at 169, 524 *A.*2d 188 (citing *Gregg v. Georgia,* 428 *U.S.* 153, 173, 96 *S.Ct.* 2909, 2925, 49 *L.Ed.*2d 859, 874–75 (1976) (plurality opinion); *State v. Des Marets,* 92 *N.J.* 62, 82, 455 *A.*2d 1074 (1983); *State v. Hampton,* 61 *N.J.* 250, 273–74, 294 *A.*2d 23 (1972)).]

Regarding contemporary standards of decency, the Court began its analysis by recognizing that the standard "against which the death penalty must be tested, however, is that of the community, not that of its scientists, penologists, or jurists." *Id.* at 171, 524 *A.*2d 188. In affirmatively answering the question of whether contemporary standards in our society deem capital punishment to be an appropriate penalty for murder, the Court relied, among other things, on the legislative passage of a death penalty statute in 1982, five years earlier, as presumptive evidence that it accords with community standards; the absence of "other evidence" of community standards to rebut the legislative presumption; and the actions of juries in imposing twenty-six death sentences between 1982 and 1987 as a "true reflection of society's morality." *Id.* at 172–73, 524 *A.*2d 188. In addition, the Court observed that

> the passage since 1972 of death penalty statutes in thirty-seven states is strong evidence of community standards here. Despite our diversity, we are a nation of shared values. When, in the course of a decade, thirty-seven states call for the death penalty, the probability that the legislature of each state accurately reflects its community's standards approaches certainty.
>
> [*Id.* at 173, 524 *A.*2d 188 (internal citations omitted).]

The Court went on:

> If there was some decrease in support for the death penalty during the 1960s, if there were more people then than there are now who found the infliction of death indecent and immoral, the evidence does not suggest that the change was significant or of long duration. When the meaning of a constitutional provision depends, as does the cruel and unusual punishment clause, on community standards, and when the consequent validity of the most important laws—laws affecting life and death—depends, therefore, also on those standards, the judiciary must measure this critical factor with a scale that registers only changes of significance, signifi-

cant not only in the extent of change, but also in the duration of change in light of our history. As far as we can see, nothing even approaching that kind of change occurred in the 1960s or has ever occurred in this country or in this state on this issue.

[*Id.* at 173–74, 524 *A.*2d 188.]

The Court added:

Those who contend that the Legislature's enactment of a capital punishment statute does not accurately reflect community standards must also deal with the evidence provided by public opinion polls. Surveys conducted in 1981 and 1977 by the Eagleton Institute of Politics of Rutgers University indicate that approximately 72% of New Jersey residents support the imposition of the death penalty for murder. While we do not regard public opinion polls as decisive of issues of constitutional law, we cannot ignore their relevance to the largely empirical determination of the content of community standards.

[*Id.* at 174 n. 10, 524 *A.*2d 188 .]

My differences with *Ramseur* are legion. They need not be catalogued here, however, because, even granting its validity in 1987, what has occurred in the ensuing fourteen years requires us to reassess whether the death penalty conforms with contemporary standards of decency.

## III.

That there has been a change in the public's appetite for execution is undeniable as evidenced by the flood of public outcry and repeated calls for re-assessment of the institution of the death penalty itself. In light of those current trends and recent findings, we should now be particularly mindful of the opportunity to conduct a meaningful and independent review of capital punishment under our own constitution.

Recent polls and studies reveal that although Americans still generally favor the death penalty, their overall support is wavering and declining. Enthusiasm for the death penalty is at its lowest point in nineteen years. Frank Newport, *Support For Death Penalty Drops to Lowest Level in 19 Years, Although Still High at 66%*, Gallup News Service, Feb. 24, 2000. Moreover, the number of death penalty supporters has fallen significantly for the second year in a row—to 64%, down from 75% in 1997. Hum-

phrey Taylor, *Support for Death Penalty Down Sharply Since Last Year, But Still 64% to 25% In Favor,* The Harris Poll, Aug. 2, 2000. Now, 63% of voters favor suspension of the death penalty until issues of fairness can be studied. NBC News/Wall Street Journal Poll (July 27–28, 2000) <http://pollingreport.com/crime.htm>. Most importantly, when provided with additional information, public support for the death penalty declines dramatically: It drops to below 50% when the alternative of life without parole is offered. Gary Langer, *Death Penalty Ambivalence: Poll Points to Support for Execution Moratorium in U.S.,* ABCNEWS/Washington Post Poll, May 2, 2001. Thus recent enactments guaranteeing life without parole and enhanced sentencing provisions are important factors that affect the public's response to capital punishment. *See* Law Enforcement Officers Protection Act, *N.J.S.A.* 2C:11–3(b)(2); Joan's Law, *N.J.S.A.* 2C:11–3(b)(3); Persistent Offenders Accountability (Three Strikes and You're In) Act, *N.J.S.A.* 2C:43–7.1(a); No Early Release Act, *N.J.S.A.* 2C:43–7.2.

Segments of the legal community have recently joined the chorus of concern. The American Bar Association has called for a moratorium on the death penalty until the problems with its application are addressed. American Bar Association Death Penalty Moratorium Resolution (Feb. 3, 1997). More recently, United States Supreme Court Justice Ruth Bader Ginsberg gave her support to a moratorium proposal being considered by the Maryland legislature. Anne Gearan, *U.S. Supreme Court Justice Urges Death Penalty Halt,* Associated Press, April 10, 2001.

Capital punishment has received similar negative attention and strong criticism far beyond our borders. The international community has moved more quickly toward an understanding of the flaws and dangers inherent in any capital punishment scheme. In every year since 1997, the United Nations Commission on Human Rights voted overwhelmingly in favor of resolutions calling for a moratorium on all executions. *Question of the Death Penalty,* U.N. ESCOR, Hum. Rts. Comm., 57th Sess., 78th mtg., U.N. Doc.

E/CN.4/RES/2001/68 (2001). In 1999, Russia commuted over seven hundred death sentences to life sentences in its effort to abolish its death penalty. Angela Charlton, *Yeltsin Commutes Death Sentences,* Associated Press, June 3, 1999. Russia is far from alone on this front, as numerous other countries have recently abandoned the death penalty. In allowing capital punishment to exist within our borders, the United States is now alone among developed Western democratic nations. Toni M. Fine, *Moratorium 2000: An International Dialogue Toward a Ban on Capital Punishment,* 30 *Colum. Hum. Rts. L.Rev.* 421, 422 (1999). Those statistics clearly demonstrate the cleavage between the death penalty and basic notions of decency, nationwide and worldwide.

Further data on individual states collected by the U.S. Department of Justice demonstrates that, when compared with the states in the Northeast, that cleavage widens. Those states carry out the fewest executions. The disparity is stark: From 1979 to 1999, there were only three executions in the Northeast (all in Pennsylvania), followed by fifty in the West, sixty-four in the Midwest, and 481 in the South. Tracy L. Snell, Bureau of Justice Statistics, *Capital Punishment 1999* (Dec.2000), at 10. Admittedly, some of the disparity may be due to the fact that the Northeast is composed of relatively few states that authorize capital punishment. However, the high number of executions in other regions of the country cannot, by itself, be explained by the number of states in those regions that use the death penalty; two states, Texas and Virginia, alone account for 272 of the executions. *Ibid.*

Consistent with nationwide figures, public support for the death penalty has fallen significantly in the tri-state area. A 1998 poll of New York citizens and a 2001 poll of Connecticut citizens found that only 38% and 42%, respectively, continued to support the death penalty when offered the option of life without parole. Quinnipiac College Poll (June 17, 1998) <http://www.deathpenalty-info.org/Polls.html# NewYork>; Quinnipiac College Poll (June 22, 2000) <http://www.quinnipi-

ac.edu/news/poll/ctpolls.html# CT06006>. A 1999 Star–Ledger/Eagleton poll found that while 63% of New Jersey citizens supported capital punishment, only 44% did so when presented with the alternative of life in prison without parole. Kathy Barrett Carter, *63% of Jerseyans Favor Death Penalty*, The Star Ledger, Oct. 10, 1999. Of additional note, 42% percent of those polled in New Jersey agreed that an African–American is more likely than a white person to receive a death sentence for the same crime, and a majority (56%) agreed that a poor person is more likely to be sentenced to death than someone else. *Ibid.*

One final observation regarding contemporary standards of decency involves *Ramseur's* conclusion that it is "a true reflection of society's morality" that twenty-six juries in New Jersey imposed the death penalty from 1982 to 1987. 106 *N.J.* at 173, 524 *A.*2d 188. Based on that figure, if public standards remained constant, at least sixty-two death sentences would have been expected between 1987 and 1999. In fact, only twenty-six death sentences were imposed during that period, Hon. David S. Baime, *Report of the Special Master on Proportionality Review: State v. Thomas Koskovich* 1a (Jan. 24, 2000), obviously reflecting a diminishing level of support for that extreme sanction among our fellow citizens.

## IV.

Equally problematic is *Ramseur's* holding, admittedly based on "conflicting and inconclusive evidence," that the Legislature "could reasonably find that the death penalty deters murder." 106 *N.J.* at 180, 524 *A.*2d 188. We now know that the dozen states that have chosen not to enact the death penalty since *Gregg v. Georgia* in 1976 have not had higher homicide rates than states with the death penalty. The "homicide rates had risen and fallen along roughly symmetrical paths, suggesting to many experts that the threat of the death penalty rarely deters criminals." Raymond Bonner & Ford Fessenden, *States With No Death Penalty Share Lower Homicide Rates*, N.Y. Times, September 22, 2000. *See*

*also* Jon Sorenson, et. al., *Capital Punishment and Deterrence: Examining the Effect of Executions on Murder in Texas,* 45 *Crime and Delinquency* 481 (1999) (finding no deterrent effect of death penalty in Texas); William Bailey, *Deterrence, Brutalization, and the Death Penalty: Another Examination of Oklahoma's Return to Capital Punishment,* 36 *Criminology* 711 (1998) (finding no evidence for a deterrent effect of death penalty in Oklahoma); Craig J. Albert, *Challenging Deterrence: New Insights on Capital Punishment Derived From Panel Data,* 60 *U. Pitt. L.Rev.* 321 (1999) (finding no deterrent effect of the death penalty based on data garnered from fifty-one American jurisdictions between 1982 and 1994). Like the change in the public's attitude toward capital punishment, that information underscores the need to revisit *Ramseur.*

## V.

I concur in the reversal of this defendant's death sentence and, for the reasons I have expressed, I dissent from the majority's conclusion that *Ramseur* resolves the issue of the constitutionality of the death penalty. It is time for this Court to reevaluate the state's death penalty statute. We can no longer ignore the fact that the so-called justifications in favor of the death penalty have withered and that a consensus is growing-not only at home, but across the country and around the world-that the death penalty is unfair, unjust and incompatible with present standards of decency. In light of present day realities, *Ramseur* must be revisited and, in the interim, a moratorium must be imposed on the use of the extreme and irreversible sanction of death.

LaVECCHIA, J., concurring and dissenting.

The majority's opinion thoroughly analyzes numerous claims of error in the guilt and penalty phases of the trial of Thomas Koskovich. I concur in all of the majority's conclusions concerning the guilt phase and write only to express my disagreement on three issues arising in the penalty phase. Based on those three

errors, viewed collectively, the majority finds reversible error requiring a new penalty proceeding. *Ante* at 502–503, 776 *A*.2d at 177. Because I am not persuaded that reversible error occurred, individually or collectively, I would not disturb the jury determination.

I.

First, defendant raises several objections to the victim-impact testimony presented to the jury by Loretta Giordano, Jeremy Giordano's mother. The majority's analysis of the merit of those challenges sensitively addresses the right of a family member to express in his or her own way the uniqueness of the victim as a human being and the victim's integral relationship to a family unit left to bear the harm caused by the crime. *Ante* at 508–509, 776 *A*.2d at 181. And, appropriately, the majority cautions trial courts to be vigilant in preserving the boundaries set by *State v. Muhammad*, 145 *N.J.* 23, 678 *A*.2d 164 (1996), that necessarily circumscribe victim-impact testimony, particularly when certain forms of expression such as poetry are used. *Ante* at 508, 776 *A*.2d at 181. Confronted with nonprose expressions by grief-stricken family members of murder victims, the majority approaches that alleged error by blending sensitivity and vigilance into a practical conclusion. However, that practicality is not evident in the majority's review of the use of the victim-impact testimony.

After a lengthy recitation of the instruction, the majority initially turns aside the assertion that the trial court impermissibly allowed the jury to weigh the victim-impact statement against non-catch-all mitigating factors favoring defendant when considering whether to impose the death penalty. Noting that the court "stressed the limited manner in which the victim-impact evidence could be used," *ante* at 511–512, 776 *A*.2d at 183, the majority evaluates that criticism in the context of the overall charge discussion concerning the use of victim-impact testimony. That contextual evaluation properly avoids undue emphasis on differ-

ences in word choice and maintains appellate focus on the overall effectiveness of the charge in instructing the jury concerning its duties and obligation. That approach should have been used, as well, when reviewing defendant's argument that the charge impermissibly instructed the jury to "balance" the background of defendant against that of the victim. *Ante* at 508, 776 *A*.2d at 181.

Defendant focuses on the following language in the trial court's charge to the jury: "But this impact statement ... kind of balances the victim's background and circumstances against the defendant's background. Balance them. But it's a-it's a sort of a parallel opportunity." Defendant maintains that that statement suggests that the jury was impermissibly invited to "compare the worth" of the defendant against the "worth" of the victim in violation of *State v. Muhammad.* The majority agrees, and that supposed error then contributes to its decision to require a new penalty-phase trial. I respectfully disagree. That discrete and brief comment should not be considered out of context. We have stated on numerous occasions that " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.' " *State v. Marshall,* 123 *N.J.* 1, 135, 586 *A*.2d 85 (1991) (quoting *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A*.2d 608 (1973)); *accord State v. Martini,* 131 *N.J.* 176, 271, 619 *A*.2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. Purnell,* 126 *N.J.* 518, 544, 601 *A*.2d 175 (1992); *State v. Hunt,* 115 *N.J.* 330, 373, 558 *A*.2d 1259 (1989). Examination of the court's "balancing" statement in the context of the entire charge, and specifically in juxtaposition to those portions of the charge that immediately precede and follow it, compels a more reasonable appellate response. Properly considered, that comment is unobjectionable and certainly does not present error requiring a new penalty trial.

Shortly before setting forth the challenged portion of the jury charge, the trial court stated in regard to the victim-impact statement:

And I want to point out to you that that kind of evidence is admitted for a limited purpose and not for any other purpose. That evidence is to be used by you in determining the appropriate weight to be given to *certain mitigating factors*. And those are the kind of catch-all mitigating factors.... They [the catch-all mitigating factors] do relate to the defendant's *background and his makeup* and to the circumstance of his offense.

[Emphasis added.]

Immediately after the challenged segment, the trial court stated:

And it's—it's to be considered in relation to those-those mitigating factors, 6 through 14, and any others you may find. And it's not to be considered in terms of boosting an aggravating factor.... It's only meant to effect [sic] your determination of the weight of those *certain mitigating factors*.

[Emphasis added.]

The court then continued, in great detail, to instruct the jury that a crime against a "very nice, decent person" is no worse than a murder of "somebody who isn't so attractive." The court stressed that "you are meant to use the fact that—that statement that Mrs. Giordano made for the purpose of helping you to weigh the impact of the mitigating factors dealing with the defendant's history and his record and circumstances of the offense." Thus, the comprehensive charge informed the jury properly on how it was to use Mrs. Giordano's victim-impact statement. The court stressed that the victim-impact statement could be used only to determine the weight to give to *certain* of defendant's mitigating factors and thereby appropriately instructed the jury on the limited use of the evidence. Moreover, the court's full explanation specifically undercuts the asserted inference that the jury was invited to balance the "worth" of the victim against the "worth" of the defendant.

Accordingly, I cannot subscribe to the majority's conclusion finding reversible error in the jury charge concerning the use of the victim-impact testimony. I reject a conclusion that is based on isolating and parsing everyday language that is not inappropriate when properly viewed in the context of the entire set of instructions given by the trial court. When viewed in that manner, the

court's "balancing" remark is not likely to effect juror misapplication of the victim-impact testimony.

## II.

Defendant also argues that the trial court erred in not explicitly informing the jury about the court's intent to consecutively sentence defendant on his non-capital convictions so that the jury would be aware of the likelihood that defendant would spend the rest of his life in prison regardless of the jury's determination concerning the death penalty. The majority faults the trial court's equivocation concerning the nature of the sentences that would be imposed for the non-capital convictions, that is, the sentence ranges for each and whether they would be served consecutively to one another. The State argues that reversal on that ground would be improper because the court specifically informed the members of the jury that defendant would never pose a threat to society should they not sentence him to death.

In *Martini, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208, the Court held that, with regard to non-capital convictions, "[t]he jurors *should* be informed of the sentencing options available to the judge, and that that determination of sentence had not yet been made." (Emphasis added). *Martini* also notes that "the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court." *Ibid.* Lastly, "the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count." *Ibid.*

Due process requirements are satisfied "if either the judge or defense counsel provides the relevant parole ineligibility information to the jury." *State v. Loftin,* 146 *N.J.* 295, 371, 680 *A.*2d 677 (1996)(citing *Simmons v. South Carolina,* 512 *U.S.* 154, 168–69, 114 *S.Ct.* 2187, 2196, 129 *L.Ed.*2d 133, 149–51 (1994)). Although the Court in *Loftin* stated that the trial court should so inform the jury when "there is a realistic likelihood that it will impose a

sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence," *id.* at 372, 680 *A.*2d 677, the Court did not mandate as much because it recognized a judge may harbor some uncertainty about what sentence will ultimately be imposed. *Ibid.* That is what the trial court said here. Unless the same result is mandated in every case, the failure to so inform the jury in the present case can only be harmless error. *Ibid.* Defense counsel was allowed wide latitude in commenting on what the other potential sentences would be. That satisfied all federal and state due process requirements.

The majority expresses concern that a jury not be kept in the dark regarding the extent of defendant's potential sentence should he not be sentenced to death. However, *Loftin* held that, notwithstanding the failure of the trial court to give precise sentencing information, the error will not be reversible if defense counsel had the opportunity to argue to the jury that defendant would likely spend the remainder of his life in prison if the death sentence were not imposed. *Ibid.* It is uncontested in this record that defense counsel on several occasions during her opening and closing statements in the penalty phase told the jury that defendant would never "see the light of day." Defendant's trial counsel more than adequately conveyed to the jury the point that defendant would be spending the rest of his life in prison should he not be sentenced to death. As in *State v. Papasavvas,* 163 *N.J.* 565, 621, 751 *A.*2d 40 (2000), here "defense counsel was given the freedom to argue that defendant would never be released from prison if the jury did not sentence him to die." The trial court's comments during *voir dire* also made clear to the prospective jurors that "[t]he likelihood is that ... [defendant] would be sentenced to a number of consecutive terms to the point at which he would in fact, never be released from prison," should he not be sentenced to death. The arguments of defense counsel, and the comments of the trial court during *voir dire,* enabled the jury to be " 'fully informed about their sentencing options,' including the practical 'effect of a life sentence.' " *Loftin, supra,* 146 *N.J.* at

373, 680 *A.*2d 677 (quoting *State v. Bey (III),* 129 *N.J.* 557, 601, 610 *A.*2d 814 (1992)).

In *State v. Nelson,* 155 *N.J.* 487, 501, 715 *A.*2d 281 (1998), the defendant asserted that the mandate of *Loftin* was not met because the trial court specifically instructed the jury not to consider the defendant's likely sixty-year parole disqualifier when deciding whether to impose the death penalty. In rejecting defendant's argument, the Court stated: "We understand the logic of the defendant's argument but disagree with its reality." *Id.* at 505, 715 *A.*2d 281. A realistic approach to defendant's contentions here necessarily leads to a similar conclusion.

What the majority characterizes as the trial court's expression of "equivocation" regarding whether defendant's sentences would run concurrently or consecutively is more properly demonstrative of the court's desire to appear fair and impartial. That view comports with the court's statement to counsel that it did not want to tell the jury that it was leaning toward imposing sentences to run consecutively. Indeed, the trial court's comments out of the presence of the jury indicate that, although it was leaning toward imposing consecutive sentences, it had not decided on that issue.

As with all other aspects of a jury charge, the challenged omission must be subjected to a harmless error analysis. *R.* 2:10–2. The trial court's charge instructed the jury in compliance with *Loftin's* observation that defendant's sentence on the non-capital counts should not influence its consideration of whether defendant should be sentenced to death. *Loftin, supra,* 146 *N.J* at 372, 680 *A.*2d 677. The trial court nonetheless told the jury not to "be worried" about defendant's posing a threat to society, alleviating any concerns that defendant would not be sufficiently punished. The instruction stated, in pertinent part, as follows:

And without committing myself in advance to precisely what [defendant's non-capital sentences] will be, I can tell you that they will be sufficient to make sure that society is fully protected from the risk of any further violence from the defendant. So when you decide what the penalty should be in this case, decide it in terms of what you think the appropriate penalty is for this crime of the knowing and purposeful murder of Jeremy Giordano. Don't be worried that—that. If you

do not sentence the defendant to death or direct the defendant be sentenced to death for this crime, that he will be out on the street in the near future. That will not occur. So you do not have to worry about that—that if you fail to impose the death penalty society will not be protected from further acts of violence by Mr. Koskovich, because it will be. The point is decide in terms of what is the appropriate penalty for this case, whether the penalty should be death or less than death.... If you do not impose the death penalty unanimously, then I will sentence the defendant to a term of imprisonment which may go up to life imprisonment for this crime, and it must be at least 30 years without any possibility of parole.

"No specific words are mandated to convey to a capital jury the essence of its task." *Marshall, supra,* 123 *N.J.* at 150, 586 *A.*2d 85; *see also State v. Chew,* 150 *N.J.* 30, 87, 695 *A.*2d 1301 (1997) (finding no plain error in jury charge "[a]lthough not as clear as it could have been"). Rather, the charge must be viewed in context and under the circumstances of the specific case. "The effect of the purportedly-erroneous charge must be evaluated in light of the totality of the circumstances." *State v. DiFrisco,* 137 *N.J.* 434, 491, 645 *A.*2d 734 (1994) (citing *Marshall, supra,* 123 *N.J.* at 145, 586 *A.*2d 85). As noted, the majority seemingly ignores *Loftin's* requirement that a court should instruct the jury that a determination has not been made with regard to the non-capital sentences. The trial court stated that it had not yet determined defendant's non-capital sentences. Also, in *Loftin* as in this case, defense counsel repeatedly stressed to the jury that defendant would likely die in prison if not sentenced to death. *See Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677. The majority seeks to distinguish *Loftin* by asserting that "the remarks of counsel in the present case were effectively erased by the trial court's equivocations." *Ante* at 518, 776 *A.*2d at 188. But those supposed "equivocations" concerned the trial court's statement to the jurors that it was not "precisely sure" whether the non-capital sentences would be made to run concurrently or consecutively to defendant's capital murder conviction. Such an instruction fully comports with *Martini, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208.

The model charge for a penalty-phase proceeding is "necessarily advisory." *State v. Ramseur,* 106 *N.J.* 123, 155, 524 *A.*2d 188 (1987). A court's compliance with the manual "does not foreclose constitutional challenge to trial procedure," *State v. Harris (I),*

156 *N.J.* 122, 189, 716 *A*.2d 458 (1998), nor should a departure from the manual necessarily indicate error. " '[A] defendant is entitled to a fair trial but not a perfect one.' " *Lutwak v. United States*, 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953); *State v. Feaster*, 156 *N.J.* 1, 84, 716 *A*.2d 395 (1998) (citing *Marshall, supra*, 123 *N.J.* at 170, 586 *A*.2d 85). The trial court's evenhanded instruction, when viewed along with the emphatic and unchallenged contentions of defense counsel that should defendant be spared a death sentence he would be spending the remainder of his natural life in prison, indicates that the charge did not constitute reversible error. Again, as with the victim-impact instruction error discussed herein, it does not provide persuasive support for overturning the jury's determination in this matter.

## III.

Finally, for the reasons set forth by Justice Coleman in his dissenting opinion, I disagree with the majority's conclusion concerning the trial court's charge on the weighing of aggravating and mitigating factors. For all of the foregoing reasons, I respectfully dissent from that portion of the majority's opinion that reverses the penalty-phase verdict.

Chief Justice PORITZ and Justice COLEMAN join in this opinion.

*For affirmance: Conviction*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*For reversal and remandment: Sentence*—Justices STEIN, LONG, VERNIERO and ZAZZALI—4.

*For affirmance: Sentence*—Chief Justice PORITZ and Justices COLEMAN and LaVECCHIA—3.

*For affirmance in part/reversal in part*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.